## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| QCX LLC, d/b/a Polymarket US,<br><br>   *Plaintiff*,<br><br>     vs.<br><br>DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,<br><br>   *Defendant*s. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.  This action seeks to prevent imminent and irreparable harm arising from Michigan's enforcement of state gambling laws against federally regulated derivatives exchanges—enforcement Congress has expressly prohibited.  Plaintiff QCX LLC, d/b/a Polymarket US, operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").  Through the Commodity Exchange Act ("CEA"), Congress vested the CFTC with sole regulatory authority over event contracts and other derivatives traded on designated contract markets, ensuring national uniformity and precluding precisely this kind of state interference.

2.  The threat to Polymarket US is immediate and concrete.  On March 3, 2026, Michigan filed suit against another CFTC-designated contract market, KalshiEX LLC, on the

theory that federally regulated event-contract trading constitutes "unlicensed gambling." *See* Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ (Ingham Cnty. Ct. Mar. 3, 2026).  This action demonstrates Defendants' willingness to use state law to shut down federally authorized markets despite clear federal preemption.  Polymarket US therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, potential criminal liability, forced cessation of operations within Michigan, and severe collateral consequences to its nationwide operations.

3.      The resulting harm would be irreparable.  Even a meritless state enforcement action would immediately disrupt Polymarket US's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, harm Michigan residents, and force Polymarket US to choose between exercising its federal right to operate nationwide or submitting to unlawful state coercion.  Such disruption to a nationally uniform market cannot be remedied through damages.  The chilling effect on lawful activity and the deprivation of Michigan residents' access to a federally regulated exchange is precisely the harm Congress sought to prevent.

4.      Any enforcement action by Michigan *would* be meritless.  The CEA grants the CFTC exclusive jurisdiction over derivatives traded on designated contract markets and expressly preempts state laws attempting to regulate or prohibit such trading.  In 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" over derivatives "traded or executed on a contract market designated" under the Act.  7 U.S.C. § 2(a)(1)(A).  Since then, Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives—including event contracts—traded on federally regulated contract markets.

5.      The CFTC itself has repeatedly reaffirmed that designated contract markets and event contracts lie squarely within its exclusive jurisdiction, and that conflicting state enforcement

actions undermine the public interest.  On January 29, 2026, CFTC Chairman Michael S. Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two decades" and have played an "important role . . . in the broader financial system."  He warned that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest."  He directed the CFTC to reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives."[1]

6.    The CFTC acted decisively in fulfilling that responsibility.  On February 17, 2026, the CFTC filed an amicus brief in a Ninth Circuit appeal seeking to enjoin the State of Nevada's threatened enforcement action against another designated contract market, Crypto.com.  *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2.  The CFTC asserted that State efforts to "invade" the federal government's authority as it relates to swaps "present a fundamental threat to Congress's statutory design."  *Id.* at 2.  It argued that, because event contracts are properly considered "swaps" under the CEA, state laws regulating event contracts on CFTC-regulated markets are preempted.  *Id.* at 14–27.  The CFTC also expressed concern that "subjecting derivatives listed on a CFTC-registered" designated contract market—such as Polymarket US—"to State regulation would have destabilizing economic effects."  *Id.* at 28–29 (citation modified).

7.    The same day, CFTC Chairman Michael Selig wrote an editorial defending the agency's exclusive jurisdiction over prediction markets.  Chairman Selig made clear that, because

---

[1] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 ("*Unleashing Innovation*").

prediction markets are CFTC-registered exchanges, the *CFTC*, not states, properly exercises authority over these markets: "The CFTC will no longer sit idly by while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products."[2]  Chairman Selig also highlighted the "legitimate economic functions" served by event contracts, such as "allow[ing] businesses and individuals to hedge event-driven risks, enabl[ing] investors to manage portfolio exposure, and provid[ing] the public with information about the outcome of future events." *Id.*

8.      Defendants suffer no cognizable harm from being barred from enforcing state gambling laws in a domain Congress explicitly removed from state control.  Michigan remains free to regulate, license, and tax gambling within the State.  Any asserted local interests—such as consumer protection—are speculative as applied to federally regulated derivatives exchanges, and already governed and safeguarded by federal oversight.  By contrast, absent judicial intervention, Michigan's actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect.

