# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

QCX LLC d/b/a Polymarket US,

        *Plaintiff*,

              v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; and HENRY WILLIAMS, in his official capacity as Executive Director of the Michigan Gaming Control Board,

        *Defendant*s.

Hon. Paul L. Maloney

Case No.: 1:26-cv-00710-PLM-PJG

**ORAL ARGUMENT REQUESTED (as to Preliminary Injunction)**

---

## PLAINTIFF QCX LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>

## ORAL ARGUMENT REQUESTED (AS TO PRELIMINARY INJUNCTION)

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................4

    A.    Over The Past Century, Federal Regulation Of Exchange-Traded Derivatives Becomes Extensive—And Exclusive. .....................................4

    B.    Congress Expands The CFTC's Exclusive Jurisdiction To Include Event Contracts. ..........................................................................................6

    C.    The CEA Sets Forth The Comprehensive Regulatory Framework For Event Contracts. .......................................................................................7

    D.    Polymarket US Operates A Designated Contract Market Subject To The CFTC's Exclusive Jurisdiction.......................................................8

    E.    The CFTC Has Reaffirmed Its Exclusive Jurisdiction Over Event Contracts, and Another Court in This Circuit Has Enjoined Contrary State Enforcement.......................................................................11

    F.    Michigan's Attorney General Sues Another Prediction Market For Offering Federally Regulated Sports-Event Contracts. ...........................13

LEGAL STANDARD.........................................................................................................15

ARGUMENT ......................................................................................................................15

    I.    Polymarket US Is Likely To Succeed On The Merits. ................................15

        A.    The CEA Expressly Preempts Michigan's Gambling Laws......................16

        B.    The CEA's Comprehensive Scheme Bars Michigan From Regulating Polymarket US's Event Contracts. ..........................................18

        C.    Michigan's Attempt To Regulate Contracts Listed On Polymarket US's Contract Market Conflicts With Federal Law. ................................21

        D.    The Federally Regulated Event Contracts Here Are Swaps. ....................23

    II.    Polymarket US Will Be Irreparably Harmed Without Immediate Relief.............27

    III.    The Balance Of Equities And Public Interest Strongly Favor Preliminary Relief.............................................................................................29

    IV.    Preliminary Relief Without A Bond Is Appropriate. ...............................30

CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
46 F.4th 489 (6th Cir. 2022) ..............................................................................28

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008)..............................................................................................18

*Am. C.L. Union of Mich. v. Does 1-6*,
755 F. Supp. 3d 1003 (E.D. Mich. 2024)............................................................15

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)............................................................................................27

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................................18, 19, 20

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905)..........................................................................................4, 5

*Bibbo v. Dean Witter Reynolds, Inc.*,
151 F.3d 559 (6th Cir. 1998) ...................................................................15, 18, 22

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ..............................................................................15

*CFTC v. Baragosh*,
278 F.3d 319 (4th Cir. 2002) ..............................................................................19

*CFTC v. British Am. Commodity Options*,
560 F.2d 135 (2d Cir. 1977)...............................................................................19

*CFTC v. Schor*,
478 U.S. 833 (1986)..............................................................................................8

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025)........................................................................28, 29

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
767 F. Supp. 3d 556, 584 (W.D. Mich. 2025)  ...................................................28

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
No. 1:25-cv-0047-HYJ-MV, Dkt. Nos. 19, 20 (W.D. Mich. Feb. 19, 2025) .........30

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973)............................................................................................15

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023) ...............................................................................24

*Cox v. Total Quality Logistics, Inc.*,
   142 F.4th 847 (6th Cir. 2025) ...................................................................17

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) .................................................................15, 20, 21

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   622 F.2d 216 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ....................................19

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*,
   2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002) ......................................................22

*F.T.C. v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) ...................................................................21

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) .........................................................................18, 23

*FMC Corp. v. Holliday*,
   498 U.S. 52 (1990) ...............................................................................17

*Gregory v. Wendell*,
   39 Mich. 337 (1878) ...............................................................................4

*Highland Coop v. City of Lansing*,
   492 F. Supp. 1372 (W.D. Mich. 1980) ............................................................30

*Hofmayer v. Dean Witter & Co., Inc.*,
   459 F. Supp. 733 (N.D. Cal. 1978) ................................................................6

*Hughes v. Talen Energy Mktg., LLC*,
   578 U.S. 150 (2016) ...............................................................................18

*Ingersoll-Rand Co. v. McClendon*,
   498 U.S. 133 (1990) ...............................................................................21

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ...............................................................................21

*Int'l Trading, Ltd. v. Bell*,
   556 S.W.2d 420 (Ark. 1977) .......................................................................6

*Jones v. B.C. Christopher & Co.*,
   466 F. Supp. 213 (D. Kan. 1979) ..................................................................6

*KalshiEX LLC v. CFTC*,
   2024 WL 4164694 (D.D.C. Sept. 12, 2024) ........................................................22

*KalshiEX LLC v. Flaherty*,
   2025 WL 1218313 (D.N.J. Apr. 28, 2025) .........................................................20

*KalshiEX LLC v. Orgel*,
   2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ...............................3, 7, 13, 21, 23, 24, 25, 26

*Kelly v. Carr*,
   691 F.2d 800 (6th Cir. 1980) ....................................................................5, 20, 21

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ...........................................................................29

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012) .........................................................................................18

*L.P. Acquisition Co. v. Tyson*,
   772 F.2d 201 (6th Cir. 1985) ...........................................................................29

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980) ...............................................................................6

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .........................................................................................27

*Martin-Marietta Corp. v. Bendix Corp.*,
   690 F.2d 558 (6th Cir. 1982) ...........................................................................29

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982) .............................................................................4, 5, 19, 20

*Mississippi v. Louisiana*,
   506 U.S. 73 (1992) ...........................................................................................16

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
   55 F.3d 1171 (6th Cir. 1995) ...........................................................................30

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) .........................................................................................27

*N. Nat. Gas Co. v. State Corp. Comm'n*,
   372 U.S. 84 (1963) .....................................................................................17, 20

*Nantahala Power & Light Co. v. Thornburg*,
   476 U.S. 953 (1986) .........................................................................................17

*Nken v. Holder*,
   556 U.S. 418 (2009) .........................................................................................15

*Nye v. CSX Transp., Inc.*,
   437 F.3d 556 (6th Cir. 2006) ...........................................................................16

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
   515 F. Supp. 202 (N.D. Ala. 1981) ...................................................................6

*Palmer v. Michigan*,
   2022 WL 908966 (W.D. Mich. Mar. 29, 2022) ...............................................30

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
   579 U.S. 115 (2016) .........................................................................................16

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
   608 F.2d 175 (5th Cir. 1979) ..........................................................................6

*Ricci v. Chicago Mercantile Exchange*,
   409 U.S. 289 (1973) ..............................................................................26, 27

*Ricci v. Chicago Mercantile Exchange*,
   447 F.2d 713 (7th Cir. 1971) ........................................................................26

*Rice v. Bd. of Trade of City of Chi.*,
   331 U.S. 247 (1947) ......................................................................................5

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ....................................................................................18

*Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*,
   735 F.2d 653 (2d Cir. 1984) ........................................................................19

*Sinclair & Co., Inc. v. Gurule*,
   757 P.2d 225 (Idaho Ct. App. 1988) ..............................................................6

*Snider v. Creasy*,
   548 F. Supp. 601 (S.D. Ohio 1982), *aff'd*, 728 F.2d 369 (6th Cir. 1984) ..............30

*State by Spannaus v. Coin Wholesalers, Inc.*,
   250 N.W.2d 583 (Minn. 1976) ......................................................................6

*State v. Monex Int'l, Ltd.*,
   527 S.W.2d 804 (Tex. Ct. App. 1975) ............................................................6

*State of Nevada ex rel. v. Blockratize, Inc.*,
   No. 26-OC-00012-1B (First Jud. Dist. Ct. Nev. Jan. 16, 2026) ............................21

