Nos. 25-7187, 25-7516, 25-7831

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D/B/A CRYPTO.COM | DERIVATIVES NORTH AMERICA,
*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,
*Defendants-Appellees,*

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the Judgment of the United States
District Court for the District of Nevada
(Dist. Ct. No. 2:25-cv-00978-APG-BNW)

**BRIEF OF *AMICI CURIAE* OF OHIO, NEW JERSEY, 37 OTHER STATES, AND
THE DISTRICT OF COLUMBIA SUPPORTING APPELLEES**

| | |
|---|---|
| JENNIFER DAVENPORT<br>New Jersey Attorney General | DAVE YOST<br>Ohio Attorney General |
| JEREMY M. FEIGENBAUM<br>New Jersey Solicitor General<br>STEPHEN EHRLICH<br>Deputy Solicitor General<br>25 Market Street, P.O. Box 112<br>Trenton, New Jersey 08625-0112<br>Stephen.Ehrlich@njoag.gov | MATHURA J. SRIDHARAN*<br>Ohio Solicitor General<br> *Counsel of Record<br>ZACHERY P. KELLER<br>Deputy Solicitor General<br>30 East Broad Street, 17th Floor<br>Columbus, Ohio 43215<br>614.466.8980<br>Mathura.Sridharan@OhioAGO.gov |
| *Counsel for Amicus Curiae*<br>  *State of New Jersey* | *Counsel for Amicus Curiae*<br>  *State of Ohio* |

*Additional counsel listed after signature block*

**Exhibit 1**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................ii

STATEMENT OF AMICI INTEREST .......................................................... 1

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 4

SUMMARY OF ARGUMENT ..................................................................... 10

ARGUMENT ................................................................................................. 13

    I.    The CFTC's reading of federal statutes deserves no special weight..................................................................................... 15

    II.    Under the major-questions doctrine, the Court should reject "the CFTC's new claim of expansive authority......................... 19

    III.    The federalism canon forecloses the expansive authority the CFTC now asserts............................................................... 25

    IV.    The CFTC lacks the States' experience in regulating gambling. ..................................................................................... 28

CONCLUSION ............................................................................................. 32

ADDITIONAL COUNSEL ........................................................................... 33

CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................... 35

CERTIFICATE OF SERVICE..................................................................... 37

**Exhibit 1**

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Ah Sin v. Wittman,*
    198 U.S. 500 (1905)...................................................................... 12, 26

*Alaska v. Fed. Subsistence Bd.,*
    544 F.3d 1089 (9th Cir. 2008)............................................................17

*Altria Grp., Inc. v. Good,*
    555 U.S. 70 (2008)...............................................................................17

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015)............................................................................30

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003).............................................................25

*Bond v. United States,*
    572 U.S. 844 (2014)........................................................ 2, 12, 25, 26

*Cantor v. Detroit Edison Co.,*
    428 U.S. 579 (1976)............................................................................31

*Chamber of Commerce v. Whiting,*
    563 U.S. 582 (2011)............................................................................15

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993)..................................................................... 17, 25

*Davidson v. Sprout Foods, Inc.,*
    106 F.4th 842 (9th Cir. 2024) ...........................................................31

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)............................................................................26

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
    527 U.S. 173 (1999)............................................................................25

*Green v. Fund Asset Mgt., L.P.,*
    245 F.3d 214 (3d Cir. 2001) .............................................................31

**Exhibit 1**

*Kansas v. Garcia,*
589 U.S. 191 (2020)................................................................ 10, 15

*King v. Burwell,*
576 U.S. 473 (2015)............................................................ 13, 21, 28

*Learning Res., Inc. v. Trump,*
607 U.S. —, 2026 WL 477534 (2026)........................................ *passim*

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)........................................................... *passim*

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982).................................................................5

*Murphy v. NCAA,*
584 U.S. 453 (2018)............................................................ *passim*

*NFIB v. OSHA,*
595 U.S. 109 (2022)............................................................... 4, 20

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944).................................................................17

*Spectrum Ne., LLC v. Frey,*
22 F.4th 287 (1st Cir. 2022)........................................................31

*Util. Air Regulatory Group v. EPA,*
573 U.S. 302 (2014)................................................................20

*Va. Uranium, Inc. v. Warren,*
587 U.S. 761 (2019)........................................................... 10, 15, 16

*West Virginia v. EPA,*
597 U.S. 697 (2022).......................................................... *passim*

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001).................................................................14

*Wyeth v. Levine,*
555 U.S. 555 (2009).......................................................... *passim*

iii

**Exhibit 1**

**Statutes, Regulations, and Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ............................................................... 15

17 C.F.R. §40.11 ............................................................... 6, 7, 29

76 Fed. Reg. 44776 (July 27, 2011) ............................................... 7

77 Fed. Reg. 48208 (Aug. 13, 2012)........................................... 7, 19

89 Fed. Reg. 48968 (June 10, 2024) .............................................. *passim*

7 U.S.C §1a ............................................................... 6, 14, 22

7 U.S.C. §2 ............................................................... *passim*

7 U.S.C. §7a-2 ............................................................... 6, 29

**Other Authorities**

156 Cong. Rec. S5902 (daily ed. July 15, 2010) ...................................... 6

Am. Gaming Ass'n, *State of the States 2025: The AGA
   Analysis of the Commercial Casino Industry* (May 13,
   2025)............................................................... 5

