## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| QCX, LLC d/b/a/ Polymarket US | Civil Action No.: 1:26-cv-00710-PLM-PJG |
| *Plaintiff,* | |
| v. | |
| DANA NESSEL, et al. | |
| *Defendants.* | April 28, 2026 |

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, NATIONAL TRIBAL GAMING COMMISSIONERS & REGULATORS, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 31 FEDERALLY RECOGNIZED INDIAN TRIBES AS AMICI CURIAE IN SUPPORT OF DEFENDANTS**

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Arizona Indian Gaming Association ("AIGA"), California Nations Indian Gaming Association ("CNIGA"), Minnesota Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"), National Tribal Gaming Commissioners & Regulators ("NTGCR"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 31 federally recognized

1

Indian tribes ("Amici Tribes")[1] (collectively, "Tribal Amici") respectfully submit this brief in support of Defendants' response to QCX, LLC, d/b/a Polymarket US's ("Polymarket") motion for preliminary injunction.

## INTRODUCTION

Polymarket asks this Court to override the unique tribal-state regulatory structure of sports betting in Michigan, abandon the long-standing national policy of state and tribal sports-betting regulation, and turn decades of federal law on its head. The Court should not do so.

America's history is replete with prospectors taking resources from Indian lands without permission from Tribes. But Congress put a stop to that practice long ago. Yet Polymarket would have this Court believe that, without so much as a whisper of legislative intent, Congress gave it permission to enter Indian lands and siphon gaming revenues away from tribes over such tribes' objections. Congress did no such thing.

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Grand Traverse Band of Ottawa and Chippewa Indians; Jamestown S'Klallam Tribe; Jamul Indian Village of California; Hannahville Indian Community; Keweenaw Bay Indian Community; Kickapoo Traditional Tribe of Texas; Lac Vieux Desert Band of Lake Superior Chippewa Indians; Little Traverse Bay Bands of Odawa Indians; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Gun Lake Tribe); Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Nottawaseppi Huron Band of Potawatomi; Oneida Nation of Wisconsin; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Saginaw Chippewa Indian Tribe of Michigan; Santa Ynez Band of Chumash Mission Indians; Sault Ste. Marie Tribe of Chippewa Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.

When Congress enacted the Indian Gaming Regulatory Act ("IGRA"), it sought to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments[.]"  25 U.S.C. § 2702(1).  IGRA has been incredibly successful on that front.[2]  Since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming.  Gaming revenue supports thousands of jobs in hundreds of communities and provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus.

In Michigan, IGRA's framework has allowed the twelve federally recognized Indian tribes within Michigan[3] (collectively, the "Michigan Tribes") and State of Michigan to forge a historic and unique regulatory relationship over sports betting throughout the state and to protect their sovereign interests.  In 2021, the Michigan Tribes became the first tribes in the United States to operate statewide online sports wagering.  This partnership promotes the health, safety, and welfare of each sovereign's citizens

---

[2] *See, e.g.*, Nat'l Indian Gaming Comm'n, FY 2023 Gross Gaming Revenue Report 4–5 (Jul. 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

[3] These Tribes include: Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Hannahville Indian Community, Keweenaw Bay Indian Community, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Gun Lake Tribe), Nottawaseppi Huron Band of Potawatomi, Pokagon Band of Potawatomi Indians, Saginaw Chippewa Indian Tribe of Michigan, and Sault Ste. Marie Tribe of Chippewa Indians.

through comprehensive gaming regulation and ensures that gaming revenue is used for the public's benefit.

In contrast, Polymarket, without any license or approval by the Michigan Tribes or the State, brazenly entered onto state and tribal lands to conduct unregulated gaming. In doing so, Polymarket is siphoning away vital tribal and state governmental revenue to its owners' private pockets.

Polymarket asks this Court to subvert this longstanding and comprehensive regulatory regime of IGRA. The consequences of Polymarket's arguments are difficult to overstate. Its reading of the Commodity Exchange Act ("CEA") would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; undermine existing tribal-state gaming compacts and regulatory frameworks; allow Polymarket—not states or tribes—to regulate this sports-betting activity on state and tribal lands; permit Polymarket to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination. In Michigan in particular, Polymarket's theory would undermine the Tribal-State Gaming Compacts ("Compacts") between the Michigan Tribes and State, which have been approved by the United States and carefully balance both tribal and state interests over the regulation of gaming throughout Michigan.

Accordingly, this Court should deny Polymarket's motion for preliminary injunction.

