UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QCX LLC,                                              )
         Plaintiff,                              )
                            )       No. 1:26-cv-710

v.                                                   )
                            )

                            )       Honorable Paul L. Maloney

DANA NESSEL, *et al.*,                                )
         Defendants.                             )
_____)

### OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiff's motion for a preliminary injunction. (ECF No. 15). The Court previously considered the motion to the extent that it requested a temporary restraining order and denied it. (ECF No. 17). The Court has now had the benefit of more extensive briefing from the parties and from amici. At the heart of this case is the question of where the state interest in regulating gambling ends and the federal interest in regulating financial derivatives begins. Plaintiff argues that its products are on the derivative side of that line, while Defendants argue they are on the gambling side. As a purely academic exercise, the idea that certain financial derivatives and simple sports wagering are fundamentally similar may have some purchase.[1] But as a matter of statutory interpretation, there is a real difference in the plain meaning and common usage of the terms associated

---

[1] *See, e.g.*, Timothy E. Lynch, *Derivatives: A Twenty-First Century Understanding*, 43 Loy. U. Chi. L.J. 1, 49 (2011) ("[T]he purely speculative form of derivatives contracts, where both counterparties are mere speculators, is identical to what we commonly refer to as gambling contracts or wagering. . . . The more we understand such derivatives contracts, the more obvious it becomes that they share their defining characteristics with these Super Bowl bets.").

1

with the different sides of the line,[2] and the Court must recognize the "background principle" that when a federal statute touches on "areas of traditional state responsibility," courts must look for a clear statement from Congress that it intended to "effect a significant change in the sensitive relation between" the federal and state governments. *Bond v. United States*, 572 U.S. 844, 858 (2014). In the single prong Plaintiff cites, from a six-pronged definition of a single type of financial derivative, in the Wall Street Reform and Consumer Protection Act passed in the wake of the 2008 financial crisis, there is no clear statement that Congress intended to supersede the states' traditional role in regulating gambling. But even if Plaintiff were correct that its products fit the statutory definition of a certain regulated derivative, it is not clear that the statutory framework prevents states from regulating in the porous zone where derivatives and gambling meet. Plaintiff thus has not met its burden to show a likelihood of success on the merits, and the cloudy legal forecast weakens its showings on the other factors. Plaintiff's motion for a preliminary injunction will thus be denied.

## I.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs seeking a preliminary injunction must demonstrate that they are likely to succeed on the merits, they are likely to suffer irreparable harm absent the injunction, the balance of equities favors them, and the injunction is in the public interest. *Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023) (citing *Winter*, 555 U.S. at 20).

---

[2] *See id.* at 23 ("Rarely is the term 'derivative' popularly associated with something as mundane as the outcome of the Super Bowl or even sports gambling generally.").

The last two factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These are factors, not elements, though a slim enough chance of success on the merits is fatal on its own. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## II.

Plaintiff, QCX LLC, is better known by its trade name, Polymarket US.[3] It operates a prediction contract market, wherein parties may form contracts with each other stipulating that one party will pay the other if a specified thing happens (or fails to) in a specified way. Plaintiff then charges a fee for facilitating the transaction. The prediction contracts include contracts involving sporting events and their outcomes. (*See, e.g.*, ECF No. 14-12 at PageID.207). Defendants, officials of the state of Michigan, recently brought an enforcement action against a different prediction contract market operator, KalshiEX. Defendants alleged that KalshiEX was in violation of state laws against operating an unlicensed sports betting establishment. Fearing that enforcement action against it is imminent, (ECF No. 14-1 at PageID.93-94 ¶¶ 8-9), Plaintiff filed the present motion for a preliminary injunction.

## III.

### A. Plaintiff Has Not Shown a Substantial Enough Likelihood of Success on the Merits to Merit a Preliminary Injunction.

Plaintiff's theory on the merits has two parts. First, it argues that its sporting event products fall under the definition of "swap." 7 U.S.C. § 1a(47). Second, proceeding from

---

[3] Plaintiff represents that this is distinct from "Polymarket," which does not permit trading within the United States. (ECF No. 38 at PageID.1074).

that premise, Plaintiff argues that the Commodity Futures Exchange Commission (CFTC) is the sole entity that may regulate their products, to the exclusion of the states; some courts have accepted this argument. *See, e.g., KalshiEX, LLC v. Flaherty,* 172 F.4th 220, 228-31 (3d Cir. 2026); *KalshiEX LLC v. Orgel,* No. 3:26-cv-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026). But if Plaintiff's products are not "swaps," Plaintiff's theory never gets off the ground. The Court thus begins there.

### 1. Plaintiff's products are not "swaps."

This is a statutory interpretation question, so the Court must begin with the text. *Ohio Telecom Ass'n v. FCC,* 150 F.4th 694, 708 (6th Cir. 2025). But that text does not exist in a vacuum; it must be understood given its "place in the overall statutory scheme," *Roberts v. Sea-Land Servs., Inc.,* 566 U.S. 93, 101 (2012), and in recognition of the context of its passage and "certain unexpressed presumptions" against which Congress legislates, *Bond,* 572 U.S. at 857. In the Court's judgment, the statutory definition of "swap" is ambiguous, and the context of the statute and the presumption against intruding into traditional areas of state authority lead to the conclusion that Plaintiff's products are not included in it.

### a. *The statutory definition of "swap" is ambiguous.*

Plaintiff devotes precious little energy in its initial brief to explaining what the text in the swap definition means. It argues that the definition "comfortably covers event contracts" and would include "event contracts based on the winner or score of the NFC Championship" but does not explain exactly why. (ECF No. 14 at PageID.82). The relevant portion of the statute for Plaintiff's argument is "the term 'swap' means any agreement, contract, or transaction-- . . . that provides for any purchase, sale, payment or delivery . . . dependent on

the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." § 1a(47)(A)(ii). The parties contest the scope of what constitutes an *event* or a *contingency*, and what it means for each to be *associated with* an enumerated consequence.