9.      For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, preserve the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.  Immediate judicial intervention is necessary to uphold Congress's mandate, protect the federal market structure, and safeguard the rights of users nationwide.

---

[2] *Chairman Selig: Op-Ed: States Encroach on Prediction Markets*, Commodity Futures Trading Commission (Feb. 17, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstate ment021726.

## JURISDICTION AND VENUE

10.     This is an action for declaratory and injunctive relief brought under the Supremacy Clause of the United States Constitution (including in reliance on this Court's equitable powers under *Ex parte Young*, 209 U.S. 123 (1908)).  Defendants are charged with enforcing the state laws at issue here.  This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 2201, and 2202.

11.     This Court has personal jurisdiction over the Defendants.  The Defendants are domiciled and perform their duties in Michigan.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b).  All Defendants are residents of the State of Michigan.  And a substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

13.     Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York.  Polymarket US operates a derivatives exchange and prediction market where users can buy, sell, and exchange financial products known as event contracts.  Polymarket US is an exchange market that is federally regulated by the CFTC pursuant to the CEA.

14.     Defendant Dana Nessel is the Attorney General of Michigan.  This suit is brought against Attorney General Nessel in her official capacity.

15.     Defendant Jim Ananich is the Board Chair of the Michigan Gaming Control Board.  This suit is brought against Mr. Ananich in his official capacity.

16.     Defendant Joni M. Thrower Davis is a Member of the Michigan Gaming Control Board.  This suit is brought against Ms. Thrower Davis in her official capacity.

17.     Defendant Andrew T. Palms is a Member of the Michigan Gaming Control Board.  This suit is brought against Mr. Palms in his official capacity.

18.     Defendant Deidre A. Lambert-Bounds is a Member of the Michigan Gaming Control Board.  This suit is brought against Ms. Lambert-Bounds in her official capacity.

19.     Defendant Mark Evenson is a Member of the Michigan Gaming Control Board. This suit is brought against Mr. Evenson in his official capacity.

20.     Defendant Henry Williams is the Executive Director of the Michigan Gaming Control Board.  This suit is brought against Mr. Williams in his official capacity.

21.     Defendants Nessel, Ananich, Thrower Davis, Palms, Lambert-Bounds, Evenson, and Williams have the power and duty to enforce Michigan gaming laws, including the laws preempted by federal law.  Mich. Comp. Laws §§ 432.405, 432.413(5) (2019).

## FACTUAL AND LEGAL BACKGROUND

**A.     Event contracts are derivative financial instruments that incorporate real-time information to generate accurate predictions about real-world events.**

22.     This case is about derivatives—financial instruments that derive their value from an underlying asset or event.  Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world."  *Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

23.     One common kind of derivative is a "swap."  Swaps are financial contracts where two parties agree to exchange, or swap, payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

24.     An event contract, in turn, is a swap "whose payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane."  CFTC, *Futures Glossary:*

*A Guide to the Language of the Futures Industry*.[3]  "They are derivative instruments that allow two parties to speculate on future market conditions without owning the underlying asset." *Chairman Selig: Op-Ed*, *supra*.

25.    "In 1992 the CFTC issued its first official recognition of event contracts by granting relief to the Iowa Electronic Markets, a futures market at the University of Iowa in which traders can buy and sell contracts pegged to events such as presidential elections and corporate earnings."  *Chairman Selig: Op-Ed*, *supra*.  "Years later, HedgeStreet, now known as Nadex, became the first marketplace to offer event-driven binary contracts that allowed retail traders to speculate on mortgage rates and gasoline prices."  *Chairman Selig: Op-Ed*, *supra*.