*United States v. Brien*,
   617 F.2d 299 (1st Cir. 1980) ........................................................................19

*United States v. Phillips*,
   690 F. Supp. 3d 268 (S.D.N.Y. 2023) ............................................................19

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. VI, cl. 2 ..................................................................................15

**STATUTES**

7 U.S.C. § 1 ............................................................................................22, 23

7 U.S.C. § 2 ..........................................................................1, 6, 16, 17, 19

7 U.S.C. § 5 ..........................................................................1, 8, 19, 21, 28

7 U.S.C. § 7 ..................................................................................7, 8, 19

7 U.S.C. § 7a-2 ..........................................................7, 8, 10, 19, 21, 25, 26, 29

7 U.S.C. § 7b ................................................................................................8, 19

7 U.S.C. § 8 ...............................................................................................7, 8, 19

7 U.S.C. § 9 ................................................................................................8, 19

7 U.S.C. § 12a .................................................................................................19

7 U.S.C. § 13a .................................................................................................19

7 U.S.C. § 13a-1 ................................................................................................8

7 U.S.C. § 13a-2 .........................................................................................19, 22

7 U.S.C. § 13b ..............................................................................................8, 19

7 U.S.C. § 25 ...................................................................................................19

15 U.S.C. § 8302 ..............................................................................................7

15 U.S.C. § 8321 ...................................................................................7, 19, 26

Mich. Comp. Laws § 432.403 ...........................................................................13

Mich. Comp. Laws § 432.404 ...........................................................................13

Mich. Comp. Laws § 432.411 .....................................................................13, 22

Mich. Comp. Laws § 750.305 .....................................................................14, 27

Pub. L. No. 74-675, 49 Stat. 1491 (1936) .......................................................4, 17

Pub. L. No. 93-463, 88 Stat. 1389 (1974) .......................................................5, 17

Pub. L. No. 106–554, 114 Stat. 2763 (2000) (codified at 7 U.S.C. § 1a(19)) ...............6

Pub. L. No. 111–203, 124 Stat. 1376 (2010) (codified at 7 U.S.C. § 1a(47)(A)(ii)) ........6

REGULATIONS

17 C.F.R. § 12a ................................................................................................19

17 C.F.R. § 38 ........................................................................................7, 19, 22

17 C.F.R. § 40 ....................................................................................7, 8, 19, 26

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73
    Fed. Reg. 25669 (May 7, 2008) ...................................................................8

*Further Definition of "Swap," "Security-Based Swap," and "Security-Based
    Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement
    Recordkeeping*, 77 Fed. Reg. 48208, 48246 (2012) ........................................7

**OTHER AUTHORITIES**

119 Cong. Rec. 41333 (1973) .................................................................................5

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019)..................................................7

Order Instituting Proceedings, *In re Blockratize, Inc.*, 2022 WL 73864 (CFTC Jan. 3, 2022) ...............................................................10, 23

*Buffalo Wild Wings (@bwwings)*, Instagram (Feb. 8, 2026), https://www.instagram. com/p/DUgIPoekVo8 .......................................................23

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) .............................20

*J.P. Isbell, Free Fries Frenzy from McDonald's: Michiganders Can Feast Every Time the Detroit Lions Pick Off a Pass*, Michigan News Source (Aug. 9, 2024), https://www.michigannewssource.com/2024/08/ free-fries-frenzy-from-mcdonalds-michiganders-can-feast-every-time-the-detroit-lions-pick-off-a-pass/ (last visited Mar. 3, 2026) ...................................................23

*Jurisdiction*, Merriam-Webster Dictionary (2025) ........................................................16

Appellant CFTC's Brief, *KalshiEX, LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024), 2024 WL 4512583...................................................24

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982) .........................................................................4

Little Caesars, *Little Caesars Road to the Super Bowl Sweepstakes*, https://mobilestatic.littlecaesars.com/documents/Little%20Caesars%20-%20NFL% 20Super%20Bowl%202026%20Sweepstakes.pdf (last visited Feb. 8, 2026) .........................................................................23

Michigan Gaming Control Board, *Michigan Gaming Control Board Opens Investigations Into Unlicensed Sports Prediction Markets* (Apr. 11, 2025), https://www.michigan.gov/mgcb/news/2025/04/11/michigan-gaming-control-board-opens-investigations-into-unlicensed-sports-prediction-markets.............................13

CFTC Amicus Brief, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026) ...........................................2, 12, 23, 25, 29

Complaint, *Nessel v. KalshiEX LLC*, No. 36-1087-CZ (Ingham Cir. Ct.) .........................................................................3

S. Rep. No. 93-1194 (1974) .................................................................................5

## INTRODUCTION

Plaintiff QCX LLC, d/b/a Polymarket US, seeks emergency relief to prevent imminent and irreparable harm caused by Defendants' defiance of federal law.  Polymarket US operates a lawful, nationwide event-contract market overseen by the Commodity Futures Trading Commission ("CFTC").  Event contracts are a type of derivative where two parties agree to exchange payments based on the outcome of an event.  Because event contract markets and other national derivatives exchanges cannot operate under an irregular patchwork of state laws, Congress granted the CFTC "exclusive jurisdiction" over derivatives traded on designated contract markets through the Commodity Exchange Act ("CEA").  7 U.S.C. § 2(a)(1)(A).  Defendants ignore Congress' command.  They now threaten Polymarket US with crippling state enforcement unless it abandons its federally protected right to operate its CFTC-designated and regulated market in Michigan. Judicial intervention is necessary to put an end to this unlawful coercion, preserve the status quo, and enforce Congress' federal scheme.

State attempts to exert authority over national derivatives markets are not new.  For decades, States treated national exchanges as matters of local concern and derivatives trading as illegal gambling.  Unwilling to permit the continued balkanization of nationwide markets, Congress created the CFTC in 1974, granting it "exclusive jurisdiction" over derivatives traded on federally regulated contract markets.  7 U.S.C. § 2(a)(1)(A).  Only uniform, nationwide standards and a single, nationwide regulator could protect the "national public interest" "in interstate and international" derivatives trading.  *Id*. § 5(a).  Congress has since expanded that exclusive jurisdiction to encompass new categories of derivatives, including event contracts traded on federally regulated markets.

The CFTC has repeatedly reaffirmed that event contracts traded on designated contract markets fall within its exclusive jurisdiction and that conflicting state enforcement actions undermine the public interest.  On January 29, 2026, CFTC Chairman Michael S. Selig explained that "prediction markets" and "event contracts" have "operated within the CFTC's regulatory perimeter for more than two decades" and "play an important role in the broader financial system." Spencer Decl. Ex. 1 (Selig Remarks) at 5.  He warned that state litigation against federally regulated markets injects "uncertainty" that "has not served our markets well" and undermines "the public interest."  *Id*.  And he emphasized that the CFTC would reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives" against state enforcement actions.  *Id*.

The CFTC acted decisively in fulfilling that responsibility.  On February 17, 2026, the CFTC filed an amicus brief in a Ninth Circuit appeal seeking to enjoin the State of Nevada's threatened enforcement action against another designated contract market.  *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2 (Spencer Decl. Ex. 2).  The CFTC asserted that State efforts to "invade" the federal government's authority "present a fundamental threat to Congress' statutory design."  *Id*. at 2.  It emphasized that "*States cannot invade* the CFTC's exclusive jurisdiction" "by re-characterizing" federally regulated exchange trading "as illegal gambling."  *Id.* (emphasis added).  And it explained that "subjecting derivatives listed on a CFTC-registered" designated contract market "to State regulation would have destabilizing economic effects," *id*. at 28 (capitalization altered), and "erode the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system," *id*. at 17–18.