CFTC Letter No. 25-36, Advisories (Sept. 20, 2025) .............................. 9

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For
   Monday Night Football Games*, Event Horizon (Sept. 30,
   2025)............................................................... 8

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On
   Things*, Event Horizon (April 3, 2025) ........................................... 8, 30

Kalshi Website, Sports........................................................ 8

Laya Neelaatkandan, *Kalshi says Super Bowl trading
   volume surpassed $1 billion*, CNBC (Feb. 10, 2026)......................... 21

Lev Akabas, *Kalshi's Volume Has Been 90% Sports During
   Football Season*, Sportico (Oct. 3, 2025).............................. 8

Exhibit 1

Michael S. Selig, *States Encroach on Prediction Markets*,
    Wall Street Journal (Feb 16, 2026) ................................................ 9, 19

Pub. L. 93-463, §201(b), 88 Stat. 1389 (1974) ............................................ 5

State-Amicus Br., *KalshiEX LLC v. Assad, et al.*, No. 25-
    7516 (9th Cir.) ............................................................................ *passim*

**Exhibit 1**

## STATEMENT OF AMICI INTEREST

*Amici* consist of New Jersey, Ohio, 37 other States, and the District of Columbia ("the *amici* States").  They are interested in this case because it concerns an overbroad preemption theory that threatens the States' longstanding ability to protect their citizens.  The *amici* States also re-spond to a recent brief from the Commodity Futures Trading Commission ("CFTC").  In that brief, the CFTC wrongly argues that federal law dis-places the States' ability to regulate sports betting.  The *amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION

This brief is best read as a sequel.  The original was filed in a related case, involving Nevada's dispute with Kalshi.  *See* State-Amicus Br., *KalshiEX LLC v. Assad, et al.*, No. 25-7516 (9th Cir.), DktEntry 48.1 ("State-Amicus Br.").  There, thirty-nine States—along with the District of Columbia—explained why they may regulate online sports betting, re-gardless of whether prediction markets package such betting as so-called "events contracts."  The States relatedly explained why preemption the-ories to the contrary are far-fetched.

In a nutshell, here is the States' position.  Prediction-market litigants in this case and others argue that somewhere buried within subsections

1

Exhibit 1

of subsections of complex derivatives-related statutes, Congress snuck in its intent to drastically reshape this country's gambling laws. But when Congress makes major changes to this nation's power structure, it speaks clearly. *Bond v. United States*, 572 U.S. 844, 857–59 (2014); *see also Learning Res., Inc. v. Trump*, 607 U.S. —, 2026 WL 477534, at *7–*9 (2026) (Roberts, C.J., op.). Thus, if Congress truly meant to preempt the States' traditional authority over sports betting, it would not be a secret. That matters here because nothing in the text of the relevant statutes displaces (much less clearly displaces) the States' traditional authority over sports betting. In fact, even with all those statutes in place, the Supreme Court recently declared that States are "free to act" as they wish on the "controversial subject" of "sports gambling." *Murphy v. NCAA*, 584 U.S. 453, 486 (2018).

The *amici* States, however, do not offer this brief to repeat themselves. They instead address a new development: the CFTC's recent decision to pick a side. That decision was a sharp pivot. Prediction markets began offering online sports betting in January 2025. For roughly a year there-after, the CFTC was careful not to endorse this behavior. Indeed, just a few months ago, the CFTC warned prediction markets that they should

2

**Exhibit 1**

prepare for the prospect that state law bars such conduct. Yet in recent weeks, under new leadership, the CFTC now suggests that things have been "plain" all along. *See* CFTC Br.15. It argues that federal law dis-places the States' power over sports betting. *See* CFTC Br.15, 22–24.

The CFTC's preemption theory misreads federal statutes. The theory stems from a 2010 amendment to the Commodity Exchange Act that Con-gress made in response to the 2008 financial crisis. Congress gave the CFTC jurisdiction over "swaps," a derivative sometimes associated with the financial crisis. *See* 7 U.S.C. §2(a)(1)(A). But Congress made no men-tion of sports betting (at the time, such betting was still illegal in most of the country). The CFTC nonetheless argues, echoing litigants like Crypto and Kalshi, that sports bets qualify as "swaps" within its exclu-sive authority. CFTC Br.14–20. That endorsement does not make the argument any more likely. The argument still rests on a dubious foun-dation: that Congress, in response to the financial crisis, quietly removed the States' traditional power over sports gambling without anyone notic-ing for years—including the Supreme Court in *Murphy*. *See* State-Ami-cus Br.1–2.

**Exhibit 1**

The CFTC's implausible theory—which trumpets the CFTC's *own* authority—warrants skepticism rather than deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). After all, courts are wary of federal agencies using established statutory law to claim new and exceptional authority over significant topics. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (*per curiam*). The CFTC's new claim of authority is exactly that: in effect, the Commission asks to be declared this country's sole regulator of sports betting. *See* CFTC Br.4, 13, 23. In our system of divided sovereignty, that type of power grab requires "clear congressional authorization." *West Virginia*, 597 U.S. at 723 (quotation omitted). None exists here.