## ARGUMENT

**I.      Congress Did Not Impliedly Repeal IGRA or the Compacts.**

**A.      IGRA's Structure**

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government and is in a state that permits such gaming.  25 U.S.C. § 2710(d).  Class III gaming—including sports betting—is authorized on Indian lands only where tribes and states have entered into a compact to regulate that gaming.  25 U.S.C. § 2710(d)(1); *see also* 25 C.F.R. § 502.4(c).  The Secretary of the Interior must review and approve these agreements in order for lawful class III gaming to occur on tribal lands.  25 U.S.C. § 2710(d)(8).  These core provisions have remained unchanged since 1988.

Under this regime, regulation of class III gaming on Indian lands is shared between tribes, states, and the federal government.  Congress crafted this comprehensive regulatory regime to advance clearly-articulated policy goals to: (1) "promot[e] tribal economic development, self-sufficiency and strong tribal governments"; (2) "provide a statutory basis for regulation" that protects tribes' ability to be the primary beneficiary of gaming on their lands; and, (3) create a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating tribal revenue.  25 U.S.C. § 2702.  Congress made it abundantly clear that tribes—not private entities—must benefit from any gaming conducted on their Indian lands.  *See, e.g.*, 25 U.S.C. §§ 2710(b)(2)(A), (d)(2)(A).  For many tribal governments, gaming is essential to their self-determination.

*See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022).

### B.  Michigan's Cooperative Sports-Betting Regulatory Structure

Working within IGRA's comprehensive regulatory scheme, the Michigan Tribes and the State have developed a cooperative model of gaming regulation that protects consumers, layers regulatory responsibility, and provides significant revenues to governments serving tribal members and Michigan's citizenry.

Seven of the Michigan Tribes[4] entered into Tribal-State gaming compacts in 1993. Four of the Michigan Tribes[5] entered into Tribal-State gaming compacts in 1999.  And finally, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Gun Lake Tribe) entered into a Tribal-State gaming compact in 2009.  The Secretary of the Interior reviewed and approved (either affirmatively or by law) these agreements.[6]

---

[4] Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Hannahville Indian Community, Keweenaw Bay Indian Community, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Saginaw Chippewa Indian Tribe, and Sault Ste. Marie Tribe of Chippewa Indians.

[5] Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Nottawaseppi Huron Band of Potawatomi Indians, and Pokagon Band of Potawatomi Indians.

[6] *See Gaming Compacts*, U.S. Dep't of Interior, Bureau of Indian Affs., https://www.bia.gov/as-ia/oig/gaming-compacts?field_us_state_s__value=MI&field_bogs_federally_recognized_target_id=All&field_approve_or_not_approved_value=All.

6

Michigan's Lawful Sports Betting Act of 2019 (the "Lawful Sports Betting Act") allows internet sports betting within the State to be conducted "only to the extent that it is conducted in accordance with [the Lawful Sports Betting Act]."  Mich. Comp. Laws § 432.404(1).  The Lawful Sports Betting Act expressly defines "sports betting" to include exactly the type of betting that Polymarket offers.  *See* Mich. Comp. Laws § 432.403(bb); Pl. Mot. for Prelim. Inj. at PageID.68-69, *QCX LLC, d/b/a Polymarket US¸ v. Nessel, et al.*, No. 1:26-cv-00710 (W.D. Mich. Mar. 6, 2026), Dkt. No. 14 [hereinafter PI Motion]; Compl. at PageID.15, *QCX LLC, d/b/a Polymarket US¸ v. Nessel, et al.*, No. 1:26-cv-00710 (W.D. Mich. Mar. 4, 2026), Dkt. No. 1 [hereinafter Complaint].  Under the Lawful Sports Betting Act, a sports betting operator license may only be issued to either: "A person who holds a casino license under the Michigan Gaming Control and Revenue Act," or "An Indian tribe that lawfully conducts class III gaming in a casino located in [Michigan] under a facility license" issued in accordance with IGRA.  Mich. Comp. Laws § 432.406(1).  Currently, all 12 Michigan Tribes are licensed to offer sports betting under the Act.  This regulatory framework means that federal, tribal, and state regulations apply to every aspect of online sports wagering in Michigan, and ensures that there are no jurisdictional gaps.