*Events* and *contingencies* are the central objects in the definition. Other courts interpreting the word "event" surveyed dictionaries and found it referred to happenings of some importance, but not to outcomes or results of those things. *See, e.g., N. Am. Derivatives Exch., Inc. v. Nevada*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025). Common usages, though, allow it to mean essentially anything that happens. *See* American Heritage Dictionary, *Event* (3d ed. 1996) ("Something that takes place; an occurrence"). A "contingency," meanwhile, is a possible future event. *See* American Heritage Dictionary, *Contingency* (3d ed. 1996) ("An event that may occur but that is not likely or intended; a possibility."). Taking the terms "event" and "contingency" to their broadest possible extent risks rendering the statute's other definitions of "swap" superfluous, as the things they enumerate would be subsumed by the all-encompassing "event" clause. *See N. Am. Derivatives Exch., Inc.*, 2025 WL 2916151, at *8-9. Of course, the potential narrower readings of the term "event" carry their own interpretive challenges. In a best-of-three series where one team had won the first game, a contract concerning whether there would be a third game would be functionally identical to one concerning the outcome of the second game in the series, but the contracts would be treated differently if happenings are treated differently from outcomes. There is also not a clear way to distinguish happenings from outcomes in some cases: is a team's receipt of the Stanley Cup solely an

outcome, or can it be a happening in itself? Both the narrower and expansive understandings have problems, and the text itself does not make clear which was intended.

The *events* and *contingencies* that give rise to "swaps," though, are those that are *associated with a potential financial, economic, or commercial consequence.* If that qualifier is restrictive enough, the scope of "event" and "contingency" could be irrelevant. But Plaintiff's reading would render it meaningless. Plaintiff argues that outcomes of sporting events can have economic ramifications in terms of "the team's valuation, retailers' sales of team merchandise, and the hometown economy." (ECF No. 14 at PageID.83). These are all potential consequences dependent on the reactions of parties outside the game. *Anything* can potentially have economic ramifications given enough attenuation and happenstance. Granted, the word "associated" *can* include the most remote of attenuated connections-upon-connections. *See* American Heritage Dictionary, *Associate,* (3d ed. 1996) ("To connect in the mind or imagination[.]"). But as the Supreme Court explained when interpreting the similar language of "relate to," reading the text "to extend to the furthest stretch of its indeterminacy" would "be to read Congress's words of limitation as mere sham" because "really, universally, relations stop nowhere." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995) (citation modified). The Court rejected the idea that the provision at issue could imply chains of "infinite relations" or "infinite connections" and concluded that it had to "go beyond the unhelpful text and the frustrating difficulty of defining its key term" and "look instead to the objectives" of the statute "as a guide to [its] scope." *Id.* at 656; *see also Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 523 (2018) ("A statute's meaning does not always turn solely on the broadest imaginable

definitions of its component words. Linguistic and statutory context also matter." (citation modified) (citation omitted)). So, too, must this Court examine the statute's purpose and context to determine where the chain of association should be cut off, and how Congress's words of limitation should be given meaning.[4]

> b. *The statute's context, purpose, and structure undermine Plaintiff's proposed reading of the "swap" definition.*

The statutory definition of "swap" was enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010 ("Dodd-Frank"). Pub. L. No. 111-203, 124 Stat. 1376. Dodd-Frank was passed in the aftermath of the 2008 financial crisis. Congress concluded that "a major contributor to the financial crisis was the unregulated over-the-counter ('OTC') derivatives market." S. Rep. No. 111-176, at 29 (2010); *see also United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (explaining that after the 2008 financial crisis, "many saw the previous lack of regulation in swaps as a contributing cause"). Congress attributed the growth of the OTC derivative market "to the Commodities Futures Modernization Act of 2000[,] which explicitly exempted OTC derivatives, to a large extent, from regulation by the Commodity Futures Trading Commission ('CFTC') and limited the SEC's authority to regulate certain types of OTC derivatives." S. Rep. No. 111-176, at 29.[5]

---

[4] The Third Circuit concluded that products similar to Plaintiff's were "swaps" based solely on the text, determining that "[t]he outcome of a sports event can certainly be associated with a potential financial, economic, or commercial consequence." *Flaherty*, 172 F.4th at 227. That court did not explain what "associated with" meant or articulate any limit on the chains of association. *See id.* at 227-28. The court did write, though, that New Jersey's interpretation "raise[d] the bar beyond what the Act requires." *Id.* at 227. In so concluding, the Third Circuit did not identify any ambiguity in the statute and thus did not continue the analysis as the Supreme Court did in *Travelers Insurance*. *See* 514 U.S. at 656.

[5] *See also* Michael Greenberger, *Too Big to Fail—U.S. Banks' Regulatory Alchemy: Converting an Obscure Agency Footnote into an "At Will" Nullification of Dodd-Frank's Regulation of the Multi-Trillion Dollar Financial Swaps Market*, 14 J. Bus. & Tech. L. 197, 250 (2019) (explaining that it has "been widely observed" that deregulation of swaps markets contributed to the 2008 financial crisis).

"Lacking authority to regulate the OTC derivatives market, regulators were unable to identify or mitigate the enormous systemic threat that had developed." *Id.* Dodd-Frank was intended to ensure that OTC derivatives were "regulated by the SEC and the CFTC" and that "all trades will be reported so that regulators can monitor risks in this vast, complex market." *Id.* at 32. The regulatory tools in the Act were intended to "provide market participants and investors with more confidence during times of crisis, taxpayers with protection against the need to pay for mistakes made by companies," and "regulators with more information about the risks in the system." *Id.* at 33.

The OTC derivative market was "primarily the province of highly sophisticated and largely institutional parties such as banks and other financial institutions, insurance companies, hedge funds, other types of investment funds, and even government entities."[6] The modern "swap" developed by the 1980s.[7] In 1989, the CFTC explained that "a swap may be characterized as an agreement between two parties to exchange a series of cash flows measured by different interest rates, exchange rates, or prices with payments calculated by reference to a principal base." Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694, 30695 (July 21, 1989). By 2000, swaps had become pervasive in financial markets. *Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 171 (D.D.C. 2012). By the time of the financial crisis, the notional value of the swaps market was almost $600 trillion, and the collapse of that unregulated market is "now almost universally

---

[6] Colleen M. Baker, *Regulating the Invisible: The Case of Over-the-Counter Derivatives*, 85 Notre Dame L. Rev. 1287, 1297 (2010).

[7] Greenberger, *supra* note 4, at 228.

recognized" as a "principal" factor contributing to the crisis.[8] It is this market and the institutional entities engaged in it that Congress had in mind when it set about to "promote the financial stability of the United States by improving accountability and transparency in the financial system" by passing Dodd-Frank. Pub. L. No. 111-203, 124 Stat. at 1376.