26.    Event contracts are usually binary:  One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position).  The terms of the contract specify its payout and expiration date.  For example, the parties might take a position on whether Lansing will get more than 3 feet of rain (the approximate yearly average) in 2026.  At the end of the year, the party that correctly predicted the outcome is paid the agreed amount by the party that did not.  If 2026 turns out to be an especially wet year and Lansing sees 4 feet of precipitation, the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

27.    Event contracts have any number of uses.  For example, they can be used to mitigate financial risk.  *See Chairman Selig: Op-Ed*, *supra* ("Event contracts . . . allow businesses and individuals to hedge event-driven risks.").  A hardware store in Lansing might purchase an event contract predicting that the city will have a particularly dry year.  If the weather turns out as

---

[3]  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm  (last visited Mar. 3, 2026).

the owner predicted, the payout from the contract could offset the owner's loss of income from replacement gutters.

28.     Event contracts can have enormous predictive value.  Because they can be purchased and sold at any time before the expiration date, the price will reflect the trader's own expectations about the likelihood of a particular outcome.  Consider a contract that pays out $1 based on whether the Tigers win the American League.  As traders buy and sell positions on that contract, its price changes to reflect traders' overall perception about the value of that contract.  If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price.  When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it.  The result is that the price of the contract will reflect the overall market's view, in real time, about the probability of the outcome.  And those probabilities are set by trading activity, not fixed odds.

29.     Prediction markets, where event contracts are traded, are "used by tens of millions of Americans."  *Chairman Selig: Op-Ed*, *supra*.  They generate valuable public information about the most important real-world events—finance, weather, news, technology, and sports, to name a few.  Because traders put capital at stake, prediction markets incentivize accurate predictions.  And because prediction markets enable real-time trading on a nationwide basis, they aggregate diverse perspectives and rapidly incorporate new information.  As a result, prediction markets regularly outperform pundits and polls.

30.     When it comes to "sports forecasting," for example, empirical studies show that prediction markets "significantly outperform" the experts.  *E.g.*, M. Spann & B. Skiera, *Sports*

*Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[4]

31.     The same is true of elections.  Through the final days of the 2024 election campaign, for example, prediction markets accurately predicted President Trump would win a decisive victory, despite the view of many pollsters that the race would be considerably closer.[5]

32.     Event contracts, like other derivatives, provide significant financial value and generate rich information.  They allow parties to mitigate risk, although others are equally free to trade; more participants means more liquidity, more efficient trading, and a greater predictive function.  Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world.  And, through the collective wisdom of these efficient, transparent markets, event contracts provide precise, real-time information about events that matter to the public at large.

**B.     Over the past century, federal regulation of exchange-traded derivatives became extensive—and exclusive.**

33.     For about as long as derivative trading has existed in the United States, however, individual States have attempted to regulate or prohibit it as unlawful gambling.  "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

---

[4] https://tinyurl.com/2zm5axpc.

[5] CNN, How prediction markets saw something the polls and pundits didn't (Nov. 8, 2024), https://www.cnn.com/2024/11/08/business/polymarket-election-trump-nightcap; Newsweek, *Mystery 'Trump Whale' Speaks Out After Winning $50 Million by Defying Polls* (Nov. 8, 2024), https://www.newsweek.com/trump-whale-trader-wins-50-million-election-polls-1982768.

34.    The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture." *Merrill Lynch*, 456 U.S. at 360–61.

35.    Congress buttressed this federal scheme a decade later with the CEA, but left the states a role in regulating these kinds of derivatives. It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). States were therefore free to "supplement[] or bolster[] the federal scheme." *Rice v. Bd. of Trade of City of Chicago*, 331 U.S. 247, 255 (1947).

36.    By the 1970s, however, exchanges had become too important to the national economy to permit the "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control. 119 Cong. Rec. 41333 (1973). So Congress created the CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 356. "The idea that the C.F.T.C. should regulate the area was firmly expressed." *Kelly v. Carr*, 691 F.2d 800, 803 (6th Cir. 1980).