On March 3, however, Defendant Nessel sued another federally regulated designated contract market in state court based on the long-rejected theory that States can use their gambling laws to regulate nationally traded derivatives on a federally authorized market. *Nessel v. KalshiEX LLC*, No. 36-1087-CZ (Ingham Cnty. Cir. Ct.), Dkt. No. 1 (Spencer Decl. Ex. 3).  On March 5, Defendant Nessel sought an emergency *ex parte* temporary restraining order, *without notice*, against KalshiEX.  *Nessel v. KalshiEX LLC*, No. 36-1087-CZ (Ingham Cnty. Cir. Ct.), Dkt. No. 4. The State's actions in that case usurp the CFTC's exclusive regulatory authority and threaten to disrupt the uniform, national system of derivatives trading Congress designed.

The threat to Polymarket US is immediate and concrete.  Michigan's ongoing litigation and its request for an emergency *ex parte* temporary restraining order confirm the State's willingness to invoke state law to shut down federally regulated markets despite express federal preemption.  Polymarket US now faces a real and imminent risk of identical enforcement— exposing it to civil penalties, potential criminal liability, forced cessation of Michigan operations, and severe collateral consequences to its nationwide business.

Recently, another court in this Circuit issued a temporary restraining order and preliminarily enjoined similar state enforcement efforts against another CFTC-regulated prediction market for allegedly violating state gambling laws.  *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *10 (M.D. Tenn. Feb. 19, 2026).  The Middle District of Tennessee held that the prediction market was likely to succeed on the merits of its claim that the State's enforcement action was preempted by the CEA and would likely suffer irreparable harm absent relief.  *Id.* at *10–11.  This Court should reach the same conclusion here.

Absent injunctive relief, the resulting harm will be immediate and irreparable.  Even a meritless enforcement action would disrupt Polymarket US's federally authorized operations,

undermine user trust, and force Polymarket US to choose between exercising its right to operate a national market and submitting to unlawful state coercion.  These are the very harms Congress sought to prevent, and they are irreparable.

The balance of equities and the public interest overwhelmingly favor injunctive relief. Defendants lose nothing by being barred from enforcing state gambling laws in an area Congress removed from state control.  By contrast, Defendants' actions threaten to fracture a uniform federal regulatory framework, disrupt lawful markets, and deprive Michigan residents of lawful access to information-rich platforms Congress sought to protect.

Immediate injunctive relief is therefore necessary to preserve the status quo, prevent unlawful state overreach, and avert imminent harm pending resolution of this action.

## BACKGROUND

### A.    Over The Past Century, Federal Regulation Of Exchange-Traded Derivatives Becomes Extensive—And Exclusive.

The conflict between state gambling laws and federally regulated derivatives trading was resolved decades ago in favor of federal control.  Derivatives—financial instruments that derive their value from an underlying asset—have for more than a century been "of the utmost importance to the business world."  *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905).  For as long as derivatives trading has existed in the United States, however, States— Michigan included—have attempted to regulate or prohibit it as unlawful gambling.  *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982); *see, e.g.*, *Gregory v. Wendell*, 39 Mich. 337, 343–44 (1878) (holding that a commodity futures contract was "a mere scheme to gamble upon prices" and "void as against public policy").

"[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 394 (1982), is a result of those "coarse attempts" by States to

regulate derivatives trading as gambling, *Christie Grain*, 198 U.S. at 247–48.  Initially, Congress permitted a limited state role:  The CEA provided that it would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act.  Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936).  States were therefore free to "supplement[] or bolster[] the federal scheme," absent direct "conflict with the requirements of the Act."  *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 253, 255 (1947).

By the 1970s, however, derivatives trading had become too important to the national economy to permit "[v]aried and often conflicting" state laws to interfere with national exchanges. 119 Cong. Rec. 41333 (1973).  It was time "for a significant change in the parameters of Federal authority over the exchanges." *Id.*  Congress responded with the Commodity Futures Trading Act of 1974, which created the CFTC and established "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 355–56.

The 1974 Act empowered the CFTC to regulate "all" commodity futures and granted the CFTC "*exclusive* jurisdiction" over transactions "traded or executed on a contract market designated" under the Act.  Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974) (emphasis added).  It also "wholly and unequivocally eliminated" the language the Supreme Court had relied on to permit state regulation. Van Wart, *supra*, at 692–93.  In this way, Congress made clear that, "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned."  S. Rep. No. 93-1194, at 36 (1974).  As the Sixth Circuit has explained, "[t]he idea that the C.F.T.C. should regulate the area was firmly expressed." *Kelly v. Carr*, 691 F.2d 800, 803 (6th Cir. 1980).

State and federal courts alike quickly recognized that the as-revised CEA "preempt[ed] the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).[1]  And it was not just state securities and commodities laws that were preempted—the CEA also "preclude[d] antigambling proceedings" and the application of other "state gambling laws" against CFTC-regulated exchanges.  *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981).[2]

### B.    Congress Expands The CFTC's Exclusive Jurisdiction To Include Event Contracts.

Congress later expanded the kinds of derivatives covered by the CEA to foster innovation. In 2000, Congress broadened the definition of "commodity" to include certain events—specifically, any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and "associated with a financial, commercial, or economic consequence."  Pub. L. No. 106–554, § 101(4), 114 Stat. 2763, 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)).

In 2010, as part of the Dodd-Frank Act, Congress again expanded the CFTC's authority to regulate event contracts.  Dodd-Frank categorized event contracts as a kind of swap, meaning "any agreement" providing for payment "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  Pub. L. No. 111–203, § 721(a)(21), 124 Stat. 1376, 1666 (2010) (codified at 7 U.S.C. § 1a(47)(A)(ii)).  And Dodd-Frank provided that the CFTC would exercise

---

[1] *Accord, e.g.*, *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978); *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 423 (Ark. 1977); *State by Spannaus v. Coin Wholesalers, Inc.*, 250 N.W.2d 583, 586 (Minn. 1976); *State v. Monex Int'l, Ltd.*, 527 S.W.2d 804, 806 (Tex. Ct. App. 1975).

[2] *Accord, e.g.*, *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979); *Sinclair & Co., Inc. v. Gurule*, 757 P.2d 225, 228 (Idaho Ct. App. 1988).

"exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A); *see also Orgel*, 2026 WL 474869, at *3 ("In 2010 . . . Congress amended the CEA to grant the CFTC exclusive jurisdiction over the regulation of *swaps*, as well.").  Congress thus put exchange-traded swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures."  Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019).

"The CEA defines 'swap' broadly."  *Orgel*, 2026 WL 474869, at *7 (cleaned up).  That is because the statute "is designed to account for financial innovation."  Spencer Decl. Ex. 4 (Chairman Op-Ed) at 2.  Congress therefore directed the CFTC "to further define the term[] 'swap.'"  15 U.S.C. § 8321(b); *see id.* § 8302(d)(1) (similar).  And with input from interested parties—the States included—the CFTC has exercised that authority to clarify what kinds of agreements "will not be considered swaps."  *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208, 48246 (2012); *see, e.g.*, *id.* (explaining that it will not treat household "mortgages with variable rates of interest" as swaps).

**C.    The CEA Sets Forth The Comprehensive Regulatory Framework For Event Contracts.**

The CFTC exercises comprehensive regulatory authority over designated contract markets and event contracts traded on them.  To qualify as a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles."  17 C.F.R. § 38.3(a); *see* 7 U.S.C. §§ 7(d), 8(a).  These principles require contract markets to establish and enforce rules to prevent price manipulation, market disruption, and other forms of abusive practices.  7 U.S.C. § 7(d)(4), (5), (12).

7

The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" for "trading" on federally regulated exchanges.  7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).  Exchanges may either seek pre-approval from the CFTC or certify a contract's compliance with the CEA and the Commission's requirements.  *Id.* §§ 7a-2(c)(1), (4)(A); 17 C.F.R. § 40.2(a), 40.3(a), 40.11(c).  The CFTC may investigate, stay, or amend contracts even after listing.  17 C.F.R. § 40.2(c).  Under the Dodd-Frank "Special Rule," the CFTC may—but is not required to—prohibit listing of an "[e]vent contract" involving certain subjects, including "gaming," if it finds listing "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C).