## BACKGROUND

**I.** Our country's division of power has long distinguished between gambling and financial derivatives. Through their police powers, the States have traditionally regulated gambling, including gambling on sports. *See* State-Amicus Br.3–7 (discussing that tradition, including the experiences of Ohio and New Jersey). For much of this country's history, the States simply outlawed sports betting. *See Murphy*, 584 U.S. at 458–62. But in *Murphy*, the Supreme Court made clear that the States are

4

**Exhibit 1**

"free to act" as they choose on the subject. *Id.* at 486. Since then, the States have made different choices. Today, some States continue to bar sports betting, while other States allow sports betting but heavily regu-late the activity. *See* Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, at 12–13 (May 13, 2025), perma.cc/J27S-WLSB.

For about a century, the States' regulation of gambling has co-existed with federal regulation of derivatives markets. The federal government began regulating futures markets in 1921. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 (1982). Then, in 1936, Con-gress expanded federal regulation through the Commodity Exchange Act. *Id.* at 362. And, in 1974, Congress created the CFTC and gave it "exclu-sive jurisdiction" over certain enumerated derivatives. Pub. L. 93-463, §201(b), 88 Stat. 1389 (1974) (amending 7 U.S.C. §2(a)).

In response to the 2008 financial crisis, Congress increased federal oversight of derivatives markets. Specifically, in 2010, Congress ex-panded the CFTC's "exclusive jurisdiction" to cover "swaps"—a form of derivative that contributed to the crisis. *See* 7 U.S.C. §2(a)(1)(A); State-Amicus Br.9–10. As part of this financial reform, Congress offered a

5

**Exhibit 1**

complex, six-part definition outlining which agreements, contracts, or transactions qualify as "swap[s]." *See* 7 U.S.C §1a(47)(A). And, in a corresponding move, Congress made it generally "unlawful" for people to enter into swaps outside of a CFTC-regulated contract market. 7 U.S.C. §2(e); *see also* CFTC Br.4.

At the same time, Congress added statutory language empowering the CFTC to prohibit certain contracts if they "involve," among other topics, "gaming." 7 U.S.C. §7a-2(c)(5)(C)(i). In discussing this change, lawmakers noted their desire to prevent "gambling through *supposed* 'event contracts,'" including "gaming contract[s]," which are "used predominantly by speculators or participants not having a commercial or hedging interest." *See* 156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010) (emphasis added) (statements of Sen. Blanche Lincoln and Sen. Dianne Feinstein).

**II.** Since receiving authority over swaps in 2010, the CFTC has taken a constrained view of what fits within that category. For example, shortly after its jurisdiction increased, the CFTC promulgated a rule prohibiting designated contract markets from listing any contract "that involves, relates to, or references … gaming." 17 C.F.R. §40.11(a). This prohibition,

6

**Exhibit 1**

the CFTC explained, matched "Congress's intent to prevent gambling through the futures markets." 76 Fed. Reg. 44776, 44786 (July 27, 2011). The prohibition remains on the books today. *See* 17 C.F.R. §40.11(a).

The CFTC exercised similar caution in later rulemakings. In 2012, as part of a rule jointly promulgated with the SEC, the CFTC refused to read the term "swaps" in a way that would disrupt "customary business arrangements" that "historically have not been considered to involve swaps." 77 Fed. Reg. 48208, 48247 (Aug. 13, 2012). Swaps, the CFTC explained, "involve risk-shifting arrangements with financial entities." *Id.* at 48248. As a result, the CFTC did not read the term "swaps" to capture transactions or arrangements involving "personal or family ac-tivities" that ordinary "consumers" regularly engage in. *Id.* at 48247.

Just two years ago, the CFTC issued a proposed rule that directly con-fronted the relationship between state-gambling regulation and federal-derivatives regulation. The CFTC acknowledged that "gambling is over-seen by state regulators with particular expertise" and that federal-de-rivatives law is "not aimed at protecting against gambling-specific risks and concerns." 89 Fed. Reg. 48968, 48982–83 (June 10, 2024). The CFTC further disclaimed having the "statutory

7

**Exhibit 1**

experience" necessary to exercise jurisdiction over the "rapidly evolving field" of gambling. *Id.* at 48983.

**III.** The dispute here concerns sports betting on designated contract markets. (For ease of reading, this brief calls the relevant platforms "prediction markets.") These markets began offering sports-related events contracts at the beginning of last year. And they actively advertised such contracts as sports betting. Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025), perma.cc/CWK2-TZCV. This form of sports betting has quickly taken hold with the public. *See, e.g.*, Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM. Prediction markets, in turn, have quickly expanded the types of sports bets they offer. Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R. Today, people can make all types of sports bets on these platforms—ranging from who will win a game, to whether a team will cover a point spread, to more obscure wagers about how a given athlete will perform. *See, e.g.*, Kalshi Website, Sports, https://kalshi.com/sports/all-sports (last accessed March 2, 2026).

**Exhibit 1**

Until recent weeks, the CFTC was careful not to endorse this activity. Most notably, in September, the CFTC issued a staff advisory directed at platforms offering sports-related events contracts. CFTC Letter No. 25-36, Advisories (Sept. 20, 2025), https://www.cftc.gov/ PressRoom/PressRe-leases/9137-25. The advisory warned that the CFTC had never "taken any official action to approve" the listing of such contracts. *Id.* at 2 n.4. The advisory further explained that the CFTC "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under" the Commodity Exchange Act. *Id.* Those offering sports-related events contracts, the advisory thus cau-tioned, must be prepared for the possibility that state law will "result in the termination" of such contracts. *Id.* at 2.