Consistent with IGRA, the Michigan Tribes use their gaming revenue, including sports betting revenue, for the public benefit, including to "help fund operations of local government agencies" and "tribal government operations [and] programs."  *See* 25 U.S.C. §§ 2710(b)(2)(B)(i), (v).  The Michigan Tribes also help fund the State

government through net win payments, and local governments through two-percent revenue sharing payments.[7]  They also have contributed tens of millions of dollars to the State through sports betting tax payments paid by Tribal Operators.[8]  As of November 2025, the Michigan Tribes have contributed more than $1 billion in gaming revenue to the State through the Michigan Strategic Fund or the Michigan Development Corporation, and more than $680 million in gaming revenue to local governments within the State.[9]

Additionally, the regulatory relationship between the Michigan Tribes and State ensures the protection of consumers.  For example, this system prohibits anyone under the age of 21 from placing sports bets and includes stringent problem-gambling measures to protect the public more broadly.  *See, e.g.*, Mich. Comp. Laws §§ 432.403(e), 432.212. Further, Michigan's regulations prohibit the "[m]isuse of inside information" as a type of "[s]uspicious wagering activity."  Mich. Admin. Code. R. §§ 432.711(w)(iii), 432.743(4).

---

[7] *See Tribal Gaming Report 2024*, Mich. Gaming Control Bd. at 3–5 (Apr. 11, 2025), https://www.michigan.gov/mgcb/-/media/Project/Websites/mgcb/Annual-Reports/2024/2024-Tribal-Gaming-Annual-Report---Final-Draft.pdf?rev=b82b6ff60f19467eaba531c6533a6f37&hash=A8553A316C0B830450EA643F3AA84AB0.

[8] *See Internet Sports Betting Revenue and Tax/Payments – 2025*, Mich. Gaming Control. Bd. (Dec. 15, 2025), https://www.michigan.gov/mgcb/-/media/Project/Websites/mgcb/Detroit-Casino-Revenue-Files/Internet-Sports-Betting---2025.xlsx?rev=f95184e0bc4e4455863d6a7a670d4d95&hash=%20C95F8DB1934A80F0DF7A517B70E4603D.

[9] *Tribal Casino Revenue Sharing Payments*, Mich. Gaming Control Bd. (last visited Jan. 24, 2026), https://www.michigan.gov/mgcb/tribal-casinos/tribal-casino-revenue-sharing-payments.

Polymarket's sports-betting activities fall squarely within IGRA's scope when they occur on Indians lands.  *See* 25 C.F.R. § 502.4(c) (classifying sports betting as class III gaming).  Under IGRA, however, Polymarket may not operate class III gaming activities—including sports betting—on the Michigan Tribes' Indian lands unless, among other things, its gaming activities are conducted in conformity with a tribal-state compact.  *See* 25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c).

### C.    Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of a "Swap" in 2010.

Polymarket does not assert that its conduct complies with IGRA.  In fact, Polymarket has made no attempt to ensure that its sports betting activities on Indian lands—in Michigan, and across the country—comply with IGRA.  Instead, Polymarket argues that Congress's addition of a single term—"swaps"—within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), preempts the field of what is unequivocally sports betting, and therefore effectively repealed core provisions of IGRA.  *See* PI Motion at PageID.65-66.  Under this theory, Congress silently stripped away tribes' and states' longstanding authority over sports betting[10] while allowing for-profit companies like Polymarket to run internet casinos pursuant to their own private oversight.

---

[10] Polymarket also suggests that its sports-event contracts are not sports betting because there is no betting against the house. PI Motion at PageID.84.  Rather, Polymarket claims that it "does not operate as a counterparty in the derivatives market."  Complaint at PageID.16-17.  However, a "house" is not a necessary element of gaming.  For example,

Contrary to what Polymarket maintains, *id.* at 11, if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"), then all sports betting—including sports betting conducted by the Michigan Tribes and other tribes under IGRA—is governed by the CEA. *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282, at *1 (D. Nev. 2025), *appeal filed*, No. 25-7516 (9th Cir. Nov. 25, 2025). As discussed below, Polymarket's interpretation of "swaps" is so broad that it necessarily consumes all sports betting (and potentially other kinds of gaming). And with one inapplicable exception, the CEA prohibits off-market swaps. *See* 7 U.S.C. § 2(e). Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a [designated contract market ('DCM')]." *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.* (*Crypto.com*), 815 F. Supp. 3d 1169, 1185 (D. Nev. 2025), *appeal filed*, No. 25-7187 (9th Cir. Nov. 13, 2025).

Polymarket's argument thus does double violence. First, by permitting Polymarket to offer sports betting on Indian lands, its argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on

---

pari-mutuel wagering—a type of betting system where all bets or wagers are pooled and players bet against each other rather than a "house"—is considered gaming. *See* Mich. Comp. Laws § 431.302(o) (defining "pari-mutuel wagering" to mean "the form or system of gambling in which the winner or winners divide the total amount of money bet, after deducting the net commission"). Another example is provided in the IGRA regulations, which define class II gaming to include, among other things, nonbanking card games that are necessarily played without a house. 25 C.F.R. § 502.3(c).