Title VII of Dodd-Frank is entitled "Wall Street Transparency and Accountability," and Subtitle A is entitled "Regulation of Over-the-Counter Swaps Markets." *Id.* at 1641. Part II of Subtitle A is entitled "Regulation of Swap Markets." *Id.* at 1658. The statutory language at issue in this case, defining "swap," is in the first section of Part II, section 721. *Id.* The following section, 722, begins by putting swaps under the regulatory jurisdiction of the CFTC in 722(a), *see id.* at 1672; *Phillips*, 155 F.4th at 113, then, under the subheading "Regulation of Swaps Under Federal and State Law," contains language prohibiting state regulation of swaps as insurance contracts, Pub. L. No. 111-203, 124 Stat. at 1673. There is no mention of state gaming or gambling laws. In contrast, under Subtitle B of Part II, "Regulation of Security-Based Swap Markets," *id.* at 1754, Congress included section 767, "State Gaming and Bucket Shop Laws," *id.* at 1799, which provides that "[n]o state law which prohibits or regulates the making or promoting of wagering or gaming contracts, or the operation of 'bucket shops' or other similar or related activities, shall invalidate . . . any put, call, straddle, option, privilege, or other security subject to this title," *id.* at 1800. Had Congress foreseen an overlap of swaps and traditional gambling contracts like it foresaw an overlap of swaps and traditional insurance contracts, it knew how to craft a provision to preempt state law, as it did

---

[8] Greenberger, *supra* note 4, at 251-52.

for security-based instruments. The lack of any such provision indicates that Congress did not believe an overlap of swaps and traditional gambling existed.

Later in the law, in section 723 of Part II(A), entitled "Clearing," subsection (e) makes it unlawful for "any person" to "enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market." *Id.* at 1675. This is consistent with a focus on large financial institutions and the goals from the Senate Report of monitoring markets presenting systemic risks to the economy. It is inconsistent with any intention to include everyday consumer transactions in the definition of "swap."

The foregoing suggests Congress had nothing like Plaintiff's products in mind when it defined "swap." The primary issue it set out to solve had nothing to do with sports-related contracts. The universe of materials available to Congress would not have placed swaps and betting on sporting events in the same field of policy. The markets with which Congress was concerned were dominated by large financial institutions and did not involve individuals staking relatively small amounts of money on the outcome of a football game. The term "swap" would not have been understood by educated users of the language to include "sporting event contracts" to the extent that that category could be separated from sports betting, and the CFTC did not use the term "swap" that way before the passage of Dodd-Frank. *See* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. at 30695. Nor did it do so afterward: it understood that Congress used "swap" to refer to the financial instruments at the root of the financial crisis rather than intending a "broad reading" which would sweep in "customary consumer and commercial agreements." Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement," 77 Fed. Reg.

10

48208-01, 48246 (Aug. 13, 2012).[9] While the words in the statutory definition of "swap" control rather than its usual definition, "[i]n settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond*, 572 U.S. at 861; *see also United States v. Hill*, 963 F.3d 528, 537 (6th Cir. 2020) ("[T]he Supreme Court has repeatedly relied on the ordinary meaning of a statutory word to clarify the meaning of a vague statutory definition of that word."). Here, like in *Bond*, the meaning of the term being defined plays a "limiting role" by setting the outer boundaries of what Congress envisioned as being potentially included. 572 U.S. at 862. A more limited reading is also supported by the "background assumption that Congress normally preserves 'the constitutional balance between the National Government and the States.'" *Id.* The Court now turns to that assumption in more detail.

  c. *The assumption against intrusion in core State prerogatives suggests the definition of "swap" is narrower than Plaintiff proposes.*

In construing statutes, "the background principle that Congress does not normally intrude upon the police power of the States is critically important," as maintaining the "constitutional balance" between federal and state authority "protects the liberty of the

---

[9] The CFTC offered guidance that customary consumer agreements were not swaps in response to comments suggesting "a broad reading of the swap and security-based swap definitions could cover certain consumer and commercial arrangements that historically have not been considered swaps or security-based swaps." 77 Fed. Reg. at 48248. It specifically noted that it did "not intend to suggest that many types of consumer and commercial arrangements that historically have not been considered swaps are within the swap or security-based swap definitions," and sought to provide guidance "to allow consumers and commercial and non-profit entities to engage in such transactions without concern that such arrangements would be considered swaps or security-based swaps." *Id.* Effectively, the CFTC heard from commenters concerned that it could one day adopt a reading as broad as Plaintiff's, and it sought to assuage those commenters by assuring them that Congress never intended for its definitions to sweep so far.

11

individual from arbitrary power." *Bond*, 572 U.S. at 863; *see BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 544 (1994) ("Federal statutes impinging upon important state interests cannot be construed without regard to the implications of our dual system of government." (citation modified)). "[I]t is well-established that the regulation of gambling . . . is a legitimate state interest." *Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010). A state's gambling laws reflect "the state's paramount interest in the health, welfare, safety, and morals of its citizens" and thus "lie[] at the heart of the state's police power." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (describing gambling laws as "at the heart of a state's police powers"); *see United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare."). The federal courts have recognized that regulating gambling falls within the states' legitimate police powers for centuries. *See, e.g., Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905); *Booth v. Illinois*, 184 U.S. 425, 430-31 (1902); *Stone v. Mississippi*, 101 U.S. 814, 821 (1879).

This "basic principle[] of federalism" is an appropriate means of resolving ambiguity in a statute, particularly when the ambiguity "derives from the improbably broad reach of the key statutory definition given the term . . . being defined; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose." *Bond*, 572 U.S. at 859-60. In *Bond*, the Supreme Court considered whether a woman's conduct fell under the statutory definition of "chemical weapon" in the statute implementing the Chemical Weapons Convention. The statute

defined a "chemical weapon" as a "toxic chemical" not used for a legitimate purpose and defined a "toxic chemical" as "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." *Id.* at 851. The woman used an arsenic-based compound and a chemical used to clean laboratory equipment to create a mixture she spread on another person's car door and doorknob with the hope the other person would "develop an uncomfortable rash." *Id.* at 852. Ultimately, she succeeded only in inflicting "a minor chemical burn" successfully treated by "rinsing with water." *Id.* Nonetheless, she was charged with possessing and using a chemical weapon under the statute. *Id.* at 852.