37.    Congress provided that the CFTC would regulate "all" commodity futures. Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974). "The statutory definition of 'commodity' is extraordinarily broad and includes practically all goods, articles, services, rights and interests except for onions (due to a history of market manipulation) and movie box-office receipts (because of Hollywood lobbying)." *Chairman Selig: Op-Ed*, *supra*. Congress granted the CFTC "*exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the CEA. 7 U.S.C. § 2(a)(1)(A) (emphasis added).

38.    Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority.  *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord, e.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).  The Sixth Circuit explained that "Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states," and that it was "apparent that individual states are without authority to adjudicate claims of the C.F.T.C. Act in state courts."  *Kelly*, 691 F.2d at 804 n.12.

39.    State officials protested this change.  By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states."  *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 363–64 (1978).  The Massachusetts Secretary of State demanded that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud."  *Id.* at 379.  And a state securities commissioner from Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities."  *Id.* at 383.

40.    Following the 2008 financial crisis, Congress again changed the regulatory landscape.  The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways most relevant here.

41.      *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction.  As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).

42.      Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (defining "swap").

43.      *Second*, the Act introduced what is known as the "Special Rule," which supplies the CFTC the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving subjects including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C).

44.      The CEA grants the CFTC "exclusive jurisdiction" to regulate exchange-traded event contracts, to determine whether they involve "gaming," and to prohibit them based on the CFTC's view of the public interest.  7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C).  Its "text is designed to account for financial innovation."  *Chairman Selig: Op-Ed*, *supra*.

**C.    The CEA sets forth the comprehensive regulatory framework for event contracts.**

45.      The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework.  Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a).  That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

46.     The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform. To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles."  17 C.F.R. § 38.3(a)(2); *see* 7 U.S.C. §§ 7(d), 8(a).  Core principle 1 requires the contract market to comply with *all* CFTC regulations. *See* 17 C.F.R. § 38.100(a)(2).  And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative[,] or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

47.     The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily publication of the price and volume of actively traded contracts.  *See* 17 C.F.R. §§ 38.200–38.301; 7 U.S.C. § 7(d)(8).  For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market" and "rules prohibiting abusive trade practices on the contract market."  7 U.S.C. § 7(d)(2)(A).  And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner."  17 C.F.R. § 38.151(b).  In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate.  As Chairman Selig explained in his editorial, contract markets "aren't the

Wild West . . . but [are] self-regulatory organizations that are examined and supervised by experienced CFTC staff." *Chairman Selig: Op-Ed*, *supra*.

48.    Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The most common method of certification is known as self-certification. Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and analysis"—with accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things. 17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

49.    Self-certification is permissible only because "self-regulatory organizations such as contract markets possess a form of delegated" government authority, *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022), a privilege earned only after demonstrating the extensive regulatory compliance necessary to receive CFTC designation. And the CFTC retains authority to investigate, stay, or amend the contract even after it has been listed. 17 C.F.R. § 40.2(c).

50.    More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations. For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement,

restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D.      The CFTC licenses Polymarket US as a designated contract market subject to federal law and the CFTC's exclusive jurisdiction.**

51.      The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply with the CEA and the CFTC's regulations.  Order of Designation, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).

52.      Today, Polymarket US specializes in contracts concerning real-world events that matter to the public.  On September 30, 2025, December 10, 2025, and February 4, 2026, Polymarket US self-certified various financial, election-related, and sports-related event contracts. *See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products[6] (listing self-certifications for contracts).

53.      These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

54.      One example is event contracts based on the winner of the Super Bowl.  The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious.  7 U.S.C. § 1a(47)(A)(ii).  To mention just a few examples:

a.    Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to skyrocket, and hometown sales to spike.  In 2025, for

---

[6] https://tinyurl.com/yamausyk.

example, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to capitalize off the team's success.[7]

b.  Retailers regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[8]

55.    Sports-related event contracts are not the same as sportsbooks.  The financial products and regulatory regimes differ in fundamental ways.