More broadly, the CFTC has "sweeping authority" to enforce the CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 842 (1986).  It may suspend or revoke the designation of a contract market, 7 U.S.C. §§ 7b, 8(b); bring administrative enforcement actions, *id.* §§ 9(4), 13b; and sue in federal court, including for injunctive relief, the rescission of contracts, and the imposition of trading bans, *id.* § 13a-1.  It may also promulgate rules to "prevent price manipulation" and "protect all market participants from fraudulent or other abusive sales practices."  *Id.* § 5(b).

### D.    Polymarket US Operates A Designated Contract Market Subject To The CFTC's Exclusive Jurisdiction.

The CFTC granted Polymarket US its designation as a contract market on July 9, 2025. Spencer Decl. Ex. 5 (July 9 CFTC Designation); Clifford Decl. ¶ 1.  That designation reflects a rigorous federal determination that Polymarket US could and would satisfy all federal requirements governing market integrity, transparency, financial safeguards, and customer protection.

Polymarket US specializes in event contracts—derivatives "whose payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, corporate earnings, level of snowfall, or dollar value of damages caused by a hurricane."  CFTC, *Futures Glossary: A*

*Guide to the Language of the Futures Industry*[3]; *see also* Clifford Decl. ¶ 5.  Event contracts "allow two parties to speculate on future market conditions without owning the underlying asset." Spencer Decl. Ex. 4 (Chairman Op-Ed) at 1.  They "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events."  *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008).

Prediction markets, where event contracts are traded, generate valuable public information about real-world events by aggregating diverse views and real-time information.  Complaint, ECF No. 1 ("Compl.") ¶¶ 28–29.  Prediction markets are "used by tens of millions of Americans."  *Id.* ¶ 29; Spencer Decl. Ex. 4 (Chairman Op-Ed) at 1.  Because traders put their money where their mouth is, prediction markets incentivize accurate predictions.  Compl. ¶ 29.  And because traders can exit their positions freely before a contract expires, prediction markets incorporate dynamic information.  *Id.*  In this way, prediction markets deliver timely insights that pundits and polls cannot match.  *Id.* ¶¶ 29–32.

Event contracts are typically binary:  One party takes the "yes" position that an event will occur; the other takes the "no" position.  Compl. ¶ 26.  The contract specifies the value to be paid on the contract, as well as an expiration date.  *Id.*  When the contract expires, the party whose prediction was correct receives a payout.  *Id.*  For example, parties might take a position on whether Lansing will get more than 3 feet of rain (the approximate yearly average) in 2026.  At the end of the year, the party that correctly predicted the outcome is paid the agreed amount.  So, if 2026 turns out to be an especially wet year and Lansing sees 4 feet of rain, the party that took the "yes"

---

[3]  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm  (last visited Mar. 6, 2026).

position would be paid and the party that took the "no" position would not. *See* Clifford Decl. ¶ 7. If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price. Compl. ¶ 28. If the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, along with the price. *Id*.

Event-contract trading, like the trading of other derivatives, provides significant value. Compl. ¶ 32. Event contracts allow parties to mitigate risk—a hardware store in Lansing might purchase an event contract predicting that the city will have a particularly dry year. *Id*. ¶ 27. If the weather turns out as the owner predicted, the payout from the contract could offset the owner's loss of income from replacement gutters. *See id*; Spencer Decl. Ex. 4 (Chairman Op-Ed) at 1 ("Event contracts . . . allow businesses and individuals to hedge event-driven risks."). But, as with other derivatives, parties who are *not* looking to mitigate risk are equally free to trade. Compl. ¶¶ 24–25, 32. More participants in the market means more liquidity, more efficient trading, more information, and greater predictive value. *Id*. ¶ 32. Event contracts supply valuable investment opportunities for traders willing to study the likelihood of occurrences in the real world. *Id*. And, through the collective wisdom of these efficient, transparent markets, event contracts provide precise, real-time information about events that matter to the public at large. *Id*.

Polymarket US specializes in contracts concerning real-world events that matter to the public. Compl. ¶ 52. On September 30, 2025, December 10, 2025, and February 4, 2026, Polymarket US self-certified various financial, election-related, and sports-related event contracts with the CFTC. *See* Spencer Decl. Exs. 6–7, 10 (Self-Certifications); *see also* Clifford Decl. ¶ 6. The CFTC did not exercise its exclusive authority to stay or prohibit trading in those contracts. *See* 7 U.S.C. § 7a-2(c).

Polymarket US's CFTC designation and contract certifications mark the culmination of a years-long effort to ensure compliance with the CEA and CFTC regulations.  In 2022, the CFTC took the position that event contracts concerning "current events" then offered by Polymarket US's parent company (Polymarket) "constitute[d] swaps under the CFTC's jurisdiction."  *In re Blockratize, Inc.*, 2022 WL 73864, at *1–2 (CFTC Jan. 3, 2022).  As part of a consent decree, Polymarket therefore agreed that it would offer future event contracts within the United States only if it obtained CFTC designation as a contract market.  *Id.* at *8.  No State or state regulatory authority objected to this order.

Polymarket US continues to comply with the CFTC order.  *See* Clifford Decl. ¶ 6.  After receiving its CFTC designation, Polymarket US represented to the CFTC that "all" its event contracts fall "within the definition of 'swap' under the [CEA]."  Spencer Decl. Ex. 8 (CFTC No Action Letter) at 2.  The CFTC accepted that representation.  *Id.* at 5.

### E.    The CFTC Has Reaffirmed Its Exclusive Jurisdiction Over Event Contracts, and Another Court in This Circuit Has Enjoined Contrary State Enforcement.

In January of this year, CFTC Chairman Michael S. Selig reaffirmed that prediction markets are "lawful innovation[s]" that "have operated within the CFTC's regulatory perimeter for more than two decades."  Spencer Decl. Ex. 1 (Selig Remarks) at 5.[4]  State efforts to usurp the CFTC's regulatory authority, he explained, have produced only "uncertainty," which "has not served our markets well, nor has it served the public interest" that "the Commission has the

---

[4] Even before Congress added "events" as a kind of CEA commodity, the CFTC had been regulating event contracts for about a decade.  *See* Ex. 4 (Chairman Op-Ed) at 1 ("In 1992 the CFTC issued its first official recognition of event contracts by granting relief to the Iowa Electronic Markets, a futures market at the University of Iowa in which traders can buy and sell contracts pegged to events such as presidential elections and corporate earnings.").

expertise and responsibility to defend its exclusive jurisdiction over" event contracts and other "derivatives." *Id*.

The CFTC exercised that responsibility almost immediately.  Last month, the CFTC filed an amicus brief in the Ninth Circuit in support of another contract market's efforts to prevent state interference with the CEA.  Spencer Decl. Ex. 2 (9th Cir. CFTC Amicus Br.).  The agency noted that "event contracts" are a kind of "swap" that are "[s]ubject to the CFTC's [e]xclusive [j]urisdiction" when "traded on CFTC-registered" contract markets.  *Id*. at 4, 14.  And, the CFTC explained, the fact that event contracts "involve swaps on sports events does not change the" analysis.  *Id*. at 24.  The CFTC argued that accepting the contrary view would "upend[] decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts."  *Id*. at 3.  The agency also explained that there was no "principled boundary" to the States' arguments that certain derivatives could be regulated as "prohibited gambling."  *Id*. at 17.  According to the CFTC, "[s]tates could characterize *any* derivative as prohibited gambling, thereby subjecting nationally (and internationally) traded swaps to a patchwork of state restrictions."  *Id*.  The CFTC concluded that "[t]he resulting market fragmentation would erode the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system."  *Id*. at 17–18.