The CFTC has since changed its tune. At the end of last year, the Commission swore in a new Chairman. Fresh on the job, and without public input or comment, the Chairman soon broadcast his view that all events contracts—including those about sports—are "swaps" within the CFTC's exclusive power. *See, e.g.*, Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street Journal (Feb 16, 2026),

9

**Exhibit 1**

https://web.archive.org/web/20260218182304/https://www.cftc.gov/Press Room/SpeechesTestimony/seligstatement021726.

A few days later, the CFTC filed an amicus brief here embracing this new position. The CFTC now argues that its exclusive jurisdiction over swaps is broad enough to cover contracts involving any uncertain outcome that can be loosely tied to potential economic consequences. CFTC Br.15, 19. Taking that "broad" reading, the argument goes, bets on the "final score" of games (or other comparable wagers) qualify as swaps. CFTC Br.15. In the CFTC's view, moreover, the States have no "concurrent jurisdiction" over this activity. *See* CFTC Br.13.

## SUMMARY OF ARGUMENT

The *amici* States offer four points in response to the CFTC.

**I.** The CFTC's preemption theory deserves no special weight. Preemption analysis generally turns on statutory interpretation. *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020); *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., op.). This case is no exception. Here, preemption depends on whether federal statutes about derivatives contain a clear statement removing the States' traditional authority over sports betting. The CFTC has "no special competence" to answer that

10

**Exhibit 1**

question about "the scope of" its own jurisdiction.  *See Loper Bright*, 603 U.S. at 400–01.  Rather, because the CFTC's fresh reading of federal stat-utes exalts its own authority, this case presents a scenario where "abdi-cation in favor of the agency is *least* appropriate."  *See id.* at 401.

Accounting for the surrounding circumstances, the CFTC's new posi-tion also does not carry any "particular power to persuade."  *See id.* at 402 (quotation omitted).  The position was prepared for purposes of liti-gation, without input from the public or the States.  The position is in-consistent with the CFTC's past guidance, including guidance offered much closer in time to the enactment of the relevant statutory text.  And the position does not arise from any special expertise in the area of sports betting.  Considering these features, the CFTC's position is "inherently suspect."  *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009).

**II.**  The CFTC's new claim of expansive power also confirms that this case implicates the major-questions doctrine.  Under the doctrine, broad and novel claims of federal-agency authority over significant topics must flow from "clear congressional authorization."  *West Virginia v. EPA*, 597 U.S. at 723 (quotation omitted).  The doctrine thus captures scenarios where an agency "claim[s] to discover in a long-extant statute an

**Exhibit 1**

unheralded power representing a transformative expansion in its regu-latory authority." *Id.* at 724 (alterations accepted, quotation omitted).

This case fits that description. The CFTC claims to have discovered within statutory provisions about financial derivatives—all of which have been in place for fifteen years or longer—"an unheralded power" to regulate sports betting for the entire country. *See id.* (quotation omitted). Such an assertion of federal power requires "clear congressional author-ization." *See id.* (quotation omitted). And the CFTC identifies none.

**III.** The CFTC's sudden claim of exclusive authority over sports bet-ting also contravenes the federalism canon. As that canon teaches, courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond*, 572 U.S. at 857–59. And the regulation of gambling falls within the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). The States have there-fore long regulated gambling, including sports betting. The Court should not upset this traditional balance absent a clear congressional directive. The CFTC's position, however, would do just that.

**IV.** The CFTC's lack of expertise as to sports betting makes preemp-

**Exhibit 1**

Supreme Court has said, to delegate broad power to a federal agency that "has no expertise" crafting "policy" on a given topic. *King v. Burwell*, 576 U.S. 473, 486 (2015). Here, the CFTC has no expertise in regulating sports betting. The States, on the other hand, have considerable exper-tise on the subject. Given that discrepancy, the CFTC's reading of statu-tory text is "especially unlikely." *See id.*

## ARGUMENT

The CFTC repeats the tale that prediction markets like Crypto and Kalshi have been telling over the last year. The Commission argues that its exclusive jurisdiction over "swaps" is so broad as to preempt the States' traditional authority over sports betting. *See* CFTC Br.22–24. By that account, Congress quietly removed the States' traditional authority fifteen years ago—when it responded to the 2008 financial crisis—by add-ing the word "swaps" to a pre-existing statutory scheme aimed at finan-cial instruments and markets. That makes no sense. Fifteen years ago, sports betting was mostly illegal. *See Murphy*, 584 U.S. at 458. Congress had tried to keep it that way. *Id.* at 461. And nobody thought that sports betting caused the mortgage crisis. Thus, applying even an ounce of com-mon sense, the preemption tale is fanciful.

**Exhibit 1**

Legally speaking, the CFTC's interpretation of federal statutes fares no better. When Congress intends major changes to the existing state of the law, it speaks clearly, not obscurely. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That matters here because the CFTC's expansive preemption theory would be a seismic change to this country's gambling laws. Consequently, the CFTC's position does not work unless Congress made a clear statement of such broad preemptive intent.