Indian lands."  25 U.S.C. § 2701(5).  Indeed, it sweeps aside the U.S. Department of the Interior's ("DOI") affirmative approval of an agreement that allows only Michigan Tribes and certain professional sports franchises to operate mobile sports wagering, to the exclusion of Polymarket.  Second, it would prohibit tribes from offering sports betting that IGRA plainly authorizes.  *See* 25 C.F.R. § 502.4(c).

Moreover, if Polymarket's position is adopted, the reach of this definition would extend beyond sports betting to encompass other forms of gaming because Polymarket's preemption argument depends on embracing an interpretation of "swap" that has "no limiting principle."  *Hendrick*, 2025 WL 3286282, at *6; *see Crypto.com*, 815 F. Supp. 3d at 1184.  Polymarket's definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino games.  This means that that virtually all gaming activity across the country must be offered on a DCM and regulated by the CFTC.  The irony of this result is that the gaming conducted pursuant to tribal-state gaming compacts or state law provides significantly more consumer protection than the type of unregulated sports betting offered by Polymarket, which allows users as young as 18 years old to engage in practically limitless betting with few, if any, guardrails.  *See Polymarket US Rulebook*, Ch. 3, § 3.1(c)(i) (last updated Mar. 20, 2026), https://www.polymarketexchange.com/files/legal/Polymarket%20US%20Rulebook%20(2026.03.20).pdf; *see also KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *10 n.9 (S.D. Ohio Mar. 9, 2026).

Further, if the CEA governs Polymarket's sports-betting contracts on Indian lands, then Congress must have intended to repeal other key provisions of IGRA that expressly grant regulatory authority over such activity to tribes, states, the National Indian Gaming Commission, DOI, and Department of Justice.  *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d).  Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands.  *See* 25 U.S.C. § 2701(5).  No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

This Court should therefore reject Polymarket's boundless interpretation of a "swap" and give effect to both statutes by excluding sports-betting contracts, such as Polymarket's, from the CEA's definition of "swap."  In any event, such an interpretation is also more faithful to the CEA's statutory language and legislative intent.

> [I]t is our intent … [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts."  It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.  These types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.

*See* 156 Cong. Rec. S5906–07 (daily ed. Jul. 15, 2010) (statement of Sen. Lincoln).

### D.  Polymarket's Theory Does Not Meet the Standard for Implied Repeals.

Polymarket's preemption argument, which relies on its overly broad interpretation of "swap," must be rejected because it would manufacture an implied repeal of IGRA

where none exists.  Polymarket cannot meet the heavy burden of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Polymarket's sports bets.

Courts apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified); *see also Beckert v. Our Lady of Angels Apartments, Inc.*, 192 F.3d 601, 606 (6th Cir. 1999).  Congress's intent to repeal must be "clear and manifest." *Epic Sys.*, 584 U.S. at 510 (citation modified).  "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 515 (citation modified); *see also Morton v. Mancari*, 417 U.S. 535, 550 (1974).

Here, there is no "clear and manifest" congressional intent, and IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting, consistent with longstanding CFTC regulations.

     *1.    Polymarket's sports-betting contracts are not "swaps."*

As relevant here, the CEA defines "swap" as "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial

13

consequence."  7 U.S.C. § 1a(47)(A)(ii).  Polymarket's sports-betting contracts simply do not fall under this definition and Congress therefore could not have intended to repeal IGRA.

First, looking at the plain language of the CEA, Polymarket's sports-betting contracts are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the *outcome* of the sports event (or parts thereof)—i.e., which team wins.  In three recent decisions, the Nevada District Court held that sports bets are not swaps for precisely this reason.  *Hendrick*, 2025 WL 3286282, at *3, *8–9.  The Southern District of Ohio also rejected this theory in part, because "absurd results would flow from defining a 'swap' to include a sports-event contract."  *Schuler*, 2026 WL 657004, at *6.

Second, this Court properly rejected a reading of the term "event" as used in 7 U.S.C. § 1a(47)(A)(ii) to mean (and allow DCMs to offer wagers on) "essentially anything that happens" because "[t]here would be no difference between event and occurrence, and the statute's other inclusive definitions of swap would serve little to no purpose as they would be subsumed by the all-encompassing event clause."  Order Deny. Pl. TRO, *QXC LLC v. Nessel*, No. 1:26-cv-00710, at PageID.230-231 (W.D. Mich. Mar. 10, 2026), Dkt No. 17 [hereinafter Polymarket TRO Denial].  As this Court reasoned, the term "event" means "a happening 'of some sort of significance that took place or will take place, in a certain location, during a particular interval of time, *such as a particular*

14

*sporting event*'" but not "[i]ndividual actions and scores in individual sporting events." *Id.* at 5 (quoting *Crypto.com*, 815 F. Supp. 3d at 1183) (emphasis added).