The Court had "doubts that a treaty about *chemical weapons* has anything to do with Bond's conduct" because there was "no reason to think the sovereign nations that ratified the Convention were interested in anything like Bond's common law assault." *Id.* at 856. It concluded that while "chemical weapon" was "defined extremely broadly," its general definition did not constitute the needed "clear statement that Congress meant the statute to reach local criminal conduct." *Id.* at 860. In reaching that conclusion the Court explained that the context of the Chemical Weapons Convention and the ordinary use of the phrase "chemical weapon," which carried connotations of military deployments of chemicals in warfare, were very far removed from the context of the woman's minor assault. *Id.* at 860-62. That "ordinary meaning" played a "limiting role," because if it did not, the statute would "apply so broadly" that it would upset the balance of federal and state authority. *Id.* at 862-65. Ultimately, the Court explained that "the context from which the statute arose demonstrates a much more limited prohibition was intended" and "the most sweeping

13

reading of the statute would fundamentally upset the Constitution's balance between national and local power," so that "convergence of factors" called for the Court "to interpret the statute more narrowly." *Id.* at 866. The Sixth Circuit has applied *Bond* to support narrow interpretations of statutes when similar convergences of factors are present. *See United States v. Toviave*, 761 F.3d 623, 627-29 (6th Cir. 2014) (explaining the analogy to the interpretive issue in in *Bond* and concluding that federal forced labor statutes did not apply to conduct involving forcing children to perform household chores).

The same factors that led to the result in *Bond* are present here. The statutory language at issue came from a bill intended to regulate the use of financial instruments by large financial institutions in the wake of the 2008 financial crisis. The term "swap," like the term "chemical weapon," emerged from a particular context and referred to a set of existing things in that context. If that context is ignored, the definition of the term "swap" becomes so broad that it sweeps in any agreement or transaction dependent on anything happening that could conceivably result in any degree of financial consequence for anyone. This would intrude not only on the province of state gambling law but also contract law (service contracts), property law (mortgages), and family law (prenuptial agreements), among others. It is difficult to imagine anything that would not have *any* potential financial consequence, especially if the downstream consequences could include others betting on the event. Plaintiff's reading would make many transactions across all spheres of life into "swaps," and thus unlawful unless they are "entered into on, or subject to the rules of, a board of trade designated as a contract market." 7 U.S.C. § 2(e). Here, too, then, the same "convergence of factors" exists as from *Bond*: "the context from which the statute arose demonstrates a much

more limited prohibition was intended" and "the most sweeping reading of the statute would fundamentally upset the Constitution's balance between national and local power." 572 U.S. at 866. Because Congress did not clearly intend that result, the Court must avoid reading the statute as Plaintiff proposes. The Court now addresses how the definition of "swap" can be read consistent with the above principles and Plaintiff's arguments.

> d.  *Plaintiff's arguments against a narrower construction of the statute are unavailing.*

Plaintiff argues that reading the "associated with a potential financial, economic, or commercial consequence" clause as requiring anything more than a hypothetical, attenuated, downstream consequence would add words to the statute. *See* (ECF No. 38 at PageID.1073). Plaintiff's alternative—allowing the chains of association to extend to infinity—suffers from the problems identified above and "effectively read[s] the limiting language . . . out of the statute," violating "basic principles of statutory interpretation." *Travelers Ins. Co.*, 514 U.S. at 661. If "associated with" extends as far as Plaintiff says, then the clause limits out nothing and becomes a dead letter, so the Court must adopt a different reading. Even if that different reading requires some extra-textual gloss, it is preferable to accepting an "illusory test" wherein "everything is related to everything else," which "no sensible person could have intended." *Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335-36 (1997) (Scalia, J., concurring). Context frequently suggests that phrases like "associated with" should not be taken to their linguistic extremes. *See Mellouli v. Lynch*, 575 U.S. 798, 811-12 (2015) (discussing the phrase "relating to"). Avoiding such extremes necessitates the application of "a limiting principle consistent with the structure of the statute and its other provisions." *Maracich v. Spears*, 570 U.S. 48, 60 (2013).

15

The search for a limiting principle is not an enterprise in adding words to the text, but a reflection of indeterminate language gaining definition from its context. Natural use of the phrase "associated with" virtually never goes to the extreme Plaintiff prefers. Instead, the context in which it is used suggests the tightness or looseness of the association. For example, the phrase "smoking is associated with lung cancer" is suggestive of a direct, causal association given the surrounding context of the evidence related to smoking; no contemporary user of the language would understand it to mean that smoking is associated with lung cancer only in the sense that it exists in the world, as do other things, such as lung cancer. But in the sentence "an out-of-state lawyer . . . is associated with a member of the local bar," *Leis v. Flynt*, 439 U.S. 438, 441-42 (1979), the connection may be loose and limited, or close and personal, depending on the context of the discussion.

Defendants suggest that the contextually appropriate limit on the chains of association is that the potential economic consequences be "inherently joined or connected with" the events underlying the contract. (ECF No. 21 at PageID.263); *accord KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025); *see KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *5-6 (S.D. Ohio Mar. 9, 2026) (accepting state's argument that "associated with" requires a "direct and inherent association with matters of financial, economic, or commercial consequence"). This would include agreements clearly within the scope of the term "swap" as Congress would have understood it, based on "interest rates, exchange rates, or prices with payments calculated by reference to a principal base." Policy Statement Concerning Swap Transactions, 54 Fed. Reg. at 30695. It would not include agreements with underlying events that are connected to financial consequences only through

16

downstream, and theoretically infinite, chains of potential consequences. Defendants' interpretation of the statute is more consonant with the context and purpose of the statute. It is also more consonant with its text, because it accurately reflects that "associated with" is an indeterminate phrase only gaining meaning *from* context and purpose.

To the extent Plaintiff might view this interpretation as underinclusive, the other prongs of the definition make any underinclusivity irrelevant. Requiring an inherent connection to a potential economic consequence might exclude, for example, weather swaps under § 1a(47)(A)(ii), but would in no way exclude them from the overall definition, as weather swaps are specifically enumerated at § 1a(47)(A)(iii)(XVII). If they are widespread and acknowledged as swaps in the trade, they would qualify as a swap under § 1a(47)(A)(iv). Reining in § 1a(47)(A)(ii) from a boundless reach would not undermine the definition's ability to capture Congress's intended targets.