56.    Event-contract prices are formed by matching buyers and sellers among diverse market participants on these national exchanges.  Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers.  The incentives in sports betting and derivatives markets are different. Sportsbooks set odds based on proprietary information; event contracts are priced by supply and demand in a relevant market—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders on a given event.  And sports bettors typically place wagers against

---

[7] *See*, *e.g.*, Rachel Moore, *Eagles to generate $1.2B Economic Impact with Super Bowl Parade Season*, PHL17 (Feb. 13, 2025), https://phl17.com/phl17-news/eagles-to-generate-1-2b-economic-impact-with-super-bowl-parade-season/ (last visited Feb. 8, 2026); Jensen Toussaint, *Philadelphia Eagles Valuation Likely to Skyrocket After Second Super Bowl Win*, Philadelphia.Today (Feb. 15, 2025), https://philadelphia.today/2025/02/philadelphia-eagles-valuation-to-rise/ (last visited Feb. 8, 2026).

[8] *See*, *e.g.*, *Buffalo Wild Wings (@bwwings)*, Instagram (Feb. 8, 2026), https://www.instagram.com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); J.P. Isbell, *Free Fries Frenzy from McDonald's: Michiganders Can Feast Every Time the Detroit Lions Pick Off a Pass*, Michigan News Source (Aug. 9, 2024), https://www.michigannewssource.com/2024/08/free-fries-frenzy-from-mcdonalds-michiganders-can-feast-every-time-the-detroit-lions-pick-off-a-pass/ (last visited Mar. 3, 2026) (offering free fries the day after any Detroit Lions game in which the Lions' defense records an interception); Little Caesars, *Little Caesars Road to the Super Bowl Sweepstakes*, https://mobilestatic.littlecaesars.com/documents/Little%20Caesars%20-%20NFL%20Super%20Bowl%202026%20Sweepstakes.pdf (last visited Feb. 8, 2026) (conditioning chance to win free Super Bowl ticket on predicting how a customer's favorite team will perform).

the "house," so sports bettors and sportsbooks are counterparties to the gambling transaction.  But Polymarket US does not operate as a counterparty in the derivatives market.  Instead, it operates as a transparent, centralized exchange matching orders of third parties.  Polymarket US makes money by charging a flat fee for each transaction; unlike a sportsbook, it does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event.

57.     Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets.  That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and approval procedures.  Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information."  7 U.S.C. § 5(a).  They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities."  *Id.*

58.     In contrast, sportsbooks operate under the auspices of state law.  And because sports gambling is regulated on a state-by-state basis, sportsbooks tend to be local operations governed by local laws.  *See Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1302 (3d Cir. 1996).

**E.     Michigan sues another prediction market, without warning, for offering federally regulated sports-event contracts.**

59.     On March 3, 2026, Michigan sued another CFTC-designated contract market in state court—without sending a cease-and-desist letter or giving any notice or warning.  Michigan alleged that, by making sports-event contracts available for trade in Michigan, the contract market is "violat[ing] Michigan's prohibitions against gambling as well as several provisions of [the

Lawful Sports Betting Act]."  *See* Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ.  Relying on that theory, Michigan is seeking permanent injunctive relief.

60.     This suit follows the Michigan Gaming Control Board's announcement it was opening investigations into "unlicensed sports prediction markets operating within the state" and its threat to "take all necessary steps as deemed appropriate."  Michigan Gaming Control Board, *Michigan Gaming Control Board Opens Investigations Into Unlicensed Sports Prediction Markets* (Apr. 11, 2025), https://www.michigan.gov/mgcb/news/2025/04/11/michigan-gaming-control-board-opens-investigations-into-unlicensed-sports-prediction-markets.