The same day, CFTC Chairman Michael Selig wrote an editorial defending the agency's exclusive jurisdiction over prediction markets.  Spencer Decl. Ex. 4 (Chairman Op-Ed).  Chairman Selig made clear that, because prediction markets are CFTC-registered exchanges, the *CFTC*, not States, properly exercises authority over these markets: "The CFTC will no longer sit idly by while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products."  *Id*. at 3.  Chairman

Selig also highlighted the "legitimate economic functions" served by event contracts, such as "allow[ing] businesses and individuals to hedge event-driven risks, enabl[ing] investors to manage portfolio exposure, and provid[ing] the public with information about the outcome of future events." *Id.*

Another court in this Circuit recently reached the same conclusion.  On the theory that sports-related event contracts markets were gambling governed by state law, Tennessee was poised to bring a state-law enforcement action against KalshiEX, another CFTC-regulated prediction market.  *Orgel*, 2026 WL 474869, at *1.  The Middle District of Tennessee, however, issued a temporary restraining order against Tennessee gaming regulators.  *Id.* at *2.  And, after additional briefing and argument, the court preliminarily enjoined those regulators from enforcing Tennessee gaming laws against KalshiEX.  *Id.* at *1.  "[T]he CEA's primary objective," the court reasoned, is "uniform regulation of the derivatives market."  *Id.* at *10.  The court explained that applying Tennessee's gaming laws to contract markets would undermine that objective.  *Id.*  The court noted that Tennessee law would have prohibited Tennesseans from trading with anyone "outside the state."  *Id.*  But the court observed that "[i]t is hard to see how a federally regulated nationwide derivatives exchange could function in this way."  *Id.*  The court therefore held that the CEA preempted state gaming laws and state gaming regulators' authority over CFTC-regulated contract markets.  *Id.*

### F.  Michigan's Attorney General Sues Another Prediction Market For Offering Federally Regulated Sports-Event Contracts.

On March 3, 2026, Michigan Attorney General Dana Nessel sued KalshiEX alleging that the contract market was "engage[d] in unlicensed gambling" in violation of the Michigan Penal Code and Michigan's Lawful Sports Betting Act.  Spencer Decl. Ex. 3 (*Nessel v. KalshiEX* Compl.) ¶ 2.  In the Attorney General's view, Michigan "exercises complete control" of—and enjoys

"plenary authority over"—KalshiEX's event contracts.  *Id*. ¶¶ 6–7.  That includes the supposed authority to require contract markets to partner with (or become) an in-State casino as a condition for obtaining a state license.  *Id*. ¶¶ 23–24 (citing Mich. Comp. Laws §§ 432.403, .404).  And it includes the supposed authority for the Michigan Gaming Control Board ("Board") to "limit[]" transactions to those "located in this state" or to those in other States of the Board's choosing. Mich. Comp. Laws § 432.411(1).  The State sought fines and an injunction enjoining the contract market from "engaging in or advertising Kalshi's internet sports betting operation."  Spencer Decl. Ex. 3 (*Nessel v. KalshiEX* Compl.) at 21.

The Attorney General's suit against KalshiEX followed the Board's announcement it was opening investigations into "unlicensed sports prediction markets operating within the state" and its threat to "take all necessary steps as deemed appropriate."  Spencer Decl. Ex. 9 (Michigan Gaming Control Board Press Release).

Given the State's enforcement efforts against a similarly situated contract market, Polymarket US faces an imminent threat of similar action.  *See* Clifford Decl. ¶ 8–9.  Polymarket US does not have a Michigan sports-wagering license—because Michigan may not lawfully require Polymarket US to obtain one.  Although Polymarket US runs its market in accordance with—and subject to the exclusive jurisdiction of—federal law, Defendants have taken the position that these activities are somehow the purview of state law.  There is a real and imminent risk of civil and criminal penalties, too.  *See* Clifford Decl. ¶ 16.  Michigan's current litigating position is that prediction markets offering sports contracts in the State violate laws providing for "a fine of not more than $1,000.00" as well as imprisonment.  Mich. Comp. Laws § 750.305(1).

Polymarket US is thus forced to seek urgent injunctive relief from this Court.

## LEGAL STANDARD

"Courts in the Sixth Circuit apply the same standard to a motion for a temporary restraining order (TRO) and a motion for a preliminary injunction." *Am. C.L. Union of Mich. v. Does 1-6*, 755 F. Supp. 3d 1003, 1007 (E.D. Mich. 2024).  "When considering a motion for preliminary injunction, a district court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Because "the Government is the opposing party," the third and fourth "factors merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Polymarket US Is Likely To Succeed On The Merits.

The Constitution makes federal law "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Congress may therefore "preempt state law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), even when those laws are "deep-seated in the police power of the States," *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638 (1973).

There are three kinds of preemption.  *First*, express preemption—where "Congress expresses a clear intent to pre-empt state law in the language of the statute." *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562 (6th Cir. 1998).  *Second*, implied field preemption—where, "[e]ven without an express provision for preemption," it can be inferred that "Congress intend[ed] federal law to occupy the field" of regulation.  *Crosby*, 530 U.S. at 372.  And, *third*, conflict preemption—"where it is impossible for a private party to comply with both state and federal law"

or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372–73 (alterations adopted).

All three bar Michigan's efforts to regulate event contracts traded on Polymarket US's CFTC-regulated exchange. Those efforts are expressly preempted by the CEA's grant of "exclusive" jurisdiction to the CFTC, not state regulators. They are field preempted because the scope, structure, and purpose of the CEA confirm that Congress left no room for states to supplement federal law. And they impermissibly conflict with federal law because they stand as an obstacle to the means Congress chose to achieve its objectives. Whichever kind of preemption applies, the bottom line is the same. Michigan may not use its gambling laws to usurp the CFTC's exclusive jurisdiction over national exchanges like Polymarket US.

### A. The CEA Expressly Preempts Michigan's Gambling Laws.

"Congress can express its intent to preempt state law through explicit statutory language." *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 560 (6th Cir. 2006). Here, Congress did so by granting the CFTC "exclusive jurisdiction" over swaps traded on a designated contract market.

Express preemption "focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). And where a statute "'contains an express pre-emption'" provision, courts "do not invoke any presumption against pre-emption." *Id.*

The text of the CEA is plain and dispositive. Section 2 expressly provides that the *CFTC*, not state regulators, "shall have exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). Jurisdiction is "the power to exercise authority." *Jurisdiction*, Merriam-Webster Dictionary (2025). And where jurisdiction is "exclusive," it "necessarily denies jurisdiction" to others. *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992). That is why the Supreme Court has repeatedly held that granting a federal

agency exclusive jurisdiction preempts state law.  *E.g.*, *N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 89 (1963); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986).

The CEA frames preemption in broad terms by conferring exclusive jurisdiction "with respect to" certain transactions.  The phrase "with respect to" is "synonymous with" the term "relat[ed] to."  *Cox v. Total Quality Logistics, Inc.*, 142 F.4th 847, 857 (6th Cir. 2025).  When used in a preemption provision, the term "relate to" is "conspicuous for its breadth."  *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990).  Thus, by expressly granting the CFTC exclusive jurisdiction "with respect to" transactions on a designated contract market, 7 U.S.C. § 2(a)(1)(A), Congress "establishe[d] as an area of exclusive federal concern the subject of every state law," *FMC*, 498 U.S. at 58, that operates "with respect to" transactions on a designated contract market, 7 U.S.C. § 2(a)(1)(A).

Statutory context confirms CEA Section 2's preemptive effect.  The very next sentence states that, "*[e]xcept as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of the United States or of any State."  7 U.S.C. § 2(a)(1)(A) (emphasis added).  In other words, unlike the rest of Section 2, the grant of exclusive jurisdiction to the CFTC over trading on designated contract markets *does* "supersede or limit the jurisdiction" of state "regulatory authorities."  *Id*.