No such statement exists. As Nevada aptly explains, the text of the Commodity Exchange Act does not signal an intent to displace the States' traditional authority over sports betting. And it certainly does not do so clearly. Among other things, betting on the score of a game, or the performance of an athlete, does not fit within the statutory definition of "swaps." *See* 7 U.S.C. §§1a(47)(A), 2(a)(1)(A); Nevada Br.20–32. That financial-instrument descriptor simply "cannot bear" the weight that prediction markets place on it. *See Learning Res., Inc.*, 2026 WL 477534, at *6 (majority op.). In arguing otherwise, the CFTC resorts to a stilted, contextless reading of the statutory text.

To add to the discussion, the *amici* States emphasize four points. *First*, the CFTC's interpretation of federal statutes should receive no

14

**Exhibit 1**

deference or special weight.  *Second*, the CFTC's new claim of expansive federal power solidifies that the major-questions doctrine applies to this case.  *Third*, the CFTC's reading of statutory law violates the federalism canon, under which courts expect Congress to speak clearly when it in-tends to significantly shift this country's traditional balance of power.  *Fourth*, considering practical expertise, it is especially unlikely that Con-gress would have replaced the States (which have considerable experi-ence regulating gambling) with the CFTC (which has no experience).

**I.    The CFTC's reading of federal statutes deserves no special weight.**

**A.**  Under the Supremacy Clause, Congress may preempt state law when it acts within the boundaries of its enumerated powers.  *See* U.S. Const. art. VI, cl. 2.  But preemption is not a "freewheeling judicial in-quiry" by which courts guess at unstated "federal objectives."  *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quotations omitted).  Instead, "all preemption arguments," no matter the form they take, "must be grounded" in the text of federal law—usually the text of a "stat-ute."  *Kansas*, 589 U.S. at 208 (quotation omitted).  As a result, preemp-tion analysis almost always turns on statutory interpretation.  *Va. Ura-nium, Inc.*, 587 U.S. at 767 (Gorsuch, J., op.).  And courts apply standard

15

**Exhibit 1**

rules of statutory interpretation when deciding federal law's "preemptive effect." *Id.*

The Supreme Court recently clarified one relevant rule of statutory interpretation. Specifically, in *Loper Bright*, the Court overruled the doc-trine of *Chevron* deference, under which the judiciary sometimes deferred to federal agencies' interpretation of federal statutes. 603 U.S. at 377–80, 412–13. It is the role of judges, *Loper Bright* explained, "to determine the best reading of" federal statutes. *Id.* at 400. This remains true in cases presenting "technical statutory questions." *Id.* at 402. Federal agencies, the decision went on, have "no special competence" when it comes to interpreting "the scope of" their "own power." *Id.* at 400–01. If anything, "abdication in favor of [an] agency is *least* appropriate" in such scenarios. *Id.* at 401. The Supreme Court thus held that judges "must exercise their independent judgment in deciding whether" a matter fits within an agency's "statutory authority." *Id.* at 412.

For preemption purposes, *Loper Bright* built on top of an existing foun-dation. Even during the *Chevron* era, the Supreme Court stressed that "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Wyeth*, 555 U.S. at 577. Courts, therefore, were

16

**Exhibit 1**

not permitted to "defer[] to an agency's *conclusion* that state law is pre-empted." *Id.* at 576. Separate caselaw also taught that Courts should be "reluctant to find" preemption in areas "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *accord Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

Of course, even after *Loper Bright*, there may be times when an agency's opinion about statutory meaning carries "particular 'power to persuade.'" 603 U.S. at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). But such power depends on the circumstances. The persuasiveness of an agency's opinion involves various factors including "the thoroughness evident in its consideration, the validity of its reason-ing, [and] its consistency with earlier and later pronouncements." *Id.* at 388 (quotation omitted). Agency interpretations "issued contemporane-ously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* at 394. By contrast, agency positions "developed during the course" of litigation are naturally more questionable. *See Alaska v. Fed. Subsist-ence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008). Along similar lines, when an agency opines on preemption "without offering States or other

17

**Exhibit 1**

interested parties notice or opportunity for comment," the agency's opin-ion is "inherently suspect." *Wyeth*, 555 U.S. at 577.

**B.**  Applying this framework, the CFTC's new position deserves no special weight.  The preemption analysis in this case turns on interpret-ing federal statutes, including the statutory provision giving the CFTC "exclusive jurisdiction" over certain listed derivatives.  *See* 7 U.S.C. §2(a)(1)(A).  The CFTC has "no special competence" to perform this stat-utory analysis about the "scope of" its "own power."  *See Loper Bright*, 603 U.S. at 400–01.  Rather, because the CFTC reads federal statutes in a manner that aggrandizes its own power, this is an "occasion on which abdication in favor of the agency is *least* appropriate."  *See id.* at 401.

Delving further, the CFTC's opinion bears many features that cut against its power to persuade.  For one, the CFTC's thoughts on preemp-tion were formed "without offering States or other interested parties no-tice or opportunity for comment."  *Wyeth*, 555 U.S. at 577.  For another, the CFTC's present view of "swaps" is *inconsistent* with the CFTC's ear-lier views, which the Commission offered much closer in time to the rel-evant statutory amendments.  *See above* 6–8.  Indeed, just two years after gaining jurisdiction over "swaps," the CFTC refused to read the term so

18

**Exhibit 1**

broadly as to capture ordinary consumer transactions—concerning "personal" activities—that did not "involve risk-shifting arrangements" and "historically have not been considered to involve swaps." 77 Fed. Reg. at 48247–48. The CFTC also formed its present position for the purposes of litigation. *See* Selig, *States Encroach on Prediction Markets*, Wall Street Journal (indicating that the CFTC's brief responds to "legal attacks on the CFTC's authority"). Finally, as discussed more below (at 28–29), the CFTC has no special expertise as to sports betting.