Third, there is no "financial, commercial, or economic consequence" associated with Polymarket's sports-betting contracts.[11] Aside from whether the purchaser wins or loses their bet, Polymarket's sports-betting contracts have no direct financial consequences for the purchaser.  To constitute a swap, the underlying event itself "must be inherently associated with a potential financial consequence." *Hendrick*, 2025 WL 3286282, at *7; *see also* Polymarket TRO Denial, at 6 ("Reading *associated with* to require an inherent connection to those consequences rather than a downstream, attenuated consequence reins in the potential chains of association to infinity." (emphasis in original)).  "[E]xternalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Hendrick*, 2025 WL 3286282, at *7.  Polymarket's

---

[11] Holding sports-betting contracts meets this bar would defy rationality because, as acknowledged by Judge Roth in her dissent in *KalshiEX, LLC v. Flaherty*, "Kalshi's proffered definition [of 'swap'] would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles," and "any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme.  No. 25-1922, 2026 WL 924004, at *8 (3d Cir. 2026) (Roth, J., dissenting).  After all, even a bet over the outcome of a friendly neighborhood ping pong match may have a '*potential* financial . . . consequence' because one of the bettors would reap a financial reward based on the match's outcome." *Id.* (emphasis in original).  Clearly, "Congress could not have intended for such a rationality-defying outcome." *Id.*

sports-betting contracts do not satisfy this requirement and therefore do not qualify as swaps.

> 2. *Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator.*

Congress did not repeal key aspects of IGRA and grant the CFTC the exclusive authority to regulate nationwide sports betting.  In fact, Congress expressed the opposite intent and went out of its way to prevent event-contract markets from being used to conduct gambling.  *See* 156 Cong. Rec. S5906-07 (daily ed. Jul. 15, 2010) (colloquy between Sens. Feinstein and Lincoln).  Specifically, Congress enacted the "Special Rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming" activity on DCMs at all. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).  The CFTC acted consistently with Congress's intent by promulgating its blanket prohibition of event contracts involving gaming.  17 C.F.R. § 40.11(a)(1).  In promulgating its rule, the CFTC explained that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'"  Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (Jul. 27, 2011) (citation modified).  Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting.

And Polymarket's competitor, KalshiEX LLC ("Kalshi"), even acknowledged this fact in a brief filed with the D.C. Circuit, stating: "An event contract thus involves 'gaming' if it is contingent on a game or game-related event.  The classic example is a

contract on the outcome of a sporting event; as the legislative history directly confirms,

*Congress did not want sports betting to be conducted on derivatives markets*." *See*

Appellee Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024)

(citation omitted, emphasis added).  The Special Rule and the CFTC's regulations

undermine any claim that Congress intended to repeal IGRA and legalize sports betting.

That the CEA and IGRA overlap here is due only to Polymarket's backdoor attempt to

evade comprehensive gaming regulations.[12]

Furthermore, it is Polymarket (a private company with a direct financial interest in

offering unregulated sports betting), not Congress, who claims that the CEA's definition

---

[12] Under Polymarket's theory, simply calling a sports wager a "swap"—regardless of
whether it is actually a valid "swap"—and listing it for trade on a DCM automatically
grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory
authorities.  *See* PI Motion at PageID.85.  What, then, would prevent Polymarket from
calling "contracts" on other traditional forms of gaming, like roulette and lotteries,
"swaps" and subjecting them to the exclusive jurisdiction of the CFTC?  According to
Polymarket, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R.
§ 40.11(a)(1)—is all that is required to bless contracts blatantly designed for no other
purpose than to enable gambling.

Polymarket's theory would likewise strip this Court of its own jurisdiction to interpret
what constitutes a "swap."  Polymarket's competitor, Kalshi, has previously argued that
such determination is exclusively up to the CFTC and would only be judicially
reviewable pursuant to an Administrative Procedure Act challenge.  *See*, *e.g.*, Pl.-
Appellant Br. at 44, *KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Dec. 26, 2025),
Dkt. No. 20.1.  But, as the Nevada District Court properly held, "[T]he CEA does not
expressly delegate to the CFTC the exclusive power to decide what is a swap. … It is
emphatically the province and duty of the judicial department to say what the law is."
*Crypto.com v. Nevada*, No. 2:25-cv-00978, 2025 WL 2916151, at *6 (D. Nev. Oct. 14,
2025).