Plaintiff argues that the "Special Rule" indicates that Congress considered the potential for an overlap of the swap definition and sports betting. (ECF No. 38 at PageID.1072). The Special Rule allows the CFTC to determine that "agreements, contracts, or transactions are contrary to the public interest" if they "involve" unlawful activity, terrorism, assassination, war, or, as relevant here, "gaming," and prohibits registered entities from listing or making available for trade instruments the CFTC determines to be contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies "[i]n connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based on the occurrence, extent of an occurrence, or contingency . . . by a designated

17

contract market or swap execution facility." *Id.*[10] The full title of the Special Rule, "Special rule for review and approval of event contracts and swaps contracts," *id.*, does not clearly indicate which enumerated activities Congress thought could be involved in "swaps" as opposed to the broader category of "event contracts" or how. Even if it did, it is not clear that this provision would represent Congress's judgment that contracts involving war, terrorism, and gaming could actually be "swaps" as opposed to a failsafe against attempts to portray them as such. Further, this oblique evidence of congressional intent, at its strongest, would be insufficient to transform the text of the swap definition into a clear statement that Congress intended to sweep in activity that had long been a core state responsibility.

Plaintiff also argues that it is not the Court's job to delineate the meaning of the statutory definition of "swap," but the CFTC's. (ECF No. 38 at PageID.1076). Plaintiff's argument misconstrues both the judicial role and the "further definition" of swap Plaintiff cites. First, Plaintiff argues that courts must defer to agency interpretations when Congress expressly delegates "the authority to give meaning to a particular statutory term." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). That line of *Loper Bright*, though, refers to situations where terms are undefined and Congress expressly allows the agency to define them. *See id.* at 395 n.5. Further, the Court went on to explain that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court" is to "fix the boundaries of the delegated authority." *Id.* at 395. So when Congress charged the CFTC with "further defin[ing]" swap, 15 U.S.C. § 8321(b), it did not

---

[10] The statutory language appears to be missing any clause indicating of what the occurrence must be, such as occurrence *of an event. Compare* § 7a-2(c)(5)(C), *with* § 1a(47)(A)(ii).

confer upon it the authority to erase Congress's definition and declare that up is down and black is white. Rather, it allowed the CFTC to refine how Congress's definition would apply to particular products and situations in order to "include transactions and entities that have been structured to evade" the statutory definition. *Id.* It does not allow the CFTC to *expand* the definition of swap beyond what Congress enumerated, and it does not deprive the courts of their duty to fulfill the "traditional conception of the judicial function" by defining what the law is. *Loper Bright*, 603 U.S. at 396. The Court may thus interpret the outer bounds of the congressional definition of "swap." *Contra KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373, at *5 (D. Ariz. May 5, 2026).

Second, the "further definition" that Plaintiff cites still does not include Plaintiff's sports betting products. (*See* ECF No. 38 at PageID.1076-77). In it, the CFTC and SEC explained that "extensive 'further definition' of the terms by rule is not necessary" because the "statutory definitions of the terms 'swap' and 'security-based swap' are detailed and comprehensive." Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement," 77 Fed. Reg. at 48211. "Nevertheless, the definitions *could* be read to include certain types of agreements, contracts, and transactions that previously have not been considered swaps . . . nothing in the legislative history of the Dodd-Frank Act appears to suggest that Congress intended such agreements, contracts, or transactions to be regulated as swaps . . . ." *Id.* (emphasis added). Erroneously broad readings of the statute gave rise to the need to "clarify the treatment *under the definitions* of certain types of agreements, contracts, and transactions, such as insurance products and certain consumer and commercial contracts." *Id.* (emphasis added). Commenters "pointed out a number of areas in which a

broad reading of the swap and security-based swap definitions could cover certain consumer and commercial arrangements that historically have not been considered swaps or security-based swaps." *Id.* at 48246. In response to those comments, the CFTC and SEC wrote that they "do not believe Congress intended to include these types of customary consumer and commercial agreements, contracts, or transactions in the swap" definition. *Id.* The Commissions listed many customary transactions that did not fit the statutory definition of swap and explained that the list was "not intended to be exhaustive of the customary consumer or commercial arrangements that should not be considered to be swaps." *Id.* at 48247.

They then identified several factors that indicated that a transaction was not a swap. *Id.* The "key components" that distinguished customary transactions from swaps were that the "payment provisions of the agreement, contract, or transactions are not severable" and "the agreement, contract, or transaction is not traded on an organized market or over-the-counter, and therefore such agreement, contract, or transaction does not involve risk-shifting arrangements with financial entities, as would be the case for swaps and security-based swaps." *Id.* at 48247-48. The Commissions then clarified that these factors are not determinative and are meant merely to provide guidance. *Id.* at 48248. Throughout the discussion, the Commissions "[did] not intend to suggest that many types of consumer and commercial arrangements that historically have not been considered swaps *are* within the swap or security-based swap definitions." *Id.* (emphasis added). The regulation thus explicitly stands for the opposite of the proposition for which Plaintiff cites it. (*See* ECF No. 38 at PageID.1076 ("The regulation confirms the statutory definition of swap has been understood

expansively—enough to cover even residential 'mortgages' 'with a variable rate on interest.'")).

It also does not suggest that being traded on a designated market causes something to be a swap when it otherwise would not have been. That characteristic was important to the Commissions because it was indicative of "risk-shifting arrangements with financial entities," Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement," 77 Fed. Reg. at 48248, not because it was in itself transformative. Nor could it be, under the statutory framework. It is unlawful for anyone "other than an eligible contract participant" to "enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market." 7 U.S.C. § 2(e). For that provision to make any sense, swaps must be identifiable as swaps without regard to whether they were traded on a designated market. Plaintiff's attempt to avoid one of the downsides of its expansive reading of swap thus also fails. Because the definition of swap cannot turn on whether the transaction occurred on a designated market, the definition either produces the absurd result of forcing broad swaths of ordinary transactions onto designated markets through § 2(e), or it does not, and Plaintiff's preemption theory falls apart because excluding those other ordinary transactions excludes Plaintiff's sports betting products as well.