61.     Given the State's enforcement action against a similarly situated contract market, Polymarket US faces the imminent threat of enforcement by Michigan.  Like KalshiEX, Polymarket US does not have a Michigan sports-gaming license—because Michigan may not lawfully require Polymarket US to obtain one as a condition of offering event contracts to Michigan users.  And, similarly, although Polymarket US runs its market in accordance with—and subject to the exclusive jurisdiction of—federal law, Michigan has taken the position that these activities are somehow within the purview of state law.

62.     The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy.  Polymarket US is thus forced to choose between protecting its rights under federal law and exposure to imminent state enforcement, rendering this action ripe for adjudication and appropriate for injunctive relief now, not after irreparable harm has occurred.

**F.     Looming enforcement of preempted Michigan law irreparably harms Polymarket US.**

63.     The business consequences for Polymarket US arising from Michigan's near-certain enforcement require this Court's immediate action.  An enforcement action by Michigan—

even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing key partnerships crucial to the company's growth.  Additionally, Polymarket US would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

64.     The alternative—abruptly terminating Michigan users' access to event contracts and unwinding their current positions—is just as damaging.  Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation.  Cutting off Michiganders from its event contracts—contracts that are available to users outside Michigan—would deal a decisive blow to Polymarket US's goodwill and reputation within the state.  It would disrupt overall liquidity and impair the information that trading generates by forcing Michigan residents off the exchange.  And it would create confusion among users about what shutting off their access to the market means for their trading positions.  Unwinding existing contracts, in particular, would confuse and frustrate both Michiganders and users on the other side of the contracts.

65.     Further, reduced liquidity would deter customers from using the platform.  Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users).  Reducing liquidity dampens both, which are necessary elements of prediction markets' functions, so termination of Michigan-based trading hinders the orderly functioning of markets nationwide and could deter customers outside Michigan from using the platform at all, imposing substantial burdens on interstate commerce.

66.     All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to

potentially huge liability," on the one hand; or "suffer the injury of obeying the [preempted] law," on the other. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). There is therefore "no adequate remedy at law." *Id.*

## COUNT I
### (Commodity Exchange Act Preemption)

67.        Polymarket US incorporates the preceding paragraphs by reference.

68.        The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. VI, cl. 2.

69.        "[U]nder the Supremacy Clause, from which our preemption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (citation omitted).

70.        Courts "will give preemptive effect to federal law where (1) a federal statute expressly preempts state law, (2) a federal law impliedly preempts state law, or (3) federal law and state law actually conflict." *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 948–49 (6th Cir. 2002) (citation omitted).

71.        The CEA bars Michigan from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

**A.    Express preemption bars Michigan State regulation of Polymarket US's exchange.**

72.        Congress expressly preempted state regulation of event-contracts trading on designated contract markets.

73.        Under the CEA's express terms, the CFTC, not the Michigan Gaming Control Board, has "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving

swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A); *see Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560–61 (6th Cir. 1998) (discussing pre-Dodd Frank version of the Act).

74.      Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*."  7 U.S.C. § 2(a)(1)(A) (emphasis added).

75.      The CFTC's "exclusive jurisdiction" over federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts Michigan's supposed jurisdiction to police those exchanges.  *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("[T]he courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 563 (6th Cir. 2002) (concluding it is "manifestly clear" that a statutory grant of "exclusive jurisdiction" "preempt[s] . . . state statutes").

76.      Take, for example, Michigan law's definition of prohibited gambling: "Any person . . . who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain."  Mich. Comp. Laws § 750.301.

77.      This definition echoes the CEA's definition of a swap, which includes "any . . . transaction that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial . . . consequence."  7 U.S.C. § 1a(47)(A)(ii).  When a transaction qualifies as a

swap within the meaning of the CEA, the CFTC, not Michigan, has "exclusive jurisdiction." *Id.* § 2(a)(1)(A).