Statutory history removes any doubt.  When amending the CEA in 1974, Congress deleted a provision of the original CEA directing that "[n]othing in this section . . . shall be construed to impair any State law applicable to any [exchange-traded] transaction enumerated or described in such sections."  Pub. L. No. 74-675, § 5, 49 Stat. at 1494 (inserting this language into CEA § 4c);

*see* Pub. L. No. 93-463, § 402(d), 88 Stat. 1389, 1413 (1974 deletion of this language).  At the same time, Congress added the exclusive-jurisdiction language still found in the Act today.[5]

The effect of these amendments is clear.  The CFTC was "created by Congress in 1974 to exercise exclusive jurisdiction over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market."  *Bibbo*, 151 F.3d at 560.  Michigan therefore has no role to play in regulating Polymarket US's exchange-traded event contracts.  Any effort to enforce the state licensing regime against Polymarket US "invades" the CFTC's "regulatory turf."  *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).  The CEA expressly preempts such interference.

### B.    The CEA's Comprehensive Scheme Bars Michigan From Regulating Polymarket US's Event Contracts.

Even where "a federal law contains an express pre-emption clause," implied field preemption may still inform the "scope of Congress' displacement of state law."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Implied field preemption looks at "the scope of [the] federal statute," *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012) (alteration adopted), and at the statute's "structure and purpose."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).   "Where Congress occupies an entire field . . . , even complementary state regulation is impermissible."  *Arizona v. United States*, 567 U.S. 387, 401 (2012).

---

[5] In the seminal preemption case, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), the Supreme Court held that these same two steps—congressional removal of an anti-preemption clause and insertion of language granting exclusive jurisdiction—compelled the conclusion that the federal Warehouse Act preempted all state laws purporting to regulate matters that were "in any way regulated by the Federal Act."  *Id*. at 236; *see id*. at 232–33.

Scope, structure, and purpose all point in the same direction here:  "Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system" of regulations for trading on a CFTC-regulated contract market.  *Arizona*, 567 U.S. at 401.

As for scope, courts—including the Sixth Circuit—have recognized that the CEA establishes "a comprehensive scheme for regulation of trading in commodity futures."  *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 138 (2d Cir. 1977); *see Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 236 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) (noting "the comprehensive administrative scheme embodied in the 1974 amendments").[6]  By bringing swaps within this comprehensive scheme, Dodd-Frank "establish[ed] a comprehensive new regulatory framework for swaps," too, with "exclusive jurisdiction to implement that framework" "vested [in] the CFTC."  *United States v. Phillips*, 690 F. Supp. 3d 268, 280 (S.D.N.Y. 2023) (alterations adopted).

This framework "provide[s] a full set of standards," *Arizona*, 567 U.S. at 401, governing the stringent requirements to become and remain a designated contract market, *see* 17 C.F.R. § 38, the process for listing and obtaining approval of contracts, *id*. §§ 40.2–.10, the kinds of contracts that may be listed, *id*. § 40.11, and the enforcement mechanisms available to address contract-market or trader misconduct, *see, e.g.*, 7 U.S.C. §§ 7b, 8, 9, 13a, 13b.  And, should the CFTC identify some gap, the agency may engage in additional rulemaking, *id*. § 12a(5).

---

[6] *See also, e.g.*, *Merrill Lynch*, 456 U.S. at 355–56 (the CEA "has been aptly characterized as 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex'"); *Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735 F.2d 653, 661 (2d Cir. 1984) (same); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *CFTC v. Baragosh*, 278 F.3d 319, 324 (4th Cir. 2002) ("By 1974, Congress decided that the 'growing importance of futures markets' merited a comprehensive regime of regulation.").

The structure of the CEA similarly leaves no room for States to act when it comes to trading on a designated contract market.  The CFTC has "exclusive jurisdiction."  7 U.S.C. § 2(a)(1)(A).  The CFTC, not a state regulator, is directed to "define the term[] 'swap,'" 15 U.S.C. § 8321(b); choose whether to designate an applicant as a contract market, 7 U.S.C. § 7(a); and decide whether the promulgation of "rules and regulations" is "reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of" the CEA.  *Id.* § 12a(5).  The CFTC has the power and obligation to enforce those rules and regulations, as well as the CEA, against contract markets; States have no such authority.  *Id.* §§ 13a-2(1), 25(a).  It is up to the CFTC, not the States, to determine whether an event contract involves "gaming," whether the contract is "contrary to the public interest," and whether listing of the contract should be prohibited.  *Id.* § 7a-2(c)(5)(C).

The CEA's statutory-purpose provision explains why: to ensure that regulation of "market participants" remains "under the oversight of the Commission," 7 U.S.C. § 5(b)—and no "other regulatory agencies," *Merrill Lynch*, 456 U.S. at 386.  As the Sixth Circuit has explained, Congress' goal was "to avoid a diversity of regulations between the C.F.T.C. and the states."  *Kelly*, 691 F.2d at 804 n.12.  "[D]ifferent state laws," one Senator warned, "would just lead to total chaos."  *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Senator Clark).

In short, every indicator of congressional intent shows that Congress "intend[ed] federal law to occupy the field" of event-contract trading on designated contract markets.  *Crosby*, 530 U.S. at 372.  Michigan "may not enter" that field "in any respect," *Arizona*, 567 U.S. at 402, or use its gaming laws to regulate Polymarket US "direct[ly]" or "indirectly," *N. Nat. Gas Co.*, 372 U.S. at 91.  As another court has already held, "at the very least[,] field preemption applies."  *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).

### C.    Michigan's Attempt To Regulate Contracts Listed On Polymarket US's Contract Market Conflicts With Federal Law.

Conflict preemption applies not only "where it is impossible for a private party to comply with both state and federal law," but also where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373.  Even when "both federal and state law" share the same "ultimate goal," state law "is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987); *see Crosby*, 530 U.S. at 379 ("The fact of a common end hardly neutralizes conflicting means.").

Michigan's effort to ban the trading of sports-event contracts on Polymarket US's designated contract market frustrates the central "purposes and objectives of Congress," *Crosby*, 530 U.S. at 372, when amending the CEA: "to avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12, by "conferring the CFTC with sole regulatory authority over 'futures contract markets or other exchanges,'" *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2001); *see supra* at 4–8.

Permitting Michigan to bring an enforcement action necessarily means allowing every other State to do the same—making it all-but-inevitable that designated contract markets will be subject to "different substantive standards applicable to the same . . . conduct." *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see, e.g.*, *State of Nevada ex rel. v. Blockratize, Inc.*, No. 26-OC-00012-1B (First Jud. Dist. Ct. Nev. Jan. 16, 2026) (suit by Nevada seeking to enjoin Polymarket US's event contracts as illegal gaming barred by state law).  "Such an outcome is fundamentally at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand*, 498 U.S. at 142; *see Orgel*, 2026 WL 474869, at *10 ("state law likely stands as

an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives market").

There is also a "direct conflict" because Michigan law "deprives [contract markets] of a valuable benefit granted them in" the CEA. *Bibbo*, 151 F.3d at 564 (holding that conflict preemption barred application of an Ohio law). To ensure "a system of effective self-regulation of trading facilities," 7 U.S.C. § 5(b), Congress eliminated the requirement that contract markets demonstrate to the CFTC that new contracts satisfied a "public interest" and "'economic purpose test'" "before they could trade th[ose] contracts," *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024). In place of that requirement, Dodd-Frank gave contract markets the right "to self-certify that their proposed contracts complied with the statute and the CFTC's regulations, with no prior review required," *id.*, subject to after-the-fact public-interest review *only* by the CFTC, *see* 7 U.S.C. § 7a-2(c)(5)(C)(i) (permitting CFTC "public interest" review of self-certified gaming-related event contracts).

Michigan's asserted veto power over CFTC public-interest determinations would turn the federal statutory scheme on its head. It would strip contract markets of their right to trade after self-certification, instead requiring them to satisfy each State's individual public-interest test before offering a new contract. That reading is nonsensical. *Cf.* 7 U.S.C. § 13a-2(1) (prohibiting States from suing "contract market[s]" for CEA violations); *id.* § 13a-2(7) (limiting States to state-court suits based on general fraud laws). Decisions about what contracts may be listed on a designated contract market "are matters for uniform federal regulation subject to review by the CFTC, not matters for review or adjudication by individual state[s]." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *4 (S.D.N.Y. Oct. 17, 2002).