Combining all this, the conclusion is easy. The CFTC's opinion on preemption is "inherently suspect" and should be treated with the same caution as any argument from a self-interested party. *See Wyeth*, 555 U.S. at 577. Perhaps recognizing as much, the CFTC does not even try to argue that its position deserves special respect.

## II. Under the major-questions doctrine, the Court should reject the CFTC's new claim of expansive authority.

A. Even setting aside power-to-persuade considerations, the CFTC's position violates the major-questions doctrine. The doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power. *West Virginia*, 597 U.S. at 722–23

19

**Exhibit 1**

(alteration accepted, quotation omitted); *see also Learning Res., Inc.*, 2026 WL 477534, at *7 (Roberts, C.J., op.) (discussing the need for con-text, common sense, and skepticism when the federal government claims "broad, expansive power on an uncertain statutory basis"). "Extraordi-nary grants of regulatory authority," the Supreme Court has said, "are rarely accomplished through modest words, vague terms, or subtle de-vices." *West Virginia*, 597 U.S. at 723 (alteration accepted, quotation omitted).

The major-questions doctrine thus requires a clear statement when-ever a federal agency claims broad and novel authority over matters of great economic and political significance. *See id.* at 721, 724. Courts should therefore tread cautiously when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transform-ative expansion in its regulatory authority.'" *Id.* at 724 (alterations ac-cepted, quoting *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). Said differently, a "lack of historical precedent," "coupled with" a broad claim of federal authority, makes for "a telling indication" of fed-eral overreach. *Learning Res., Inc.*, 2026 WL 477534, at *9 (Roberts, C.J., op.) (quoting *NFIB v. OSHA*, 595 U.S. at 119).

20

**Exhibit 1**

As the States' earlier briefing explained, this case implicates the major-questions doctrine. State-Amicus Br.21–25. Sports betting is a politically and historically significant topic. The practice has been illegal for much of this country's history, and it remains illegal in many States. Am. Gaming Ass'n, *State of the States 2025*, at 12–13. Sports betting is also economically significant. The pastime has rapidly ballooned into a multi-billion-dollar industry, involving millions of Americans. State-Amicus Br.22–23; *see also King*, 576 U.S. at 486. As just one illustration of this, Kalshi recently reported over a billion dollars in trading on Super Bowl Sunday alone. Laya Neelaatkandan, *Kalshi says Super Bowl trading volume surpassed $1 billion*, CNBC (Feb. 10, 2026), https://perma.cc/PS9A-2K76. Sports gambling is thus clearly a matter of "economic and political significance." *See Learning Res., Inc.*, 2026 WL 477534, at *9 (Roberts, C.J., op.) (quoting *West Virginia*, 597 U.S., at 721).

The CFTC's new position further cements the major-questions doctrine's application. The CFTC has had jurisdiction over swaps for more than fifteen years. And it has had jurisdiction over other derivatives for half a century. But before the last few weeks, the CFTC had never

21

**Exhibit 1**

claimed that its jurisdiction was broad enough to override the States' authority over sports betting. In fact, just two years ago, the CFTC recognized that "gambling is overseen by state regulators" and that there is no "statutory mandate" to the contrary. 89 Fed. Reg. at 48982–83. Departing from its past restraint, the Commission now claims to have discovered, within fifteen-year-old statutory text, "an unheralded power" that would drastically expand its authority. *See West Virginia*, 597 U.S. at 724 (quotation omitted). That claim warrants skepticism.

In practical effect, the breadth of the CFTC's position is immense. If Crypto's and Kalshi's sports bets qualify as swaps within the CFTC's exclusive jurisdiction, then traditional sports bets cannot be treated in any other fashion. Under the federal definition, a swap is any type of "agreement, contract, or transaction" that satisfies certain conditions. 7 U.S.C. §1a(47)(A). If an agreement satisfies those conditions, the federal scheme makes it generally "*unlawful* for any person" to enter into such an agreement except via a CFTC-regulated contract market. 7 U.S.C. §2(e) (emphasis added). Thus, when unpacked, the CFTC's real argument is that all sports betting *must* occur on CFTC-regulated markets. The CFTC seems to realize these implications. *See* CFTC Br.4, 13, 23. Its brief

22

**Exhibit 1**

declares that "Congress did not carve out a role for" the States in this area. *Id.* at 13. Thus, in the CFTC's view, the States possess no "concur-rent jurisdiction." *Id.* These words leave no mystery: the CFTC seeks to be crowned this country's "sole lawful regulator" of sports betting. *See* CFTC Br.23 n.14 (quotation omitted). Candidly, "Congress would not have delegated" such "'highly consequential power' through ambiguous language." *See Learning Res., Inc.*, 2026 WL 477534, at *7 (Roberts, C.J., op.) (quoting *West Virginia*, 597 U.S. at 723–24).