of "swap" displaces tribal, state, and federal regulation of sports betting.  The text and

legislative history of the 2010 CEA amendments, confirm that the CFTC was not

established to regulate sports betting, let alone assume the role of the nation's sole

sports-betting regulator.  And, historically, the CFTC likewise did not assert such

authority itself.  *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (Jun. 10, 2024)

("The [CFTC] is not a gaming regulator … and the [CFTC] does not believe that it has

the statutory mandate nor specialized experience appropriate to oversee [gambling], or

that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources

in this manner.").  The CFTC also recently proved it is ill-equipped to serve as a gaming

regulator, asking the public just last month whether "there [is] some public interest utility

if people with an asymmetric information advantage on a particular event contract" (or,

as the CFTC also puts it, "Inside Information"[13]) "are able to trade on prediction

markets."  Prediction Markets, 91 Fed. Reg. 12516, 12522 (proposed Mar. 16, 2026).

---

[13] Last year, the Department of Justice pursued criminal convictions against professional athletes and their co-conspirators for using "Inside Information" in betting with regulated sports books.  *See Current and Former National Basketball Association Players and Four Other Individuals Charged in Widespread Sports Betting and Money Laundering Conspiracy*, U.S. Dep't of Just. (Oct. 23, 2025), https://www.justice.gov/usao-edny/pr/current-and-former-national-basketball-association-players-and-four-other-individuals.

The CFTC also solicited public comments on this question at a time when Polymarket was the subject of numerous controversies involving allegations of Polymarket users trading event contracts while in possession of "Inside Information."  Reportedly, earlier this month, at least fifty brand new accounts were created on Polymarket's platform and placed substantial bets within the hours and minutes before President Trump announced

18

Though the CFTC's recent participation in ongoing litigation and its decision to file suit against several state gaming regulators broadly defends prediction markets' offering of sports-betting subject to the CFTC's exclusive jurisdiction, its claims are unpersuasive and should be rejected. *See CFTC v. Arizona*, No. 2:26-cv-02246 (D. Ariz. Apr. 2, 2026); *CFTC v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026); *CFTC v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026); *CFTC v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026); Amicus Br. of CFTC, *Crypto.com v. Nevada*, No. 25-7187 (Feb. 17, 2026), Dkt. No. 37.2. Strikingly, in defending the legality of sports-betting contracts, the CFTC makes hardly any mention of its regulations implementing the Special Rule, and for good reason: the CFTC already promulgated regulations effecting a blanket ban of gaming contracts, like Polymarket's sports-betting contracts. *See* 17 C.F.R. § 40.11(a). To date, the CFTC has not amended this regulation, and no amount of posturing can change the fact that its current regulations plainly state that DCMs, like Polymarket, "*shall not*" offer event contracts involving "gaming." *See* 17

---

the U.S.-Iran ceasefire. *See* Ken Sweet, *Well-timed bets on Polymarket tied to the Iran war draw calls for investigations from lawmakers*, Associated Press (Apr. 9, 2026), https://apnews.com/article/polymarket-kalshi-trump-iran-prediction-congress-d16d7bdf9a56cc1466b44baaf634aeeb. Before that, Polymarket faced accusations of permitting insider trading on its platform regarding "well-timed bets on the capture of former Venezuelan President Nicolas Maduro and the outbreak of war in Iran." Mary Cunningham, *Polymarket buckles down on insider trading after scrutiny over suspiciously timed bets*, CBS News (Mar. 24, 2026), https://www.cbsnews.com/news/polymarket-insider-trading-rules-iran-war-venezuela/.

C.F.R. § 40.11(a) (emphasis added).  Moreover, the CFTC fails to acknowledge that the preemption argument advanced by Polymarket necessarily means Congress impliedly repealed key aspects of IGRA and other applicable federal laws without any expression of intent to do so.  Further, the power to interpret statutes ultimately belongs to the courts, not the CFTC.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).

This Court should reject Polymarket's efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

### 3.    *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to partially repeal IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes.  *See, e.g.*, *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Atty. W. Div. of Michigan*, 369 F.3d 960, 971 (6th Cir. 2004). Federal courts have consistently applied these canons to ensure that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes, without a clear statement from Congress.  *See, e.g.*, *Mancari*, 417 U.S. at 550–51; *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020).

This Court should therefore reject Polymarket's preemption argument requiring an implied repeal of IGRA.