To sum up, Plaintiff's sports-related products do not fall within the statutory definition of "swap." Congress included language in that definition, "associated with," which can only be defined by reference to context and purpose. Context and purpose make clear that Congress intended the definition of swap to capture a set of products in the financial industry which caused the 2008 financial crisis and threatened to create other crises in the future, and not to place broad swaths of everyday economic activity under the authority of the

21

Commodity Futures Trading Commission. "Associated with" thus takes on the more limited sense it frequently does in ordinary use rather than extending to infinity as it hypothetically can, and the part of the swap definition on which Plaintiff relies requires an inherent connection with potential economic consequences that Plaintiff's sports products lack. Plaintiff's attempts to rehabilitate its understanding that the swap definition is effectively unbounded rely on faulty readings of other statutory provisions and regulations.

Courts across the country, and within the Sixth Circuit, are split on this issue. *Compare Schuler*, 2026 WL 657004, at *5-6 (concluding sports-related event contracts are not swaps), *and Hendrick*, 817 F. Supp. 3d at 1023 (same), *with Flaherty*, 172 F.4th at 228 (concluding sports-related event contracts are swaps), *and Orgel*, 2026 WL 474869, at *7-8 (same). The Sixth Circuit declined to address the issue when considering a motion to grant an injunction during the appeal of the Southern District of Ohio's decision in *Schuler*, *Kalshiex LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *3 (6th Cir. Apr. 24, 2026), and other courts have also declined to address it, *Martin*, 793 F. Supp. 3d at 684; *see also Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) (declining to decide whether sports event contracts are swaps but emphasizing that taking the definition "to its logical extreme" would be "rationality-defying" and "radically upend the legal landscape governing the gambling industry"). But the Court cannot reconcile Plaintiff's position with the text of the statute, its context or purpose, or with principles of statutory interpretation the Court is bound to apply. The Court thus finds that Plaintiff's likelihood of success on the merits is low for this reason alone. Further buttressing this conclusion are the problems with Plaintiff's preemption theory *even if* its products are swaps, which the Court now addresses.

## 2.  Even if Plaintiff's products were swaps, Michigan law would not be preempted.

Plaintiff argues that if its products are swaps, then Michigan gambling law would be preempted as applied to those products because the CFTC has "exclusive jurisdiction" over "transactions involving swaps . . . traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). Defendants disagree, as did the Sixth Circuit's motion panel in *Schuler*. *See* 2026 WL 1295806, at *3-6. The Court is not bound by the Sixth Circuit's decision given its preliminary stage but finds its analysis persuasive. The Court now turns to each of Plaintiff's preemption theories.

The Supremacy Clause provides that federal law prevails over state law when the two conflict. *See* U.S. Const. art. VI, cl. 2. Federal preemption of state law can come about in a few ways. First, Congress may enact an "express preemption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Second, Congress may enact laws occupying a field that "must be regulated by its exclusive governance." *Id.* Third, state law may conflict with federal law by either making compliance with both impossible or creating an obstacle to the "accomplishment and execution of the full purposes and objectives of Congress." *Id.* Plaintiff claims that each of these is relevant here.

### a.  *Express preemption*

Plaintiff argues that the "exclusive jurisdiction" language in § 2(a)(1)(A) constitutes an express preemption provision preempting all state laws regarding swaps on a designated contract market. If that language was intended to expressly preempt state law, the verbiage is odd. *See Schuler*, 2026 WL 1295806, at *4. Other provisions in the Commodities and Exchange Act use the terms "supersede and preempt the application of any State or local

23

law" in express preemption clauses not at issue here. § 16(e)(2); *accord* § 27f(b). The cases Plaintiff cites in its opening brief for the proposition that the "exclusive jurisdiction" language expressly preempts state law do not stand for that proposition. (*See* ECF No. 14 at PageID.75-76). One, *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992), concerns the Supreme Court's "exclusive" jurisdiction to hear cases between states, so preemption of state laws is not at issue. If anything, the case undercuts Plaintiff's position by demonstrating that "jurisdiction" is usually used in the judicial sense referring to courts rather than in a sense which would preempt substantive law. *See Schuler*, 2026 WL 1295806, at *4. The other two, *Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84, 89 (1963), and *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986), concern statutes that do not use the phrase "exclusive jurisdiction," so it is unclear how they are relevant. Plaintiff in its reply brief also cites *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-236 (1947). But in *Rice*, the Court emphasized the unique legislative history of the statute in question, which involved a repeal of express language making federal law subordinate to the states and unequivocal indication in a senate report that the intention of the new language was to occupy the field of regulation. *See id.* at 232-34.

The difference in language between the exclusive jurisdiction clause and the express preemption provisions elsewhere, under "basic interpretive principles," suggest that the exclusive jurisdiction clause should be given different meaning. *Schuler*, 2026 WL 1295806, at *4 (citing *Arizona*, 567 U.S. at 399). "The purpose of the exclusive-jurisdiction provision" in the CEA "was to separate the functions of the Commission from those of the Securities and Exchange Commission and other regulatory agencies." *Merrill Lynch, Pierce, Fenner &*

24

*Smith, Inc. v. Curran,* 456 U.S. 353, 386 (1982). It was "intended only to consolidate federal regulation . . . in the Commission." *Id.* at 387. This suggests that the provision "give[s] the CFTC the authority to enforce the Act" and "bar[s] *enforcement* by state authorities," but does not preempt "the *underlying state law*" and "allow[s] States to enforce state laws." *Schuler,* 2026 WL 1295806, at *4. The first savings clause supports this understanding. It reads:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

§ 2(a)(1)(A). The "[e]xcept as hereinabove provided" language carries the implication that the "exclusive jurisdiction" clause limits the jurisdiction of state regulatory authorities to some degree but does not suggest that it completely removed their ability to enforce state law. Reading the "exclusive jurisdiction" clause as one that clarifies that the CFTC, rather than the SEC or state regulatory agencies, is responsible for enforcement of the CEA makes sense of both the difference in language from the express preemption provisions and the interaction with the savings clause.

The second savings clause and other parts of the statutory framework also suggest the "exclusive jurisdiction" clause is not an express preemption provision. The second savings clause reads, "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." § 2(a)(1)(A). This suggests that the "exclusive jurisdiction" clause should not be understood to limit the availability of substantive claims

under state law. *See Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chic.*, 977 F.2d 1147, 1155 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995) (explaining that the clause is "designed to preserve" state law causes of action "in the futures trading context"). Further, § 13a-2, entitled "Jurisdiction of States," allows states to sue for certain violations of the CEA, suggesting the "exclusive" jurisdiction may not be so exclusive. *See Schuler*, 2026 WL 1295806, at *4 ("[W]hat should we make of another section of the Act that gives state regulators (not just the CFTC) the jurisdiction to sue for certain violations of the Act?"). For all of these reasons, the "exclusive jurisdiction" clause is not best understood as an express preemption provision. This leaves Plaintiff's implied preemption arguments.