78.    Michigan says that sports-event contracts are "unlicensed gambling." *See* Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ.  That is not true. *See supra* ¶¶ 59–62. Moreover, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts.  7 U.S.C. § 7a-2(c)(5)(C). Thus, even if sports-event contracts *were* a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

**B.    Implied field preemption bars Michigan regulation of Polymarket US's exchange.**

79.    Through the CEA, Congress has "indicate[d] an intent to occupy exclusively [the] entire field of" event-contract trading on designated contract markets, such that there is "no room for the States to supplement" the Act. *Bibbo*, 151 F.3d at 562.

80.    Congress enacted the Commodity Futures Trading Commission Act "to avoid a diversity of regulations between the C.F.T.C. and the states." *Kelly*, 691 F.2d at 804 n.12.  And Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned" through the "grant[ of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended. *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982); *accord Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd,* 456 U.S. 353 (1982); *supra* ¶¶ 33–36.

81.    The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework." *In re Interest Rate*

*Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33,476, 33,477 (June 4, 2013)); *see supra* ¶¶ 40–43.

82.     There is no room for state interference with this "comprehensive scheme." *See CFTC v. British Am. Commodity Options*, 560 F.2d 135, 138 (2d Cir. 1977). "Even as derivatives markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different is no excuse for a court to rewrite existing law." *Chairman Selig: Op-Ed*, *supra*. Enforcement of Mich. Comp. Laws § 432.201 *et seq.* and Mich. Comp. Laws § 750.301 against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading on CFTC-regulated exchanges. *See*, *e.g.*, *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least[,] field preemption applies" to "sports-related event contracts" on a designated contract market).

**C.     Conflict preemption bars Michigan regulation of Polymarket US's exchange.**

83.     Conflict preemption also prevents enforcement of these Michigan laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

84.     Consider Michigan's position that sports-event contracts are illegal "unlicensed gambling." That is not Michigan's decision to make: The CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" and, if so, whether they should be prohibited as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(V).

85.     The CFTC has not, however, invoked this Special Rule to prohibit Polymarket US from listing sports-event contracts. Therefore, Polymarket US's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. Because the "application of state law" would countermand that decision and "directly

affect trading on or the operation of [the] market, it would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and hence is preempted." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (quoting *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992)).

86.     More broadly, if Michigan attempts to ban Polymarket US's event contracts that federal law and the CFTC have authorized, the State's actions would frustrate the CFTC's exclusive authority to regulate its designated exchanges.  As the Sixth Circuit has recognized, "the thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere."  *Curran*, 622 F.2d at 232.  That is, "Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states."  *Kelly*, 691 F.2d at 804 n.12; *cf.* 15 U.S.C. § 8325(a) (directing the CFTC to achieve "consistent *global* regulation of swaps" (emphasis added)).  Permitting a Michigan enforcement action against Polymarket US would conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US's exchange to their own, varying laws.

87.     In short, Michigan may not enforce against Polymarket US state laws that federal law preempts.

### PRAYER FOR RELIEF

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A.       A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that Mich. Comp. Laws § 432.201 *et seq*. and Mich. Comp. Laws § 750.301 are preempted under the CEA as applied to Plaintiff.

B.       Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from enforcing against Plaintiff Mich. Comp. Laws § 432.201 *et seq*., Mich. Comp. Laws § 750.301, or any other state law or regulation to the extent it purports to regulate or prohibit Plaintiff's activities governed exclusively by federal law or otherwise conflicts with federal law.

C.       Any other relief within this Court's discretion that it deems just and proper.

Dated:  March 4, 2026

Respectfully submitted,

/s/ Derek Linkous

BUSH SEYFERTH PLLC

Derek Linkous (P82268)
100 West Big Beaver, Suite 400
Troy, MI 48084
(248) 822-7800
linkous@bsplaw.com

GIBSON DUNN & CRUTCHER LLP

Orin Snyder*
Matt Benjamin*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com

Thomas H. Dupree, Jr.
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Applications for admission forthcoming

Attorneys for Plaintiff QCX LLC, d/b/a
Polymarket US