Finally, the CFTC has taken the view that it would be impossible for contract markets to comply with both federal and state law.  Federal law requires each contract market to "provide its members . . . with impartial access to its markets and services" "in a non-discriminatory manner." 17 C.F.R. § 38.151(b); *cf. de la Cuesta*, 458 U.S. at 153 ("Federal regulations have no less pre-emptive effect than federal statutes.").  But, according to the CFTC, a contract market does not comply with the "federal mandate to provide impartial national access" if it restricts the availability of contracts in a particular State based on that State's "gambling laws."  Spencer Decl. Ex. 2 (9th Cir. CFTC Amicus Br.) at 26.  Michigan law, however, would require Polymarket US to limit its platform to users over the age of 21, and to ensure that "[t]ransactions" are "limited to" those "initiated and received … by an authorized participant located in this state" and certain other States of the Board's choosing.  Mich. Comp. Laws § 432.411(1).  As the *Orgel* court held under similar circumstances, it is impossible for a contract market to "allow impartial access nationwide when those within [Michigan] can only trade with others in the state, who are over 21 years old, and those outside the state cannot trade with those within the state."  2026 WL 474869, at *10.

### D.    The Federally Regulated Event Contracts Here Are Swaps.

The CEA's definition of "swap[s]" comfortably covers event contracts: binary "contract[s]" that pay out depending on the "occurrence [or] nonoccurrence" of a future "event or contingency" that carries "potential financial, economic, or commercial consequence[s]."  7 U.S.C. § 1a(47)(A)(ii).  Consider an event contract that pays out based on whether the Federal Reserve will lower interest rates; the occurrence of that event is of enormous financial consequence to businesses and individuals across the United States.

Sports-event contracts likewise fall within the CEA's definition of swaps.  For example, event contracts based on the winner or score of the NFC Championship are "event[s] or contingen[cies]" with obvious "financial, economic, or commercial consequence[s]."  7 U.S.C.

§ 1a(47)(A)(ii); *cf.* Spencer Decl. Ex. 10 (Athletic Event Contracts) at 3 (certifying event contract where the outcome is "the official result of an athletic association").  Getting to—and then winning—the Super Bowl, for example, causes a surge in the team's valuation, retailers' sales of team merchandise, and the hometown economy.  In 2025, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to piggy-back off the team's success.  Spencer Decl. Ex. 11 (Philadelphia Eagles To Generate 1.2B Article) at 1; Spencer Decl. Ex. 12 (Philadelphia Eagles Valuation Article) at 1.  And retailers regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[7]  *Cf. Orgel*, 2026 WL 474869, at *7 ("[I]f, for example, the Titans won a Super Bowl, that would be a significant occurrence.").

The CFTC has repeatedly and consistently recognized that event contracts—including sports-related event contracts—are swaps.[8]  It determined as much when it required Polymarket to offer its event contracts only on a designated contract market.  *In re Blockratize, Inc.*, 2022 WL

---

[7] *See*, *e.g.*, *Buffalo Wild Wings (@bwwings)*, Instagram (Mar. 6, 2026), https://www.instagram.com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); J.P. Isbell, *Free Fries Frenzy from McDonald's: Michiganders Can Feast Every Time the Detroit Lions Pick Off a Pass*, Michigan News Source (Aug. 9, 2024), https://www.michigannewssource.com/2024/08/free-fries-frenzy-from-mcdonalds-michiganders-can-feast-every-time-the-detroit-lions-pick-off-a-pass/ (last visited Mar. 6, 2026) (offering free fries the day after any Detroit Lions game in which the Lions' defense records an interception); Little Caesars, *Little Caesars Road to the Super Bowl Sweepstakes*, https://mobilestatic.littlecaesars.com/documents/Little%20Caesars%20-%20NFL%20Super%20Bowl%202026%20Sweepstakes.pdf  (last visited Mar. 6, 2026) (conditioning chance to win free Super Bowl ticket on predicting how a customer's favorite team will perform).

[8] *See*, *e.g.*, *Clarke v. CFTC*, 74 F.4th 627, 634 (5th Cir. 2023) (discussing CFTC's 2014 grant to a prediction market of an exemption from the requirement to list its "event contracts" on "a designated contract market"); Appellant CFTC's Brief at 12 & n.11, *KalshiEX, LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583, at *12 (observing that "event contracts are a form of options, typically known as binary options," and that those "binary options fall within the definition of a swap").

73864, at *1–2, 8.  And it reaffirmed just two weeks ago that "event contracts" are a kind of "swap" that are "subject to the CFTC's exclusive jurisdiction" when "traded on CFTC-registered" contract markets.  Spencer Decl. Ex. 2 (9th Cir. CFTC Amicus Br.) at 4, 14.  "Sports event contracts," the CFTC explained, also "fall comfortably" within the statutory definition of "swap."  *Id*. at 19.  "That the instruments at issue here involve swaps on sports events does not change the preemption framework," the CFTC added.  *Id*. at 24.

Defendants say sports-related event contracts are essentially the same thing as wagers on sportsbooks regulated under Michigan law.  *See* Spencer Decl. Ex. 3 (*Nessel v. KalshiEX* Compl.) ¶ 2 ("Kalshi operates a so-called prediction market through which residents of the State of Michigan can engage in unlicensed gambling under the guise of trading event contracts.").  But this is just a thinly veiled effort to relitigate the long-settled rule that a State may not regulate exchange-traded derivatives under its gambling laws.  *See supra* at 20–22.  Regardless, Defendants' position is incorrect, irrelevant to the preemption analysis, and an argument that must be directed in the first instance to the CFTC, not a court.

*First*, Defendants' position is incorrect.  Sports bettors typically place wagers against the "house," meaning that sports bettors and sportsbooks are counterparties to the gambling transaction.  But that is not how event contracts work.  Polymarket US operates as a transparent, centralized exchange connecting third parties who trade with each other; it does not serve as the counterparty for any transaction.  *See Orgel*, 2026 WL 474869, at *5.  Polymarket US makes money by charging a flat fee for each transaction and makes the same amount regardless of outcome.  Unlike a sportsbook, it does not make money when a bettor loses.

*Second*, any overlap between sports gambling and sports-event contracts is irrelevant to the preemption analysis.  The Special Rule expressly anticipates that some "event contracts" will

25

"involve . . . gaming."   7 U.S.C. § 7a-2(c)(5)(C).   But the CEA authorizes the CFTC, not Defendants, to decide whether certain contracts involve gaming and whether to prohibit them based on its view of "the public interest."   *Id*.; *see also Orgel*, 2026 WL 474869, at *3–4 (discussing the CFTC's review of event contracts under the Special Rule).   If an event contract's connection to gaming brought it outside the CFTC's jurisdiction, that part of the Special Rule would serve no purpose.   Gaming or not, because the CFTC has exclusive jurisdiction over Polymarket US's sports-event contracts, the States—Michigan included—have none.

*Third*, Supreme Court precedent requires Michigan to turn to the CFTC before asking a court to interfere with Polymarket US's contract-market trading.   In *Ricci v. Chicago Mercantile Exchange*, the plaintiff sought "injunctive relief" against an exchange, disagreeing with the exchange's understanding of "the Commodity Exchange Act."   447 F.2d 713, 714 (7th Cir. 1971). The Supreme Court, however, held that "the agency should at least be requested to institute proceedings" before the plaintiff could proceed with his suit against the exchange.   409 U.S. 289, 304 (1973).   "[Q]uestions about the scope, meaning, and significance of Exchange membership rules," the Court explained, were "matters that should be dealt with in the first instance by" the CFTC.   *Id*. at 305.   Although "the courts" would "retain[] the final authority to expound the statute," "[a]ffording the opportunity for administrative action" would allow "for a more informed and precise determination by the [c]ourt[s] of the scope and meaning of the statute as applied to (these) particular circumstances."   *Id*. at 305–06 (internal quotation marks omitted).