Because this case implicates the major-questions doctrine, the CFTC's position works *only if* federal statutes contain a clear statement bestow-ing such grand authority. *See West Virginia*, 597 U.S. at 724. The CFTC identifies no such clear statement. Instead, like the litigants it supports, the CFTC relies upon a roundabout preemption theory under which Con-gress—fifteen years ago, when sports betting was mostly illegal—suppos-edly made a subtle-but-drastic change to gambling laws by inserting the word "swaps" into a pre-existing regulatory scheme aimed at financial regulation. If that sounds wrong, it is because it is.

**B.** The CFTC's contrary arguments fall flat. The CFTC no doubt ap-preciates that sports betting is a politically and economically

23

Exhibit 1

topic. *See* CFTC Br.28–29. Even so, the CFTC suggests that any back-drop "presumption" against its position fades away because the federal provision giving it exclusive jurisdiction signals some preemptive intent. *See id.* at 27 (citing 7 U.S.C. §2(a)(1)(A)). That argument dodges the key question. The key question here is not whether federal statutes about derivatives *sometimes* have preemptive effect in *some* situations. The key question is instead whether those statutes clearly displace the States' traditional authority over sports betting. And the answer to *that* ques-tion is a resounding "no."

To sharpen the point, return to the major-questions doctrine. The doc-trine, by its very nature, involves scenarios where Congress has chosen to give an agency *some* power. The doctrine, therefore, does not focus on the mere existence of agency power. The doctrine instead focuses, more specifically, on whether Congress has clearly authorized the *breadth* of power an agency is claiming. It follows here that the CFTC cannot simply rely on the fact that its exclusive jurisdiction results in some preemption. The CFTC must instead identify a clear statement supporting the broad "power *it claims*." *See West Virginia*, 597 U.S. at 723 (emphasis added). On that front, the CFTC has nothing persuasive to offer.

24

**Exhibit 1**

### III. The federalism canon forecloses the expansive authority the CFTC now asserts.

**A.**  The CFTC's position also runs afoul of the federalism canon.  As the States' earlier briefing explained, State-Amicus Br.17–21, the canon requires courts "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers."  *Bond*, 572 U.S. at 858 (quotation omitted).  Courts should thus be especially "reluctant to find" preemption in an area "traditionally governed by state law."  *CSX Transp., Inc.*, 507 U.S. at 664.

Gambling is exactly such a field.  The States have long exercised their police powers to regulate gambling.  Or, in this Court's words, "the regulation of gambling lies at the heart of the state's police power."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (quotation omitted).  Federal law has thus historically "defer[red] to, and even promote[d], differing gambling policies in different States."  *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).  The States may, as a result, act to promote the "welfare, safety, and morals" of their citizens in this field.  *Artichoke Joe's*, 353 F.3d at 737 (quotation omitted).

25

**Exhibit 1**

Applying the federalism canon, the CFTC's position should fail unless Congress made a "clear statement" signaling that it intended "a signifi-cant change in the sensitive relation between" the federal and state gov-ernments as to gambling. *See Bond*, 572 U.S. at 858–59 (quotation omit-ted); *accord Ah Sin*, 198 U.S. at 505–06. As explained above (at 14, 23), the CFTC identifies no clear statement—it offers only an attenuated the-ory, under which Congress hid broad preemptive intent in obscure sub-sections of complex statutory text.

Tellingly, the CFTC's position looks much like proposed readings that have failed in the past. For instance, in 2000, the Supreme Court rejected the FDA's attempt to claim authority over tobacco based on the word "drug" within the Food, Drug, and Cosmetic Act. *FDA v. Brown & Wil-liamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). This Court should sim-ilarly reject the CFTC's invitation to read the word "swaps" in an improb-ably broad way that would usurp the States' traditional authority.

The CFTC's position becomes even more improbable given the Su-preme Court's decision in *Murphy*. The Supreme Court decided *Murphy* years after the CFTC had already received jurisdiction over swaps. And the Court proclaimed in *Murphy* that the States are "free to act" as they

26

**Exhibit 1**

wish on the "controversial subject" of "sports gambling." 584 U.S. at 486. That would make no sense if, as the CFTC posits, sports bets have really been swaps under its exclusive authority all along.

**B.** The CFTC cannot dodge the federalism canon by staying at a high level of abstraction. It says that its position works (and no presumption against preemption applies) because Congress gave it exclusive jurisdic-tion provision "to provide national uniformity for derivatives trading" on "derivatives markets." CFTC Br.27. This argument "misunderstands" the specific focus of the federalism canon. *See Wyeth*, 555 U.S. at 565 n.3. Because courts do not expect Congress to "cavalierly" remove traditional state authority, the canon focuses on "the historic presence of state law," not "the absence of federal regulation." *See id.* (quotation omitted). That Congress granted the CFTC exclusive jurisdiction over *derivatives mar-kets* is nowhere close to the "clear and manifest" statement required to supersede "the historic police powers of the States" to regulate *gambling*, including sports gambling. *See id.* at 565. The Court should thus reject the CFTC's new claim of unbridled authority.

27

**Exhibit 1**

## IV. The CFTC lacks the States' experience in regulating gambling.

**A.** As a corollary to the above clear-statement rules, Congress is "especially unlikely" to delegate broad power to a federal agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. That makes preemption especially unlikely here, given the stark difference in experience between the States and the CFTC.