## II.    The Major Questions Doctrine Forecloses Polymarket's Theory.

In 2010, federal law—namely, the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide.  Polymarket's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that, at the time, prohibited sports betting—turning it instead into a nationwide authorization of such betting under the jurisdiction of the CFTC.[14]  Whether Congress did so is a major question.

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where the agency has asserted a "breadth" of authority over matters of "economic and political significance."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization."  *Id.* at 723 (citation modified).  Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme."  *Id.* (citation modified); *see also Learning Res. v. Trump*, 146 S. Ct. 628, 642 (2026).

---

[14] Polymarket's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952(a).  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws.

21

In effect, Polymarket contends that the 2010 CEA amendments displaced state and tribal gaming regulations, undermined tribal-state gaming compacts, legalized sports betting nationwide, and placed sports betting under the regulatory jurisdiction of the CFTC, all at a time when federal law broadly prohibited sports betting.  This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance."  *West Virginia*, 597 U.S. at 721, 723.  This Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering Polymarket's preemption argument.  *Id.* at 721, 724.

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power."  *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001).  Here, gaming regulation, and even sports-betting regulation specifically, has been understood to be within traditional state power.  *See Murphy v. NCAA*, 584 U.S. 453, 474, 481–85 (2018); *see also Artichoke Joe's Ca. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) ("[T]he regulation of gambling lies at the heart of the state's police power." (citation modified)).  As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling."  584 U.S. at 484; *see also Chicken Ranch*, 42 F.4th at 1032 (IGRA "strike[s] a delicate balance" between tribal and state sovereignty over gaming).  And even when Congress chose to prohibit sports betting nationally through PASPA, it did so *through*

state regulation, rather than by directly regulating private actors.  *See Murphy*, 584 U.S. at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207–14 (1987).  Though it imposes limited restrictions on this authority, IGRA still broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination.  *See* 25 U.S.C. §§ 2701(5), 2702(2); *W. Flagler Assocs. v. Haaland*, 71 F.4th 1059, 1062–63 (D.C. Cir 2023), *cert denied*, 144 S. Ct. 10 (2024).  And later-enacted statutes of general applicability—like the CEA—cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—like IGRA—without a clear statement from Congress. *See, e.g., Mancari*, 417 U.S. at 550.

Accordingly, because regulating gaming (including sports betting) has long been a traditional state and tribal power, Polymarket must show clear congressional language overturning that federal policy.  But it cannot because no such language exists.  *See* Order Deny. Inj. Pending Appeal at 8–12, *KalshiEX, LLC. v. Schuler*, No. 26-3196 (6th Cir. Apr. 24, 2026) (rejecting argument that the CEA likely preempts state gaming laws, in part, because the CEA has numerous savings clauses preserving states' authority to regulate aspects of derivatives markets and Kalshi could not otherwise prove that it was "the clear and manifest purpose of Congress" to "preempt Ohio's 'historic police

23

powers.'" (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009))).  Rather, the CEA

*reinforces* the federal policy in favor of state gaming regulation by disclaiming

preemption of state gaming laws.  *See* 7 U.S.C. § 16(e).  And nothing in the definition of

"swap" indicates that Congress meant to overturn the entire field of sports-betting

regulation or Indian gaming.

Second, sports betting has a "unique place in American history and society," and

therefore its own "political history."  *See FDA v. Brown & Williamson*, 529 U.S. 120,

159–60 (2000).  Given this social and political history, at the time of the 2010 CEA

amendments, Congress had already "for better or for worse, … created a distinct

regulatory scheme" for sports betting—namely, PASPA.  *Id.*  The conflict between

Polymarket's argument and the existence of PASPA's nationwide sports-betting

prohibition in 2010 therefore indicates that Congress could not have intended to regulate

sports betting in the way that Polymarket now claims.  "Given this history and the

breadth of the authority that [Polymarket] has asserted [the CFTC has]," this Court

should not defer to Polymarket's "expansive construction" of the CEA.  *Id.* at 160.

The Supreme Court eliminated PASPA as a barrier to sports betting in 2018 when

it held PASPA unconstitutional.  *See Murphy*, 584 U.S. at 486.  Since then, several states

have established regulatory schemes for sports betting under their traditional police

powers, including in Michigan, where Michigan Tribes and the State impose a

cooperative regulatory scheme for sports betting.