### b.  Field preemption

State laws may be "preempted by implication" rather than express provision, and arguments to this effect "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). "In rare cases, the Court has found that Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation[.]'" *Garcia*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). "A federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 638 (6th Cir. 2025).

Plaintiff claims that the relevant field is "trading on a CFTC-regulated contract market." (ECF No. 38 at PageID.1078 n.6). Assuming that the concept of field preemption

applies to such a microfield, this would closely match the domain over which the CFTC has "exclusive jurisdiction" pursuant to § 2(a)(1)(A). But the legislation here does not preclude supplementary state legislation. To begin with, the nominally "exclusive" jurisdiction is not actually so exclusive: the legislation specifically provides for state regulators' ability to enforce the CEA, albeit with the CFTC having the discretion to intervene, § 13a-2(1)-(3), and to proceed in state courts "on the basis of an alleged violation of any general civil or criminal antifraud statute" without the CFTC's involvement, § 13a-2(7). And the savings clauses in § 2(a)(1)(A), as discussed previously, "signal[] that Congress does not mean to preempt *the field*." *Schuler*, 2026 WL 1295806, at \*5; *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (explaining that a savings clause "negate[d] the inference that Congress 'left no room' for state causes of action"). On top of that, state contract law is foundational to the entire enterprise of contract markets. *See Schuler*, 2026 WL 1295806, at \*5. The statutory framework thus relies on the existence of state law and leaves room for states to enforce both the statute itself and state laws in the same field. Plaintiff's field preemption arguments thus are likely to fail. That leaves conflict preemption.

### c.  *Conflict preemption*

When federal and state law conflict, federal law prevails. But there must actually be a meaningful conflict. State law is impliedly preempted when it is "impossible for a private party to comply with both state and federal requirements," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

27

Beginning with impossibility preemption, Plaintiff's argument hinges on regulations requiring "impartial access" to products in a designated contract market. 17 C.F.R. §§ 38.151, 37.202. Plaintiff argues that compliance with Michigan law would require it to verify that participants are 21 years of age and comply with geographic restrictions as to where transactions are initiated and received, *see* Mich. Comp. Laws § 432.411(1), and that doing so somehow means that it would no longer be providing impartial access on its markets. Plaintiff cites the CFTC's assertion in a court filing that compliance with analogous Ohio laws would violate the impartial access requirement. (ECF No. 38 at PageID.1080; ECF No. 32-2 at PageID.1048). But neither Plaintiff, nor the CFTC in that filing, offer a coherent theory of what "impartial access" means that would prevent simultaneous compliance with the federal regulations and Michigan law. Both regulations require access criteria that are "impartial, transparent, and applied in a non-discriminatory manner," § 38.151, and § 37.202 adds that they must be "fair." The term "impartial" means without bias. *See* American Heritage Dictionary, *Impartial* (3d ed. 1996) ("Not partial or biased; unprejudiced."); *Impartial,* Black's Law Dictionary (12th ed. 2024) ("[U]nbiased and disinterested; unswayed by personal interest."). "The purpose" of these requirements "is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants." Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (Dec. 22, 2010). Contract markets may "establish different categories of market participants" and fee structures "may differ among categories if such fee structures are reasonably related to the cost of providing access or services to a particular category." *Id.* The regulation thus allows sufficient latitude to structure product offerings such that

participants in certain regions may be offered different products or pricing structures so long as those requirements are made clear. Strategies exist to comply with both state-law geographic restrictions and the federal regulations. *See Schuler*, 2026 WL 1295806, at *6; *Flaherty*, 172 F.4th at 239 & n.53 (Roth, J., dissenting). The regulations do not require that all participants be treated identically in all circumstances, nor would any ordinary English speaker think "impartial" carries that connotation. Plaintiff's impossibility argument thus fails.

Finally, Plaintiff argues that state law stands in the way of Congress's purposes and objectives. Here, it is particularly relevant to note that courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). As discussed previously, regulating gambling activity is at the heart of states' police powers, raising issues related to the "health, welfare, safety, and morals of [their] citizens." *Johnson*, 199 F.3d at 720. The Court will not find implied preemption merely where that would advance *a* congressional purpose, but only where preempting state law was *the* purpose to be advanced or where clear purposes could not be achieved any other way.

Plaintiff makes two arguments: first, that preempting state law is necessary to achieve uniformity of regulation in contract markets, and second, that state law would deprive it of "a valuable benefit granted" to it in the form of self-certification of compliance with CFTC regulations. *Bibbo v. Dean Witter Reynolds, Inc.,* 151 F.3d 559, 564 (6th Cir. 1998). As to uniformity, "no statute yet known pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc.,* 582 U.S. 79, 89 (2017) (citation modified). While one of

29

the goals of the CEA may have been to "avoid a diversity of regulations between the C.F.T.C. and the states," "[o]bviously the statutory language . . . contemplates an increased role for the state officials in the enforcement of the Act." *Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980). The statute leaves states able to enforce their general antifraud laws however they wish, *see* § 13a-2(7), and relies on the framework of each state's unique body of contract law. Even the "exclusive jurisdiction" provision builds in savings clauses already discussed. This "preservation of state regulation" suggests that uniformity is far from being pursued "at all costs" in the CEA. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 222 (1983). Further, the Special Rule, which allows the CFTC to determine that contracts involving "activity that is unlawful under any Federal *or State law*" are contrary to the public interest, § 7a-2(c)(5)(C)(i)(I) (emphasis added), suggests that Congress contemplated markets segmented by state rather than insisting on national markets with no state law involvement. Plaintiff's citation of *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990), does not help it, as that case concerned ERISA, a statute with an express "preemption clause . . . conspicuous for its breadth." Plaintiff's argument that Congress sought uniformity in *some* aspects of derivative trading on contract markets does not mean that Congress sought uniformity in *all* aspects to the extent of preempting state laws in core areas of state responsibility, so this conflict preemption argument fails.