*Ricci*'s directive—that parties like Michigan turn first to the CFTC—is on even firmer ground today than it was in 1973.   By directing the CFTC to "define the term[] 'swap,'" 15 U.S.C. § 8321(b), the CEA sets out a "prescribed order of decisionmaking":   "[T]he first decider under the Act is the expert administrative agency, the second, federal judges," *Am. Elec. Power Co. v.*

*Connecticut*, 564 U.S. 410, 427 (2011); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (Congress may "authorize[]" an agency "to exercise a degree of discretion" by "'expressly delegat[ing] to an agency the authority to give meaning to a particular statutory term.'").

Defendants' arguments "about the scope, meaning, and significance of" Polymarket US's event contracts are "matters that should be dealt with in the first instance by" the CFTC.  *Ricci*, 409 U.S. at 305.  If Defendants "are dissatisfied with the outcome of" the administrative process, "their recourse under federal law is to seek [judicial] review" of the CFTC's decision.  *Am. Elec. Power*, 564 U.S. at 427.  Defendants may not short-circuit that process by attempting to enjoin CFTC-regulated exchanges in state court.  And while the administrative process is playing out, the CEA is clear that Polymarket US may continue to list contracts it has certified to be in compliance with the Act.  *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(c); *cf. Am. Elec. Power*, 564 U.S. at 427 (rejecting emissions lawsuit by States pending EPA emissions rulemaking because the Clean Air Act "permits emissions until EPA acts").

## II.    Polymarket US Will Be Irreparably Harmed Without Immediate Relief.

Without immediate relief, "the prospect of [a] state suit" makes "irreparable injury" unavoidable.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992).  Polymarket US is put to an impossible choice: "continually violate [Michigan] law and expose [itself] to potentially huge liability"—including potential criminal liability and civil penalties—or "suffer the injury of obeying [state] law during the pendency of the proceedings and any further review."  *Id*. at 381; *see, e.g.*, Mich. Comp. Laws § 750.305(1) (criminalizing the dissemination of "information concerning the making or laying of wagers or bets"); Spencer Decl. Ex. 3 (*Nessel v. KalshiEX* Compl.) ¶ 1 (seeking "fines prescribed by state statutes against Kalshi[]").  Compliance with Michigan's preempted law would be harmful, too, and any associated costs irrecoverable given the State's sovereign immunity from damages liability.  Irreparable harm looms either way.

Even a meritless enforcement action by Michigan would inflict irreparable harm. "[A]ccusations of illegal gambling activity" would "hurt [Polymarket US's] reputation and" would "cause[] a loss of customer goodwill." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025) (internal quotation marks and citation omitted); *see* Clifford Decl. ¶¶ 12–15. As the Sixth Circuit held in another case where the Board sought to enforce a preempted gaming law, "courts can't easily compensate a movant" for these losses; they therefore "suffice[]" to establish irreparable harm. *Churchill Downs*, 162 F.4th at 643; *see ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503–04 (6th Cir. 2022) ("[I]nterference with customer relationships and damage to reputation are precisely the sorts of injuries this circuit has said are difficult to quantify monetarily, and thus constitute irreparable harm."); *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 767 F. Supp. 3d 556, 584 (W.D. Mich. 2025) (finding irreparable harm because loss of "customer goodwill" and "competitive market share" were "incalculable injuries").

Compliance with Michigan's unlawful demands would be just as harmful. Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation. Cutting off Michiganders from its event contracts—contracts that are available to users outside Michigan—would deal a serious blow to Polymarket US's goodwill and reputation within the State. *See* Clifford Decl. ¶ 13; *ACT, Inc.*, 46 F.4th at 503–04; *see also* Clifford Decl. ¶ 13.

Further, the reduced liquidity would deter customers from using the platform. Event contracts' predictive value comes in large part from price discovery and market efficiency. *See* Clifford Decl. ¶ 12. Reduced liquidity would dampen both, undermining the orderly functioning of Polymarket US's nationwide platform and resulting in a product that users could very well consider less desirable. *Id.*; *see ACT, Inc.*, 46 F.4th at 503–04. And given the State's sovereign

immunity, Polymarket US would not be able to recover any of those losses from being "forced to shut down" in Michigan—making those losses irreparable. *Churchill Downs*, 162 F.4th at 643; *see Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("[S]overeign immunity typically makes monetary losses . . . irreparable."); *see also* Clifford Decl. ¶ 11.

## III.    The Balance Of Equities And Public Interest Strongly Favor Preliminary Relief.

"The public interest would best be served by granting the injunction" because "[i]t is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). Instead, "the public's true interest lies in the correct application of the law"—including both "the federal constitution[]" and the state-law prohibition against treating federally regulated contract markets as illegal gambling operations. *Kentucky*, 57 F.4th at 612 (internal quotation marks and citation omitted).

Injunctive relief would not impair Michigan's *legitimate* interests. *Cf. L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 209 (6th Cir. 1985) ("The state has no legitimate interest in enforcing laws which frustrate federal securities regulation."). The CFTC's "exclusive jurisdiction" over derivatives trading on designated contract markets does not limit Michigan's authority to license, tax, and control sportsbooks in this State, nor to pursue civil or criminal enforcement actions against unlawful gambling. What the State cannot do is interfere with the national system of derivatives trading, by treating federally regulated activity as unlawful wagering.

Congress has assigned the *CFTC* the task of "foster[ing] the[] public interests" over that kind of trading. 7 U.S.C. § 5(b); *see id*. § 7a-2(c)(5)(C). And the CFTC has made clear that Defendants' interference does nothing by "undermining" those interests. Spencer Decl. Ex. 2 (9th Cir. CFTC Amicus Br.) at 27. Defendants might view the public interest differently. But it is the *state*, not federal, "policy" that "must give way." *Snider v. Creasy*, 548 F. Supp. 601, 603 (S.D. Ohio 1982), *aff'd*, 728 F.2d 369 (6th Cir. 1984).

## IV.    Preliminary Relief Without A Bond Is Appropriate.

"[T]he Sixth Circuit has long held that the 'district court possesses discretion over whether to require the posting of security'" before granting injunctive relief under Rule 65(c).  *Palmer v. Michigan*, 2022 WL 908966, at *6 (W.D. Mich. Mar. 29, 2022) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).  Where an "injunction would impose no meaningful burden on the" State, *id.*, or the case otherwise implicates a strong public interest, both true here, a bond is unnecessary, *Highland Coop v. City of Lansing*, 492 F. Supp. 1372, 1383 (W.D. Mich. 1980).  Polymarket US respectfully requests the Court grant a preliminary injunction without requiring a bond.[9]

### CONCLUSION

The Court should issue a temporary restraining order and preliminary injunction.

---

[9] In a separate action against Michigan Attorney General Dana Nessel and Michigan Gaming Control Board Executive Director Henry L. Williams, this court declined to require a bond when issuing a preliminary injunction in the plaintiff's favor.  *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, No. 1:25-cv-0047-HYJ-MV, Dkt. Nos. 19, 20 (W.D. Mich. Feb. 19, 2025) (no discussion of bond).

Dated:  March 6, 2026

GIBSON DUNN & CRUTCHER LLP
Orin Snyder*
Matt Benjamin*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com

Thomas H. Dupree, Jr.
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Applications for admission forthcoming

Respectfully submitted,

*/s/ Derek J. Linkous*
BUSH SEYFERTH PLLC
Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
Nicole K. Haelterman (P82922)
100 West Big Beaver, Suite 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com
linkous@bsplaw.com
haelterman@bsplaw.com

*Attorneys for Plaintiff QCX LLC, d/b/a Polymarket US*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of Local Civil Rule 7.2(b), because it contains 9392 words, excluding the portions of the brief exempted from the word count under Local Civil Rule 7.2(b)(i).  The word count was generated using Microsoft Word 2016.

*/s/ Derek J. Linkous*
BUSH SEYFERTH PLLC