Begin with the States. As the CFTC itself has previously conceded, the States have "particular expertise" addressing the "risks and concerns associated with gambling," including sports betting. 89 Fed. Reg. at 48982–83. The States confront these risks in many ways. To name a few, they (1) impose front-end screening to ensure that those facilitating gambling are suitable for the task, (2) set age limits to protect those most vulnerable to gambling addiction, (3) limit who may place bets to protect the integrity of sporting events, and (4) facilitate voluntary exclusion lists to assist problem gamblers. *See* State-Amicus Br.25–27, 32–33 (discussing the approaches of New Jersey and Ohio).

The CFTC has no history of offering similar protections. By its own admission, the CFTC lacks "specialized experience appropriate to oversee" gambling. 89 Fed. Reg. at 48983. Its regulations "are focused on

28

**Exhibit 1**

regulating financial instruments and markets, and do not include provi-sions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." *Id.* Con-sistent with the CFTC's inexperience as to gambling, Congress allowed the CFTC to prohibit contracts involving "gaming" from being listed on CFTC-regulated markets. 7 U.S.C. §7a-2(c)(5)(C). To that end, the CFTC promulgated a regulation making clear "[a] registered entity shall not list for trading" a "swap based upon an excluded commodity" that "involves, relates to, or references," among other things, "gaming." 17 C.F.R. §40.11(a)(1). Both the statutory provision and corresponding regulation are curiously absent from the CFTC's brief.

Another feature of the federal scheme exacerbates the problem. Federal law allows prediction markets to self-certify the contracts they list, with no pre-approval from the CFTC. *See* 7 U.S.C. §7a-2(c)(1). That hands-off approach, combined with an inexperienced regulator, is a sure formula for irresponsible sports betting. It is improbable, to say the least, that Congress would have left such a gap.

**B.** The CFTC does not seriously engage with the topic of regulatory experience. Nor does it discuss, in any real detail, what it is doing (or

29

**Exhibit 1**

plans to do) to confront gambling problems stemming from sports betting on prediction markets. Rather than confronting these issues, the CFTC hides behind the notion that this is all some brand new "financial inno-vation." *See* CFTC Br.17. That asks the Court to ignore reality. Risking money on the "final score of a sporting event," CFTC Br.15, is sports bet-ting, no matter how it is dressed up. *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon. The States have experience regulating such activity; the CFTC has none.

One final argument warrants a response. The CFTC's briefing prom-ises a parade of horribles if the States retain their traditional power. *See* CFTC Br.28–29. But the CFTC's vague consequentialism shows surpris-ingly little regard for this country's first principles. The CFTC decries the fact that prediction markets offering sports betting are being subject to "a patchwork of state laws and regulations." CFTC Br.7. That is a strange complaint since, in our federalist system, the possibility that States will make different choices is a feature, not a bug.

Under this country's constitutional structure, the States are *supposed* to act "as laboratories" of democracy, "devising solutions" to new and dif-ficult problems. *Ariz. State Legis. v. Ariz. Indep.*

30

**Exhibit 1**

576 U.S. 787, 817 (2015) (quotation omitted). And companies must com-monly account for both state and federal law, including in scenarios in-volving antitrust laws, securities laws, drug-labeling laws, and con-sumer-protection laws. *See, e.g.*, *Wyeth*, 555 U.S. at 581 (drug labeling); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596 (1976) (antitrust); *Da-vidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024) (food la-beling); *Green v. Fund Asset Mgt., L.P.*, 245 F.3d 214, 227 (3d Cir. 2001) (securities); *Spectrum Ne., LLC v. Frey*, 22 F.4th 287, 301 (1st Cir. 2022) (consumer protection). A key takeaway of the federalism canon—espe-cially coupled with the major-questions doctrine—is that *the States* are expected to be the primary regulators of health and safety. So the con-stitutional default is that companies like Crypto and Kalshi will have to navigate both state and federal law.

Allowing the States freedom to make their own choices is a particu-larly good thing here since "Americans have never been of one mind about gambling." *Murphy*, 584 U.S. at 458. The States are therefore "free to act" in this area until Congress clearly removes their historic authority. *Id.* at 486. Congress has not done so, and the CFTC has no special license to declare otherwise.

31

**Exhibit 1**

# CONCLUSION

The Court should affirm.

JENNIFER DAVENPORT
New Jersey Attorney General

JEREMY M. FEIGENBAUM
New Jersey Solicitor General
STEPHEN EHRLICH
Deputy Solicitor General
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Stephen.Ehrlich@njoag.gov

*Counsel for Amicus Curiae
  State of New Jersey*

DAVE YOST
Ohio Attorney General

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
  *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae
  State of Ohio*

32

**Exhibit 1**

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

STEPHEN J. COX
Alaska Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

RAÚL TORREZ
New Mexico Attorney General

33

**Exhibit 1**

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

JAY JONES
Virginia Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

KEITH G. KAUTZ
Wyoming Attorney General

34

**Exhibit 1**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** 25-7187 _____

I am the attorney or self-represented party.

**This brief contains  6,140      words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

35

**Exhibit 1**

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/ Mathura J. Sridharan_____    **Date** March 10, 2026

**Exhibit 1**

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, the foregoing was filed elec-tronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_/s/  Mathura J. Sridharan_

Mathura J. Sridharan
Ohio Solicitor General

37

**Exhibit 1**