But that has no bearing on whether Congress's CEA amendments *in 2010* had the effect of obliterating PASPA (and IGRA), and the state laws on which it relied. In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had *already* preempted all state gaming laws eight years earlier. *Murphy*, 584 U.S. at 479–80. To the contrary, the majority opinion concluded with an observation utterly incompatible with Polymarket's contention: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. In other words, Polymarket's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.[15]

Ignoring history, context, and common sense, Polymarket presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), governs nationwide sports betting. Polymarket, therefore, creates an imaginary world where Congress repealed the comprehensive regulatory scheme set forth in IGRA, similar structures set up by state law and the then-federal policy requiring states to prohibit sports

---

[15] And if sports-event contracts are indeed swaps that must be traded on DCMs, this would "have a seismic impact on Indian tribes' authority to regulate gaming on tribal land." *See Schuler*, 2026 WL 657004, at *6 n.6.

betting, as codified in PASPA.  And Polymarket incredibly argues all of this happened without even a whisper of legislative intent.

Polymarket's revisionist history cannot withstand even the slightest scrutiny.  As the Nevada District Court aptly stated, "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 2025 WL 3286282, at *9.

### III.    Polymarket's Preemption Argument Would Violate the Private Nondelegation Doctrine.

Polymarket's preemption argument turns on the extraordinary claim that Congress delegated the power to preempt state law to an interested private party simply by self-certifying its own sports-betting contracts and listing them on its exchange.  The private non-delegation doctrine, however, guards against precisely the type of unchecked, privately exercised power upon which Polymarket relies.  *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

While the Supreme Court upholds congressional delegations of power to federal agencies with an intelligible principle, it applies a different standard when those delegations are to private entities.  "[A] law … violates the private nondelegation doctrine when it allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025).  Recently, the Supreme Court found that the permissibility of a private delegation depends on whether the agency retains oversight and ultimate

26

decision-making authority over the private entity's actions. *Id.* at 693.  There, the Court

upheld the delegation to a private entity, but only because it merely played "an advisory

role" and the final decision-making authority rested with the agency.  *Id.*

In contrast, under Polymarket's theory, the CEA's self-certification provisions

empower Polymarket—a private, for-profit entity—to oversee its own sports-betting

enterprise, yet simultaneously fail to provide any mechanism for advance public

comment, mandatory agency oversight, or standards by which the CFTC may implement

its discretion.[16]

Further, even according to Polymarket, its self-certifications are not merely

advisory.  Rather, they have the force of law and CFTC inaction is sufficient to trigger

preemption.  PI Motion at PageID.81, 84-85.  "The result of this regulatory scheme is that

[Polymarket] can, without any [CFTC] review of its decision on the merits, effectively

decide" to offer sports betting free from tribal and state regulation.  *See Alpine Sec. Corp.*

*v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1328 (D.C. Cir. 2024).  Consequently,

construing the CEA to attribute legal effect on state law via Polymarket's self-

certification would be unconstitutional—a construction that must be avoided.  *See Bevan*

*& Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 377 (6th Cir. 2019) ("[W]here a statute is

---

[16] *See* Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sep. 3, 2025), https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source =substack&utm_medium=email (warning that the CFTC has "too few guardrails and too little visibility into the prediction market landscape").

susceptible to multiple interpretations, at least one of which will render the statute constitutional, we adhere to that interpretation over an interpretation that would require us to invalidate the statute.").

Moreover, Polymarket has a financial interest in self-certifying its own sports-betting contracts, regardless of such certifications' verity. And this financial interest is directly adverse to the sovereign and economic interests of the Michigan Tribes, as well as other tribes and states offering sports betting. The effects of Polymarket's self-certification go even further; in Polymarket's view, it can block tribes and states from regulating that which has long been within their sovereign authority to regulate simply by listing sports-betting contracts on its exchange. As the Supreme Court has stated, "[t]his is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny Polymarket's requests for injunctive and declaratory relief.

Dated: April 28, 2026

Respectfully submitted,

/s/ Joseph H. Webster
Joseph H. Webster
Elizabeth A. Bower
Jens W. Camp
Alexandra K. Holden
**HOBBS, STRAUS, DEAN & WALKER LLP**
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
Email: jwebster@hobbsstraus.com
       ebower@hobbsstraus.com
       jcamp@hobbsstraus.com
       aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland
**POWERS, PYLES, SUTTER & VERVILLE PC**
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Email: Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian Community, Mohegan Tribe of Indians of Connecticut, Rincon Band of Luiseño Indians, and Santa Ynez Band of Chumash Mission Indians*

Michael Hoenig
**YUHAAVIATAM OF SAN MANUEL NATION**
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Email: Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel Nation and San Manuel Gaming and Hospitality Authority*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of Local Civil Rule 7.2(b), because it contains 6,937 words, excluding the portions of the brief exempted from the word count under Local Civil Rule 7.2(b)(i). The word count was generated using Microsoft Word Version 2108.

/s/ Joseph H. Webster
Joseph H. Webster