Plaintiff's second theory is that state law denies it a benefit conferred by federal law. (ECF No. 14 at PageID.81). It argues that federal law allows it to self-certify that contracts it offers on its markets comply with federal law and regulations subject to after-the-fact review by the CFTC under the Special Rule. *See* §§ 7a-2(c)(1), (c)(5)(C). It then portrays this

30

procedure as creating a "right to trade after self-certification" which state law denies it because it would require Plaintiff "to satisfy each State's individual public-interest test before offering a new contract." (ECF No. 14 at PageID.81). Plaintiff cites no authority establishing a "right" to trade post-self-certification without any potential restriction or consequence. Obviously, it would be subject to state fraud laws, § 13a-2(7), and its contracts could be found unenforceable under state law dependent on their rules regarding, among other things, adequate consideration. States have these laws to advance the public interest, but that does not mean that they are supplanting the statutory public interest review the CFTC conducts, which requires the presence of certain enumerated factors like "war" or "terrorism." *See* § 7a-2(c)(5)(C)(i)-(ii). Plaintiff does not establish that Michigan is attempting to enforce the CEA simply because it has laws that serve its conception of the public interest.

The relevant statutes do not contain an express preemption provision that encompasses the laws Defendants might enforce against Plaintiff. There is not clear evidence of a congressional purpose to occupy the field to the exclusion of Defendants' laws, nor is there evidence that Defendants' laws frustrate a purpose of federal law so clearly expressed as to overcome the presumption against preemption of state laws in core areas of state responsibility. Thus, even if Plaintiff's products *were* swaps, its preemption arguments would still fail. To demonstrate a substantial likelihood of success on the merits, Plaintiff would need to show that it could prove its products are swaps *and* that their status as swaps could sustain some theory of preemption. The Court finds that it is unlikely to be able to accomplish either of those things, and both are necessary.

31

The Court is cognizant, though, that other courts have reached opposite conclusions. While Plaintiff's chances of success are not substantial in the Court's judgment, they are not zero. But the Court is "reluctant" to grant an injunction "based on such a low probability" lest parties "circumvent reasoned democratic processes and thwart the enforcement of presumptively legitimate laws merely by raising plausible challenges." *Schuler*, 2026 WL 1295806, at \*6 (citation modified). In these circumstances, Plaintiff must show that the remaining factors are "strongly in [its] favor" for the Court to grant an injunction. *In re Delorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir. 1985). The Court now turns to those factors.[11]

## B.  Plaintiff Has Not Shown that the Remaining Factors Strongly Favor It.

The remaining factors are the threat of irreparable harm to Plaintiff and the public interest. Plaintiff argues that it faces imminent enforcement action because Defendants have initiated proceedings against a similar company, KalshiEX. Plaintiff's theory regarding irreparable harm is that it faces a choice between incurring the costs of complying with laws it believes to be unconstitutional as applied to it or continuing on its present course and potentially generating costly legal liability. It also posits that mere accusations of illegal activity hurt its reputation and cause losses of customer goodwill. (ECF No. 14 at PageID.87). Assuming these arguments are true, it is difficult to portray what Plaintiff may face as *harm* unless the application of Michigan law against Plaintiff would indeed be unconstitutional.

---

[11] The parties and amici also presented arguments related to the interaction of Plaintiff's view of the statutory framework and the Indian Gaming Regulatory Act ("IGRA"). (*See* ECF No. 29; ECF No. 21 at PageID.283-84; ECF No. 38 at PageID.1077 n.5). The Court finds that it can adequately determine the likelihood of success on the merits without reaching the IGRA issue. Other courts in similar cases have generally not addressed the issue, but at least one has in siding with the state. *See Martin*, 793 F. Supp. 3d at 683.

32

But "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation modified); *see Abbott v. Perez*, 585 U.S. 579, 602 & n.17 (2018); *Doe v. Lee*, 137 F.4th 569, 576 (6th Cir. 2025). While there is no legitimate interest in applying the law unconstitutionally, the chance that Defendants would do so is directly proportional to the strength of Plaintiff's merits arguments. *Cf. Orgel*, 2026 WL 474869, at *11 (finding that a state would face "no harm because the court finds its enforcement in this case is likely preempted"). If state law would be applied constitutionally, however, the public interest factor is strongly in Defendants' favor. Defendants present persuasive arguments that core concerns in the state's purview are implicated—threats to people under 21 from the availability of gambling opportunities, threats of addictive or compulsive behaviors, threats to finances of its local governments, (*see* ECF No. 21 at PageID.291-93)—and Plaintiff has little retort aside from arguing that the state may not address these issues unconstitutionally. The Court will not "second-guess" the state's judgment that its legitimate laws serve their ends and the public interest. *Doe*, 137 F.4th at 576-77. Plaintiff's potential losses to its business interests, even if irreparable, pale in comparison to the potential losses to the public if Defendants are right on the merits. *See Schuler*, 2026 WL 657004, at *10 & n.9; *Hendrick*, 817 F. Supp. 3d at 1034-37. Because Defendants have the better argument on the merits at this point, the risks it identifies are all the more acute in comparison. Plaintiff has thus not demonstrated that the non-merits factors are strongly in its favor, as it must when it is behind on the merits.

## IV.

Plaintiff's position is that the federal domain over financial derivatives is vast because the universe of things that are derivatives is vast. But Plaintiff's vision of the scope of derivatives is *so* vast that it would encompass vast swaths of activity never understood to be associated with the financial industry and instead traditionally associated with core state, as opposed to federal, responsibilities. Congress is not so cavalier with the fundamental federalist structure of the government, and the Court is convinced that its laws in the wake of the 2008 financial crisis were not aimed at fundamentally redefining the balance between the federal and state governments in ways unrelated to the problems it set out to solve.

Even if Congress did go as far as Plaintiff says in defining what a "swap" is, it is far from clear that it intended that to mean that states no longer have any role to play whenever something is a swap. Contract *markets* rely on contract *law*, primarily in the states' domain, and Congress enacted language to ensure state laws were explicitly preempted from being enforced in certain ways but remained free to be enforced in others. Without a substantial chance of success on the merits, Plaintiff's arguments about irreparable harm and the public interest fall flat—the risk that it will harm the public unlawfully outweighs the risk that it will suffer losses unlawfully. Plaintiff's motion (ECF No. 15) is thus **DENIED.**

**IT IS SO ORDERED.**

Date:  June 17, 2026                                  /s/ Paul L. Maloney
                                                            Paul L. Maloney
                                                            United States District Judge